## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW DALY, on behalf of himself and all others similarly situated, | ) ) | |
| *Plaintiff,* | ) ) | Case No. 1:21-cv-06805-RAG |
| v. | ) ) | |
| WEST MONROE PARTNERS, INC., et al., | ) ) | |
| *Defendants.* | ) ) | |
| _____ | ) | |
| NATHAN A. ULERY, on behalf of himself and all others similarly situated, | ) ) | Case No. 1:22-cv-00781-RAG |
| *Plaintiff,* | ) ) | |
| v. | ) ) | |
| WEST MONROE PARTNERS, INC., et al., | ) ) | |
| *Defendants.* | ) ) | |
| _____ | ) | |

### PLAINTIFF DALY'S REPLY IN SUPPORT OF MOTION TO APPOINT SANFORD HEISLER SHARP AS INTERIM CLASS COUNSEL

## INTRODUCTION

Last October, Plaintiff Matthew Daly learned that West Monroe Partners, Inc. ("West Monroe") short-changed 146 of its former employees when it redeemed their West Monroe stock for less than its fair value. He spoke to various lawyers and ultimately chose Charles Field and Sanford Heisler Sharp, LLP ("SHS") as his counsel. *See* Ex. F, Daly Decl. ¶¶ 9–10. Mr. Field is a leading ERISA litigator with over three decades of experience in the financial services industry who himself spent ten years valuing public and private securities. Ex. G, Field Decl. ¶ 4–8; Ulery Mot. (Dkt. 50) at 1 (admitting that private securities valuation is "the key issue in these cases"). His co-lead counsel, David Sanford and retired Chief U.S. District Judge Kevin Sharp, are among the top one hundred trial lawyers in America. Ex. A, Sanford Decl. ¶ 10; Ex. H, Sharp Decl. ¶ 8. The SHS team spearheaded this case: they reviewed hundreds of pages of ESOP Plan documents and government filings, crafted the legal theories on which both complaints rely, retained an expert in securities valuation, and filed the first complaint. Ex. G, Field Decl. ¶ 11. They have invested hundreds of hours into the litigation and intend to commit many more. *Id.* And the resulting complaint, unlike Plaintiff Nathan Ulery's, asserts the full range of claims available to the Class.

Ulery's counsel, Bailey & Glasser ("B&G") and Izard, Kindall &Raabe ("IKR"), filed their complaint only after reviewing SHS's work. They did so one week before Defendants were set to file a responsive pleading, delaying this case by months to seek their own appointment as class counsel. Their pleadings omit two of Daly's theories of liability and claims under Delaware law, and they ignore Ulery's grave deficiencies as a proposed class representative.

Ulery's deficiencies are serious. *First*, Ulery has a conflict of interest with the Class. He was a member of the Defendant West Monroe's Board of Directors for ten years and a member of the Executive Team for twelve. As a director, he almost certainly *appointed* the Defendant trustee

1

that undervalued the Class's stock. He was also responsible for setting policies and procedures applicable to the challenged valuation and stock redemption, which occurred within two years of Ulery's time on the Board and within one year after he left the Executive Team. An adequate class representative would subject Ulery's fiduciary decisions to discovery and scrutiny. Ulery, in contrast, has a clear incentive to keep the spotlight elsewhere.

*Second,* Ulery is atypical of the Class. As a high-ranking company officer, he had access to information that other class members did not. Likely for that reason, he forfeits the Class's claim that West Monroe withheld information material to their decisions to cash out of the ESOP.

Daly and his counsel, Sanford Heisler Sharp, will better serve the Class. While Gregory Porter and B&G "have been litigating ERISA cases for numerous years, they have very limited trial experience." *Fink on behalf of Nation Safe Drivers Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, No. CV 19-1193-CFC, 2021 WL 4860683, at \*2 (D. Del. Oct. 19, 2021). This is especially so relative to David Sanford and former federal judge Kevin Sharp. Unlike Mr. Field, none of Ulery's attorneys appears to have any hands-on experience valuing securities as a fiduciary. And unlike SHS's ERISA team, Ulery's lead counsel has a checkered litigation record, with at least four ERISA cases dismissed on the pleadings this year alone. *See infra* at 13-14. Several courts have rejected their requests for class certification because they filed late motions on behalf of conflicted or atypical plaintiffs, having "**solicited**" at least one to serve as a class representative. *Id.* Their past is prologue here. *See* May 3, 2022 Order (Dkt. 49) (recognizing Ulery's "potential conflict of interest"). The Class should not be entrusted to their care.

