# Exhibit G

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MATTHEW DALY, on behalf of himself and all others similarly situated,**            *Plaintiff,*<br><br>v.<br><br>**WEST MONROE PARTNERS, INC., et al.**  *Defendants.* | )<br>)<br>)<br>)  **Case No. 1:21-cv-6805 (RAG/SMF)**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF CHARLES H. FIELD

I, Charles H. Field, Esq., hereby declare as follows:

1.    I am the Chair of Sanford Heisler Sharp's Financial Services Litigation Practice and counsel for Plaintiff Matthew Daly. This declaration elaborates on my February 10, 2022 declaration in support of Mr. Daly's Motion to Appoint Interim Class Counsel (Dkt. No. 13-2) and responds to certain assertions made in Plaintiff Nathan Ulery's Motion to Appoint Interim Class Counsel and the accompanying declarations.

2.    I have over three decades of experience in the legal and financial services industries, including extensive experience in complex securities valuation, ERISA compliance, and ERISA litigation.

3.    Since I joined Sanford Heisler Sharp as Co-Chair of the Firm's Financial Services Litigation Practice in 2015, I have litigated numerous class actions alleging breach of fiduciary duty against Fortune 500 companies including Walgreen Co., Transamerica Corporation, The Home Depot, Inc., UnitedHealth Group, The Allstate Corporation, and General Electric Co. *See*

Feb. 10, 2022 Decl. ¶ 5. Since 2015, Sanford Heisler's Sharp's ERISA practice group has lost only one motion to dismiss and has survived dismissal and obtained class certification in every other case in which the group has sought class certification. *See*, *e.g.*, *Snyder v. UnitedHealth Grp., Inc.*, No. CV 21-1049 (JRT/BRT), 2021 WL 5745852 (D. Minn. Dec. 2, 2021); *Cutrone v. Allstate Corp.*, No. 20 CV 6463, 2021 WL 4439415 (N.D. Ill. Sept. 28, 2021) (motion to dismiss denied; class certification pending); *Brown-Davis v. Walgreen Co.*, No. 1:19-CV-05392, 2020 WL 8921399 (N.D. Ill. Mar. 16, 2020); *Pizarro v. Home Depot, Inc.*, No. 1:18-CV-01566-WMR, 2019 WL 11288656 (N.D. Ga. Sept. 20, 2019); *In re G.E. ERISA Litig.*, No. 17-CV-12123-IT, 2019 WL 5592864 (D. Mass. Oct. 30, 2019); *Karg v. Transamerica Corp.*, No. 18-CV-134-CJW-KEM, 2019 WL 3938471, at *1 (N.D. Iowa Aug. 20, 2019).

4.      I previously worked for over two and a half decades in the investment business. For seventeen years, I served as the General Counsel, Managing Director, and Chief Legal Officer of an SEC-registered investment firm that managed approximately $50 billion in securities for institutional investors, including cities and towns, private and public investment funds, and numerous retirement plans governed by ERISA.[1] In that role, I served as an officer and director/trustee of multiple private and public investment companies that invested billions of dollars across the global markets in both publicly traded and privately held securities.

5.      I (along with others) administered the investment advisory firm's securities valuation process. As a fiduciary, the firm assigned value to each of its clients' portfolio holdings daily to furnish a reliable account value, calculate the portfolio's precise investment results, make prudent investment decisions, and compute accurate asset-based investment advisory fees. I was

---

[1] While in this role, I held numerous securities supervisory licenses including the General Securities Principal license, Registered Options Principal license, Municipal Securities Principal license, and General Securities Sales Supervisor license.

2

responsible for ensuring that process complied with the firm's fiduciary obligations as well as numerous other complex statutes and standards.

6.      I personally drafted policies and procedures to determine when and how to establish or adjust a security's fair value when prices were not readily available or reliable. As explained in Plaintiff Daly's complaint, prudent fiduciaries must determine the fair value of securities when their price becomes suspect, or when material changes call its valuation into question. That duty is squarely at issue in this case, as alleged at length in both Plaintiffs' complaints. At my previous firm, I personally established criteria for determining when existing valuations were no longer reliable, creating a framework to determine the fair valuation and verify our work.

7.      I was also a member of the firm's Fair Valuation Committee for approximately 10 years. As a member of the Committee, I valued hundreds of securities and derivatives traded in markets all over the world, from Indonesia to India, from Russia to the U.S.

8.      I also participated in several complex transactions in which the firm valued, bought, or sold privately held companies in collaboration with investment banks such as Goldman Sachs. In addition to those responsibilities, I oversaw the production of hundreds of quarterly, semi-annual and annual investment performance reports that compared the returns of a given portfolio with the results of a benchmark (e.g., Russell 2000 Index) and other comparable investment portfolios. As an officer, director/trustee, I also scrutinized attribution reports—reports that showed how individual holdings and industries affected an account's investment performance.

9.      Plaintiff Daly's complaint is a product of an extensive investigation informed by my decades of experience in securities markets, valuation, and corporate transactions. My colleagues at Sanford Heisler Sharp and I have collectively spent hundreds of hours investigating and litigating this case, reviewing hundreds of pages of documents, analyzing market data, and

conducting hours of legal research to formulate the factual and legal theories set forth in the complaint. We have also spoken with at 17 former employees who participated in the Plan.

10.     Contrary to Plaintiff Ulery's suggestion, the complaint uses comparable public companies not to arrive at a precise valuation of West Monroe; in my experience, companies do not readily disclose the detailed financial information necessary to arrive at a precise valuation. Rather, the analysis set forth in the complaint uses comparable public companies to illustrate the improbability that a company like West Monroe would grow so sharply in value in a span of months absent a significant catalyst, such as obtaining a major contract or a new patent.

11.     As explained in my prior declaration, to prepare our complaint in this case, I along with my colleagues undertook an extensive investigation. We reviewed hundreds of pages of documents—including the West Monroe Partners ESOP Plan and Trust Documents and their various amendments—gathered, reviewed, and analyzed market data, and conducted hours of legal research into the various claims and theories asserted in the complaint. With my colleagues at Sanford Heisler Sharp, I developed the theory of this case and drafted a detailed complaint that methodically discusses the alleged violations of ERISA at issue in this case. My colleagues and I fielded calls and questions from 17 former West Monroe employees since filing the complaint.

12.     Sanford Heisler Sharp has also retained a consulting expert with 35 years of experience in corporate finance and securities valuation. He has worked for decades in the financial services industry, including as a chief investment officer, portfolio manager, and securities analyst at blue-chip investment firms including Credit Suisse, Morgan Stanley, First Boston, and Nicholas Applegate. He holds a Charter Financial Analyst ("C.F.A.") designation and an M.B.A. in Finance from a top-ten business school and has valued thousands of companies both public and private.

13.     Sanford Heisler Sharp routinely advances litigation expenses of over $500,000 in

4

complex class actions including ERISA cases.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of May, 2022, in San Diego, California.

*/s/ Charles H. Field*
Charles H. Field