Plaintiff Daly respectfully submits that he and SHS are best positioned to vigorously prosecute the full range of the Class's claims, including the claims that Ulery has decided not to pursue. SHS represents an adequate and typical class representative (Daly) and has the securities

valuation and litigation expertise necessary to prevail in this case. Indeed, B&G and IRK's motion only reaffirms that they would install a conflicted and inadequate class representative, forgo key claims, and undercut the Class's case to serve their own interests. The Class deserves better.

## ARGUMENT

A court should appoint as class counsel the lawyers "best able to represent the interests of the class" in "prosecuting all theories and claims" available to the Class. *Walker v. Discover Fin. Servs.*, No. 10-CV-6994, 2011 WL 2160889, at *3-4 (N.D. Ill. May 26, 2011). In making its selection, the court must consider "the work counsel has done in identifying or investigating potential claims in the action" and "the resources that counsel will commit to representing the class," as well as counsel's pertinent experience and knowledge of the applicable law. Fed. R. Civ. P. 23(g)(1)(A). Critically here, the court also considers "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). This includes any "conflict with class interests." Manual for Complex Litigation § 21.271.

The adequacy of "the class lawyer is inseparable from that of the class representative." *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002). The court may find "conflicts precluding [a firm's] appointment [as] class counsel" when the firm represents a client with "adverse interests to the class." *Hawkins v. Lutheran Soc. Servs. of Wisc.*, No. 20-CV-352-JDP, 2021 WL 2443741, at *7 (W.D. Wis. June 15, 2021).

These factors point unequivocally to Matt Daly and his counsel, David Sanford, Charles Field, retired judge Kevin Sharp, and the SHS team.

## I. SHS Will Litigate the Theories and Claims that Ulery Forfeits

First, SHS will "most adequately represent the interests of the [C]lass in prosecuting all [its] theories and claims," including the claims Ulery omits from his complaint. *Walker*, 2011 WL

3

2160889, at *4 (appointing firm that asserted "all theories and claims" available to the class in lieu of firm whose complaint did not allege certain claims and theories).

### A.  *Plaintiff Daly Asserts the Full Range of the Class's Claims*

Daly and SHS allege that West Monroe redeemed the Class's company stock in September 2021 for a value the Defendants appraised as of nine months earlier (December 31, 2020). They plead that the stock's fair value far exceeded the redemption price that West Monroe paid in September 2021. Indeed, within weeks of the redemption, West Monroe agreed to sell half the company to private equity firm MSD Partners for several times the price it paid the Class.

Daly and SHS allege three main theories of liability. First, Daly alleges that the December 2020 valuation imprudently under-appraised the Class's shares, which itself violated ERISA (the "December Undervaluation Theory"). Second, Daly alleges that even if that December 2020 valuation was reasonable, it was stale by September 2021, when West Monroe used it to set the redemption price, and Defendants breached their fiduciary duties by failing to update it (the "Stale Valuation Theory"). Third, Daly alleges that Defendants unlawfully failed to disclose the undervaluation and impending acquisition to class members, which were material to their elections to cash out before the sale (the "Disclosure Claim").

### B.  *Plaintiff Ulery Eschews Two Key Theories Under ERISA*

Ulery and his counsel inexplicably omit the December Undervaluation Theory and the Disclosure Claim from their complaint. These omissions disserve the Class.

The Disclosure Claim finds strong support in Seventh Circuit caselaw and may offer the highest potential recovery. *See*, *e.g.*, *Solis v. Current Dev. Corp.*, 557 F.3d 772, 778 (7th Cir. 2009) (holding that ERISA plan fiduciary breached his duties by failing to disclose that the value of plan assets was higher than previously assessed, as he knew from "ongoing negotiations" with

prospective buyers, and thereby deprived participants of "reliable information upon which to make their election" decisions). That is because participants who remained invested in the Plan after the MSD deal closed received both (a) a higher price for their company stock and (b) an allocation of *additional* stock from the Plan's suspense account due to the sale and the Plan's resulting liquidation, a distribution in which the Class could have shared if Defendants had disclosed the impending deal. *See* Daly Compl. ¶ 81; Ex. I, Plan Am. 16 §§ 16.4(a), 16.5(b). Ulery asserts without support that the Class would have been "[in]eligible" to receive these additional shares, even if they had remained invested in the Plan, because they were not current employees. *See* Ulery Mot. at 6. But the governing Plan amendment makes no such distinction between current and former employees: both were eligible for the payout if they retained a balance in the Plan. Ex. I, Plan Am. 16 §§ 16.2(a) (defining "Company Sale Eligible Participant"); *id.* §§ 16.4(a), 16.5(b).

Daly pointed out these omissions in his responses to Ulery's motion to consolidate these cases, but Ulery still provides no explanation for them. Ulery's failure to respond may well be because Ulery's high-ranking position gave him access to information that was not available to the rest of the Class. Ex. F, Daly Decl. ¶ 12.[1] This would provide Defendants a unique defense as to Ulery—that he knew or should have known the information needed to make an informed election decision—and disqualify him as a class representative. *See J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc*., 628 F.2d 994, 999 (7th Cir. 1980) ("[E]ven an **arguable** defense peculiar to the named plaintiff … may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation."). Adequate counsel would not take that risk.

---

[1] Indeed, MSD Partners evidently viewed Ulery as a source of inside information about the Company. *See* Ulery Decl. ¶ 11. He was a public face of the Company's ESOP and spoke publicly about the Company's business development and revenue estimates. *See*, *e.g.*, Ex. J.

### C. Ulery Forgoes the Class's Claim Under Delaware Law

Ulery's counsel also omits the Class's claim that the Board of Directors breached their separate corporate fiduciary duties under Delaware law. B&G and IKR say that ERISA preempts such pendent state-law claims for breach of fiduciary duties based on the same facts, citing an out-of-circuit case. *See* Ulery Mot. at 7. But they ignore the leading precedent in *this* circuit, which held that ERISA **did not** preempt state-law claims for breach of corporate fiduciary duties even though the state claims rested on the "same conduct" that triggered liability under ERISA. *Halperin v. Richards*, 7 F.4th 534, 550 (7th Cir. 2021). Indeed, this Court has granted judgment to ESOP participants in a similar case (alleging that ESOP fiduciaries underpaid participants for their stock) on claims under **both** ERISA and Delaware law, holding that ERISA did not preempt the state-law claim. *See Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 918 (N.D. Ill. 1998).

Ulery's failure to assert important claims available to the Class makes him likely to prove an inadequate and atypical Class representative. *See* William B. Rubenstein, 1 Newberg on Class Actions § 3:47 (5th ed.) (noting that courts have held that a named plaintiff lacks required typicality if he fails to assert claims possessed by the class); *see also McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 283 (5th Cir. 2008) (affirming finding that class representatives were inadequate because they dropped certain demands for damages). Daly and his counsel, by contrast, will litigate the full range of the Class's claims and would readily obtain class certification.

### II. Ulery and His Counsel Have a Conflict of Interest with the Class

Second, Ulery has an apparent conflict of interest that would limit both his and his counsel's ability to "'fairly and adequately' represent the entire class." *See Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 919 (7th Cir. 2011); *Wood v. Prudential Ret. Ins. & Annuity Co.*, No. 3:15-CV-1785, 2017 WL 3381007, at *5 (D. Conn. Aug. 4, 2017) (denying

B&G and IKR's motion for class certification because their class representative had interest "adverse" to the Class such that he "would inadequately represent the interests of the plans as a whole"); *see further infra* at 13-14. For ten years from the ESOP's inception through December 2019, Ulery was a member of the West Monroe Board of Directors, a Defendant. Ulery Decl. ¶ 7. He also served as a Managing Director on the Executive Team until he left in November 2020—less than one year before the valuation and transactions challenged here. *See Id.* at 12.

### A. Ulery's Recent Position as a Fiduciary Creates a Conflict of Interest

Ulery's unique position creates an apparent conflict of interest with the Class and may well preclude his appointment as class representative. Courts routinely hold that former fiduciaries have a conflict of interest and are inadequate class representatives in cases that implicate decisions made while they were fiduciaries. *See, e.g.*, *Radell v. Towers Perrin*, 172 F.R.D. 317, 320-21 (N.D. Ill.1997) (former board member could not represent class alleging that board's decisions breached its fiduciary duties); *Andrews Farms v. Calcot, Ltd.*, 268 F.R.D. 380, 388 (E.D. Cal. 2010) (same).

That is the case here. Even if Ulery was not directly involved in the challenged valuation or transaction (as Ulery alleges), the Class's claims almost certainly implicate decisions he made or failed to make as a fiduciary. As a member of the Board in 2014, Ulery would have appointed the trustee, Defendant Argent Trust Company, which is alleged to have breached its duties in this case. *See* Ulery Compl. ¶¶ 25–26. He was also in a position to set policies that governed the challenged valuation and redemptions, which occurred within two years of his time on the Board.

As a result, Ulery may well share responsibility for the Class's losses. This could expose Ulery himself to liability. As is well established, "breaches which occurred during the limitations period may well have resulted from seeds sown outside the period." *Beesley v. Int'l Paper Co.*, No. CIV. 06-703, 2008 WL 207537, at *1 (S.D. Ill. Jan. 24, 2008). For example, fiduciaries

7

customarily formulate policies that govern when and how they should revalue securities when a prior valuation becomes suspect, *see* Ex. G, Field Decl. ¶ 6—a step that both complaints allege West Monroe should have taken in this case. *See*, *e.g.*, Daly Compl. ¶ 75; Ulery Compl. ¶ 66. If Ulery and his colleagues failed to set such a policy, or designed an inadequate one, Ulery would be partially responsible and potentially liable for the resulting harm to the Class. *See Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998) (holding that the fiduciaries' failure to adopt a prudent policy breached duty under ERISA); *Foltz v. U.S. News & World Rep., Inc.*, 613 F. Supp. 634, 636–37 (D.D.C. 1985) (holding that imprudent policies and practices supported claim based on undervaluation of ESOP stock). The same is true if Ulery set inadequate policies to govern the Board's review of the Trustee (Argent Trust Company)'s valuations or when to disclose material information to plan participants. *See Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 470–71 (7th Cir. 2010) (explaining that a fiduciary may be liable for failing to take adequate steps in advance to ensure that material information is disclosed to participants).

An adequate class representative would therefore seek to uncover and scrutinize the decisions Ulery made as a fiduciary. Ulery, in contrast, has an incentive to keep that door closed.

### B. Ulery's Relationship with Defendants Compounds his Conflict of Interest

Ulery's years-long relationship with the Defendants compounds the problem. He joined the Company in its "earliest days" and worked closely with the Defendants and their leadership (many of whom benefitted from the challenged transactions) for nearly 20 years, serving as a senior or managing director for 12. *See* Ulery Decl. at 11. This, too, raises serious questions about his adequacy as a class representative and his counsel's ability to fairly represent the Class. *See*, *e.g.*, *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 482 (S.D.N.Y. 2002) (holding that

8

plaintiff's 22-year relationship with defendants made him an inadequate class representative).[2]

### III. SHS Identified, Investigated, and Crafted the Class's Claims and Has Already Committed Substantial Resources to Their Prosecution

Ulery's inadequacies aside, "the work [SHS] has done in identifying or investigating potential claims in the action" and "the resources that counsel will commit to representing the class" strongly favor SHS's appointment. Fed. R. Civ. P. 23(g)(1)(A). Counsel who "have been involved in [the] litigation for the longest time period and have performed the most work in identifying and investigating potential claims . . . are in 'a better position to represent the class fairly and adequately than [other counsel] who did not undertake those tasks.'" *Walker*, 2011 WL 2160889, at *4 (quoting Moore's Federal Practice § 23.120(3)(a)). For this reason, courts strongly prefer class counsel who led the initial investigation and prepared the first complaint. *See, e.g.*, *Id.* at *4-5; *In re: Plasma Derivative Protein Therapies Antitrust Litig.*, No. 09 C 7666, 2010 WL 1433316, at *6 (N.D. Ill. Apr. 7, 2010); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 258 F.R.D. 260, 274 (S.D.N.Y. 2009) (all appointing counsel who prepared the initial complaint).

SHS led the investigation into this case, filed the first complaint, and has already committed substantial resources to its prosecution. To prepare the first complaint, SHS spent hundreds of hours obtaining and reviewing documents, conducting legal and market research, and crafting the theories of the case. Ex. G, Field Decl. ¶ 11. They have interviewed and fielded questions from at least 17 former employees of West Monroe and engaged an expert experienced in securities

---

[2] Of course, the size of Ulery's claim would neither make him a more appropriate class representative nor make B&G and IKR more appropriate interim class counsel. *Contra* Ulery Mot. at 15. "[T]he vast majority of courts have held that the extent of the representatives' interest is not determinative for purposes of satisfying Rule 23(a)(4)." Wright & Miller, 7A Fed. Prac. & Proc. Civ. § 1767 (4th ed.). To the contrary, "[t]he realities of the situation here and in the vast majority of class actions suggest that the amount of possible recovery by the class rather than by the individual plaintiffs furnishes the motivating force behind prosecution." *Id.*

valuation to assist in the litigation. *Id.* ¶¶ 11-12. These "meaningful steps to advance the interests of the putative class" weigh strongly in favor of appointing SHS as class counsel. *Bank of Am. Corp.*, 258 F.R.D. at 274 (choosing class counsel who filed first complaints, obtained key documents first, surveyed class members, and consulted expert); *Walker*, 2011 WL 2160889, at *4 (same).

B&G and IKR cannot say the same. They filed their complaint only after reviewing SHS's work. They do not identify any additional investigation or research they conducted, aside from speaking with Ulery and contacting class members to solicit support for their firm. Ulery Mot. at 5. Ulery's disagreements with some of Daly's allegations appear to rely on inside information *Ulery* claims to have—not on any independent investigation by B&G or IKR. *See* Ulery Mot. at 5–7 (citing Ulery's declaration); Ulery Decl. ¶¶ 12, 19 (citing no sources). And while Ulery's counsel claim to have retained a "valuation expert," they appear to have simply spoken with a consulting firm (AlixPartners); they do not describe any expert or his or her qualifications. *See* Izard Decl. ¶ 5. In contrast, SHS has retained a seasoned expert with 35 years of experience at leading financial firms who has valued thousands of companies. *See* Ex. G, Field Decl. ¶ 12.

## IV. Ulery's Attacks Misunderstand Daly's Complaint and Miss the Point

Ulery's attacks on Daly's complaint are a red herring. Daly's allegations in fact have sound support, and Ulery cites **no evidence** to support his claims of "fact errors." *See* Ulery Decl. ¶ 19:

- *First*, Daly describes the Capital Profits & Interest ("CPI") Program just as West Monroe did in a press release, and he does not "assume[ ] that the full price paid by MSD would go to the Plan Participants," Ulery Mot. at 6, citing Daly Compl. ¶ 5 (making no such allegation). Rather, Daly alleges (as Ulery does) that the CPI program allowed senior leaders to capture profits from the sale outside the ESOP. *See id.* ¶ 6.

- *Second*, Daly names the Benefits Committee as a defendant because West Monroe's own public filings state that the ESOP was "administered by a Benefits Committee (the Committee) comprising of up to three persons appointed by the Company's Board of Directors." Ex. L (Form 5500) at 28. And emails sent to the Class indicate that the

10

Benefits Committee approved the challenged transaction. *See* Daly Compl. ¶¶ 15, 78.

- *Third*, Daly's choice not to name individual members of the Board of Directors at this stage, pending confirmation in discovery into the Board's historical membership (which includes Ulery) at the relevant times is no "error." *Contra* Ulery Mot. at 5–6.

- *Fourth*, Daly's more aggressive estimate of the jump in West Monroe's share price (approximately 4.8x) makes reasonable inferences from public information.[3]

- *Fifth*, West Monroe announced the launch of the CPI program on January 25, 2021—not, as Ulery alleges, in December 2020. *See* Daly Compl. ¶ 51 & n.6.

- *Sixth*, Daly's allegation that participants received the proceeds resulting from the 2021 stock sale is consistent with the governing Plan amendment. *See* Ex. I § 16.5(b) (allocating the shares from the Plan's suspense account "or **proceeds** attributable thereto" to Plan participants) (emphasis added); *contra* Ulery Mot. at 6.

Finally, Ulery's attack on Daly and SHS's use of comparable public companies misses the point. Daly and SHS compare West Monroe's astronomical 2021 growth to that of comparable public companies to show that the December 2020 valuation of West Monroe was artificially depressed—the December Undervaluation Theory, which Ulery would have the Class forgo. Daly does not, as Ulery suggests, use the public comparators to determine a precise valuation of West Monroe, which would require inside information about West Monroe's financials. Once again, Ulery's attack does not serve the Class; rather, it attempts to obfuscate the deficiencies of his own

---

[3] Daly alleges that the October 2021 MSD deal priced West Monroe's stock at 4.8x the December 2020 valuation ($515.18 per share) used to pay the Class. This implies a total equity valuation of approximately $515.18 million (based on 1 million shares of company stock: the company was "100% employee-owned through the ESOP," Ex. K at 5, and the ESOP held 902,591 shares on December 31, 2020, Ex. L at 33, which would leave about 10% of its equity for the CPI program). The MSD deal reportedly valued the Company at about $2.5 billion, which equates to $2,500 per share—a jump of 4.8x from December. *See* Daly Compl. ¶ 5; Ulery Compl. ¶ 41. Ulery, in contrast, asserts that the share price rose only 3x. *See* Ulery Decl. ¶ 19; Ulery Compl. ¶ 44. But he does not appear to contest that the Company's **total** equity valuation (the share price x the number of shares) rose by a higher multiple, such as 4.8x. Rather, he apparently believes that the CPI program diluted the value of the Class's individual shares substantially—so that even if the MSD deal valued the *whole Company* at $2.5 billion, ESOP participants' shares were worth far less than $2,500 each. *See* Ulery Compl. ¶¶ 20, 44 (alleging the price was $1,600 per share, implying a 36% dilution). But Ulery cites no evidence that the CPI program diluted the Class's shares so significantly.

pleadings. This only confirms that the Class should not be entrusted to Ulery's care.

Ulery's misfired claims of factual inaccuracy thus suggest that he and his counsel *would not* serve the class well. Likewise, Ulery's claimed access to inside information, which he says favors the Defendants, does not make B&G and IKR fit to represent the Class. Indeed, Ulery's own motion proves that he would be a conflicted and atypical Class representative and would elevate his own interests above those of the Class. The Class deserves better.

## V. SHS Has the Knowledge, Experience, and Track Record to Litigate this Case

Plaintiff Daly's counsel is more qualified than B&G and IKR to continue its vigorous prosecution of this litigation. SHS has been recognized as the best plaintiff's employment law firm in the country. *See* Sanford Decl. ¶¶ 9–10. The firm has obtained numerous class action verdicts and settlements in the hundreds of millions of dollars and achieved exceptional recoveries in complex ERISA class actions against Fortune 500 companies including Walgreens and Transamerica. *See* Ex. A, Sanford Decl. ¶¶ 7, 12; Ex. B, Field Decl. ¶ 5.[4] The team has the expertise in securities valuation, complex class actions, and trial practice needed to prevail.

### A. *Charles Field Has Over a Decade of Experience with Securities Valuation*

Charles Field has not only led the firm's successful litigation of its many ERISA matters, Ex. B, Field Decl. ¶ 5; he also has over 25 years of experience in the financial services industry and has hands-on experience valuing securities: Before joining SHS, Mr. Field designed policies to govern the fair valuation of securities for a $50-billion asset management firm, and he served

---

[4] While Mr. Porter points out that these cases have focused on 401(k) plans, courts have held that "extensive experience litigating complex ERISA class actions" qualifies class counsel to litigate cases involving an ESOP, *see, e.g., Hurtado v. Rainbow Disposal Co.*, No. 8:17-cv-01605, 2019 WL 1771797, at *9 (C.D. Cal. Apr. 22, 2019), which is simply another defined contribution plan that invests primarily in company stock. And Mr. Porter does not explain why the distinction is meaningful in this case, which involves the same statutory provisions (ERISA §§ 404, 406, & 408) and turns on the valuation of company stock, in which Mr. Field has extensive experience.

on the firm's fair valuation committee for a decade. Ex. G, Field Decl. ¶¶ 4–8. As Ulery agrees, "[v]aluing non-public securities" is "the key issue in these cases," and it is "especially complex." Ulery Mot. at 1. Mr. Field, it appears, is the only counsel in this case who has done it himself.

### B. David Sanford and Kevin Sharp Have Unmatched Trial Experience

David Sanford and Kevin Sharp are both recognized as among the "Top 100 Trial Lawyers in America." Ex. A, Sanford Decl. ¶ 10; Ex. H, Sharp Decl. ¶ 8. Both have litigated and settled multiple ERISA class actions. *See* Ex. A, Sanford Decl. ¶ 13; Ex. H, Sharp Decl. ¶ 8. Mr. Sanford has tried many cases in his career and (after winning a six-week trial) obtained the largest verdict ($253 million) in a Title VII class action in United States history. Ex. A, Sanford Decl. ¶ 7. As a U.S. District Judge, Kevin Sharp conducted 75 trials and 60 contested evidentiary hearings concerning complex litigation, including ERISA litigation. Ex. H, Sharp Decl. ¶ 5. Mr. Porter and his colleagues, meanwhile, "have very limited trial experience," which caused another court to "question the true extent of their litigation expertise." *Fink*, 2021 WL 4860683, at *2, 4. Sanford Heisler Sharp, in contrast, is fully prepared to litigate this case through trial.[5]

### VI. Ulery's Counsel Has a Checkered Litigation Record

SHS's ERISA attorneys have survived motions to dismiss and obtained class certification in nearly every ERISA case they have brought. B&G and IKR, in contrast, have lost at least four motions to dismiss this year alone. *See Clare v. GreatBanc Tr. Co.*, No. 21-CV-3393, 2022 WL 992630, at *2 (S.D.N.Y. Mar. 31, 2022) (dismissing B&G's ESOP complaint); *Belknap v. Partners Healthcare Sys., Inc.*, No. CV 19-11437-FDS, 2022 WL 658653, at *1 (D. Mass. Mar. 4, 2022) (dismissing B&G and IKR's ERISA complaint)*; Plutzer on behalf of Tharanco Grp., Inc. Emp.*

---

[5] SHS General Counsel Russell Kornblith also has years of experience litigating complex class actions, and Associate Sean Ouellette has litigated ERISA cases against Home Depot and Walgreens, recovering $13.75 million for the class. Daly Mot. (Dkt. 13) at 5-6.

*Stock Ownership Plan v. Bankers Tr. Co. of S. Dakota*, No. 1:21-CV-3632, 2022 WL 596356, at

*1 (S.D.N.Y. Feb. 28, 2022) (summarily dismissing ERISA claims and denying B&G's request

for oral argument); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, No. 19-CV-04618-LHK, 2022 WL

74002, at *22 (N.D. Cal. Jan. 8, 2022) (dismissing B&G's ERISA claims).

Moreover, B&G and IKR have been denied class certification in multiple cases because

they represented inadequate or atypical class representatives, often after they missed deadlines.

*See Myers v. The 401(K) Fiduciary Committee for Seventy Seven Energy INC et al.*, No. 5:17-cv-

00200, Dkt. No. 140 at 3–4 (W.D. Okla. Sept. 29, 2021) (denying B&G and IKR's motion for

class certification because they made a "belated" attempt to add a new plaintiff in a manner

"inconsistent with the plan for orderly discovery and resolution of class certification," and they

did not show the existing plaintiff was adequate or typical); *Wood*, 2017 WL 3381007, at *5

(denying B&G and IKR's motion for class certification); *Bridges v. American Electric Power, et

al.*, No. 2:03-cv-00067, Dkt. No. 90 at 5 (N.D. Ohio Mar. 15, 2006) (finding that Mr. Izard and his

co-counsel had "**far exceeded the deadline for moving for class certification**, and it [was] within

the discretion of the Court to dismiss" the plaintiff's class claims, before denying class certification

due to an inadequate representative, Dkt. Nos. 110, 127). Most concerningly, in *Snider v. Admin.

Comm.*, the court denied B&G and IKR's "**remarkably untimely**" motion to consolidate actions

to add a new plaintiff, who testified that, **contrary to B&G's representation**,[6] "he did not reach

out to counsel but instead **was solicited to act as a representative of the putative class**." No.

5:20-cv-00977, 2020 WL 7630700, at *1, n.2 (W.D. Okla. Dec. 22, 2020). The court condemned

their "**no-harm, no-foul approach to litigating a complex, putative class action**." *Id.*

---

[6] Plaintiff Snider's deposition testimony appeared inconsistent with B&G's representation that
Snider had "reached out to [counsel] wishing to be a class representative and plaintiff in this case."
*Compare Snider*, No. 5:20-cv-00997, Dkt. No. 22-5 at ECF 6–9 *with id.* Dkt. No. 22-2 at 5.

### VII.    Sanford Heisler is Well-Equipped to Represent the Class

Nor do B&G and IKR have any advantage in size or resources. SHS is a national law firm with 50 attorneys and six offices across the country that routinely advances expenses exceeding the $500,000 that Ulery's counsel estimates is needed to litigate an ERISA case. Ex. A, Sanford Decl. ¶ 19; Ex. G, Field Decl. ¶ 13. Their local counsel, Matthew Singer, is not only a veteran class action litigator, who has achieved numerous eight-figure settlements, but also clerked for two years on the Seventh Circuit. Ex. E, Singer Decl. ¶ 6–7. And SHS is also familiar with the Northern District of Illinois, having litigated two ERISA cases in this court. Ex. B, Field Decl. ¶ 5.

In sum, Plaintiff Daly's counsel's experience in complex ERISA litigation, private securities valuation, and class action litigation and trial practice leaves no doubt that the firm is both well-qualified and well-equipped to successfully litigate and win this case at trial.

### CONCLUSION

Accordingly, the Court should grant Daly's motion to appoint SHS (Dkt. 12) and deny Ulery's motion to appoint B&G and IKR as interim class counsel (Dkt. 50).

Dated: May 27, 2022                                    */s/ Charles Field*

Charles Field*
**SANFORD HEISLER SHARP, LLP**
2550 Fifth Avenue, 11th Floor
San Diego, CA 92101
Telephone: (619) 577-4242
Facsimile: (619) 577-4250
cfield@sanfordheisler.com

Russell Kornblith*
David Sanford*
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Fl.
New York, NY 10019
Telephone: (646) 402-5650

15

Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
rkornblith@sanfordheisler.com

Kevin Sharp*
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020
ksharp@sanfordheisler.com

Sean Ouellette*
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, D.C. 20003
Phone: (646) 402-5644
Facsimile: (202) 499-5199
souellette@sanfordheisler.com

Matthew J. Singer
**MATT SINGER LAW, LLC**
77 W. Wacker Dr., Suite 4500
Chicago, IL 60601
Telephone: (312) 248-9123
matt@mattsingerlaw.com

*Attorneys for Plaintiff Daly*

\*   *Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

     I, Charles Field, hereby certify that on May 27, 2022, I caused the foregoing to be filed using the CM/ECF system for the United States District Court for the Northern District of Illinois, which will send notification of such filing to all registered participants.

*/s/ Charles Field*
Charles Field
