# EXHIBIT L

# WEST MONROE PARTNERS, INC.

# EMPLOYEE STOCK OWNERSHIP PLAN

(2012 RESTATEMENT WITH AMENDMENTS ONE THROUGH TWELVE)

71045293.4

**TABLE OF CONTENTS**

**Page**

ARTICLE I.     DEFINITIONS ........................................................................... 1
    1.1    Accounts .......................................................................... 1
    1.2    Administrator ................................................................. 1
    1.3    Code ................................................................................ 1
    1.4    Company Stock ............................................................. 1
    1.5    Company Stock Account .............................................. 1
    1.6    Compensation ............................................................... 1
    1.7    Controlled Group .......................................................... 2
    1.8    Disabled ......................................................................... 2
    1.9    Effective Date ............................................................... 2
    1.10    Employee ....................................................................... 2
    1.11    Entry Date ...................................................................... 2
    1.12    ERISA ........................................................................... 2
    1.13    ESOP Loan .................................................................... 2
    1.14    Highly Compensated Employee .................................. 3
    1.15    Leased Employee ......................................................... 3
    1.16    Limitation Year ............................................................ 3
    1.17    Normal Retirement Age ............................................... 3
    1.18    Other Investments Account .......................................... 3
    1.19    Participant ..................................................................... 3
    1.20    Plan Year ....................................................................... 4
    1.21    Post-Severance Compensation .................................... 4
    1.22    Qualifying Employer Securities .................................. 4
    1.23    Qualified Military Service ........................................... 4
    1.24    Related Plan .................................................................. 4
    1.25    Transfer Account .......................................................... 4
    1.26    Trust Fund ..................................................................... 4
    1.27    Union Employee ........................................................... 4
    1.28    Valuation Date .............................................................. 5

ARTICLE II.     SERVICE COMPUTATIONS ................................................ 6
    2.1    Service ............................................................................ 6
    2.2    Hour of Service ............................................................ 7
    2.3    One-Year Break-in-Service .......................................... 7
    2.4    Year of Service ............................................................. 8
    2.5    Credit for Service ......................................................... 8
    2.6    Service with Affiliated Companies .............................. 8

ARTICLE III.     PLAN PARTICIPATION ...................................................... 9
    3.1    Eligibility for Participation .......................................... 9
    3.2    Subsequent Ineligibility of a Participant ..................... 9

-i-

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE IV.     ANNUAL COMPANY CONTRIBUTIONS ................................................ 11
    4.1     Annual Company Contributions ................................................... 11
    4.2     Manner of Payment ........................................................................ 11
    4.3     Limitation on Amount of Annual Company ................................. 11
    4.4     When Contributions Made ............................................................ 11
    4.5     Special Rules for Years in Which the Plan is Top Heavy .................. 11

ARTICLE V.     INVESTMENT OF TRUST ASSETS ................................................... 14
    5.1     Investment Policy ........................................................................... 14
    5.2     Sales of Company Stock ................................................................ 14
    5.3     Borrowing to Purchase Company Stock ...................................... 14
    5.4     Valuation of Company Stock ........................................................ 16

ARTICLE VI.     SUSPENSE ACCOUNT FOR UNALLOCATED SHARES ...................... 17
    6.1     Suspense Account .......................................................................... 17
    6.2     Release of Company Stock from Suspense Account ....................... 17

ARTICLE VII.     PARTICIPANTS' ACCOUNTS AND ANNUAL ADJUSTMENTS ........... 18
    7.1     Accounts for Participants .............................................................. 18
    7.2     Charges to Accounts ..................................................................... 18
    7.3     Company Stock Account ............................................................... 18
    7.4     Other Investments Account ........................................................... 18
    7.5     Allocations .................................................................................... 18
    7.6     Limitation on Allocations to Participants .................................... 10
    7.7     Special Limitations for Participants Who Sell Their Stock ............... 22
    7.8     Special Limitations for Disqualified Persons ................................ 23
    7.9     Transfer to Avoid Nonallocation Year ......................................... 26
    7.10     Adjusting to Value of Trust Fund ................................................. 28
    7.11     Participant Statements ................................................................... 28

ARTICLE VIII.     RETIREMENT DATES ....................................................................... 29
    8.1     Normal Retirement Date ............................................................... 29
    8.2     Disability Retirement Date ............................................................ 29
    8.3     Retirement Date ............................................................................ 29

ARTICLE IX.     VESTING OF ACCOUNT BALANCES ................................................. 30
    9.1     Vesting on Retirement ................................................................... 30
    9.2     Vesting on Disability ..................................................................... 30
    9.3     Vesting on Death ........................................................................... 30
    9.4     Vesting on Other Termination ...................................................... 30
    9.5     Determination of Account Balances ............................................. 31
    9.6     Reinstatement of Forfeitures ......................................................... 32

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE X.     DISTRIBUTION OF PLAN BENEFITS ...................................................... 33
    10.1     Method of Distribution .................................................................... 33
    10.2     Form of Distribution ....................................................................... 33
    10.3     Distributions After Death ................................................................ 34
    10.4     Time of Distribution ........................................................................ 35
    10.5     Minimum Distribution Requirements ............................................. 37
    10.6     Diversification of Company Stock Account .................................... 40
    10.7     Rollover Distributions ..................................................................... 41
    10.8     Dividends and Distributions on Company Stock ............................ 42
    10.9     Distributions To Persons Under Disability ..................................... 43
    10.10    Benefits may not be Assigned or Alienated .................................... 43
    10.11    No Guarantee of Benefits ................................................................ 43
    10.12    Beneficiaries ................................................................................... 43
    10.13    Participant's Consent to a Distribution ........................................... 44
    10.14    In-Service Distribution .................................................................... 44

ARTICLE XI.     SHAREHOLDER RIGHTS AND RESTRICTIONS .............................. 46
    11.1     Voting of Company Stock ............................................................... 46
    11.2     Right of First Refusal ...................................................................... 46
    11.3     Put Option ....................................................................................... 47
    11.4     Nonterminable Rights ..................................................................... 47

ARTICLE XII.     PLAN ADMINISTRATION ................................................................. 48
    12.1     Plan Administration ........................................................................ 48
    12.2     The Trust ......................................................................................... 48
    12.3     Rights, Powers, and Duties of the Administrator ........................... 48
    12.4     Claims Procedure ............................................................................ 49
    12.5     Procedures with Respect to Domestic Relations Orders ................. 50

ARTICLE XIII.     TRANSFERS FROM OTHER BENEFIT PLANS .................................... 52
    13.1     Rollover Contributions .................................................................... 52
    13.2     Transferred Accounts from Merged Plans ...................................... 52
    13.3     Separate Accounts ........................................................................... 52
    13.4     Restrictions on Transferred Amounts ............................................. 52
    13.5     Eligibility and Vesting .................................................................... 52
    13.6     Other Provisions of the Plan ........................................................... 53

ARTICLE XIV.     AMENDMENT AND TERMINATION ............................................... 54
    14.1     Amendment ..................................................................................... 54
    14.2     Termination ..................................................................................... 54
    14.3     Merger or Consolidation of Plan, Transfer of Plan Assets ............. 54
    14.4     Vesting and Distribution on Termination and Partial Termination ..... 54

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE XV.    MISCELLANEOUS ........................................................................ 55

    15.1    No Reversion to Company ........................................................... 55

    15.2    Notices ........................................................................................ 55

    15.3    Indemnification ........................................................................... 55

    15.4    Subsidiary and Affiliated Companies ........................................ 55

    15.5    Participation Not Guarantee of Employment............................. 55

    15.6    Gender and Number .................................................................... 55

    15.7    Governing Laws .......................................................................... 56

    15.8    Text to Control ............................................................................ 56

71045293.4

WEST MONROE PARTNERS, INC.

EMPLOYEE STOCK OWNERSHIP PLAN

_____

RECITALS

West Monroe Partners, Inc., a Delaware S Corporation (the "Company"), desires to recognize and reward the contribution by its employees to its successful operation and to provide incentive for employees to increase their productivity, by enabling them to acquire stock ownership interests in the Company and to share in the profits of the Company. The Company desires to attain these objectives pursuant to a plan designed to invest primarily in Qualifying Employer Securities, which shall qualify as an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Internal Revenue Code of 1986 and Section 407(d)(6) of the Employee Retirement Income Security Act of 1974.

The Company intends to enter into a trust agreement, known as the "West Monroe Partners, Inc. Employee Stock Ownership Trust" (the "Trust Agreement"), with Reliance Trust Company, as Trustee, dated as of the date of this Plan. Pursuant to the Trust Agreement, all contributions made by the Company under this plan will be held, managed, and controlled by the Trustee.

Therefore, the Company hereby adopts the West Monroe Partners, Inc. Employee Stock Ownership Plan (the "Plan"), effective as of January 1, 2012.

# ARTICLE I.

## DEFINITIONS

Whenever used in this Plan, the following words and phrases shall have the meanings stated below, unless a different meaning is plainly required by the context:

1.1     Accounts.   The term "Accounts" means, collectively, a Participant's Company Stock Account, Other Investments Account, and Transfer Account.

1.2     Administrator.   The term "Administrator" means the individual or party vested with the authority to control and manage the operation and administration of the Plan.  The Company shall be the Administrator.

1.3     Code.   The term "Code" means the Internal Revenue Code of 1986, as amended from time to time.  Reference to a section of the Code shall include that section and any comparable section or sections of any future legislation that amend, supplement, or supersede that section.

1.4     Company Stock.   The term "Company Stock" shall mean a security issued by the Company which is stock, a marketable obligation (as defined in Section 407(e) of ERISA), or an interest in a publicly traded partnership.

1.5     Company Stock Account.   The term "Company Stock Account" means the account established for a Participant by the Administrator pursuant to Section 7.1 and to which Company Stock shall be allocated pursuant to Section 7.3.

1.6     Compensation.   Except as otherwise provided in Section 7.6(b), the term "Compensation" means a Participant's total regular earnings from the Company paid during a Plan Year for services rendered that are reportable on the Participant's IRS Form W-2, Wage and Tax Statement and Post-Severance Compensation.  In addition, the term "Compensation" shall include earnings which are not currently includible in a Participant's gross income for federal income tax purposes by reason of Section 125, 132(f), 402(e)(3), 402(h), or 403(b) of the Code and the amount of any differential wage payments made by the Company to a Participant, in accordance with Section 3401(h) and 414(u)(12) of the Code, for any period of active military service in the uniformed services in the United States for more than 30 days.  However, the term "Compensation" shall not include any of the following:  (a) bonuses or commissions; (b) any earnings in excess of the amount that is determined under Section 401(a)(17) of the Code (which amount for the Limitation Year ending December 31, 2012 is $250,000); or (c) any contributions or benefits under this Plan or under any other pension, profit-sharing, insurance, hospitalization, or other plan or policy maintained by the Company for the benefit of the Participant; or (d) any amounts paid or payable under the West Monroe Partners, Inc. Stock Appreciation Rights Plan other than amounts paid during the Plan Year beginning on January 1, 2017 to a Participant who died during such Plan Year or who retired or became Disabled on a Retirement Date (as

1

defined in Section 8.3) during such Plan Year.[1] In any case where a Participant commences participation in the Plan, or resumes active participation in the Plan after incurring a One-Year Break-in-Service, on any day other than the first day of a Plan Year, his or her Compensation for that Plan Year shall ~~be that portion~~consist of ~~his or her~~all compensation, as determined under this Section ~~1.6 paid during the period of his or her participation in the Plan for that~~1.6, paid to the Participant during such Plan Year.[2]

1.7    <u>Controlled Group</u>.  The term "Controlled Group" means: (a) the Company and one or more other corporations which are members of a "controlled group" of corporations within the meaning of Section 414(b) of the Code and the regulations thereunder; (b) the Company and one or more unincorporated trades or businesses which are under "common control" within the meaning of Section 414(c) of the Code and the regulations thereunder; (c) the Company and one or more other organizations which are members of an "affiliated service group," as determined under Section 414(m) of the Code and the regulations thereunder; and (d) the Company and any other entities that must be treated as a "controlled group" under Section 414(o) of the Code and the regulations thereunder.

1.8    <u>Disabled</u>.  The term "Disabled" shall mean, with respect to any Participant, that his or her active employment with the Company has ceased due to receipt of either (a) Social Security Disability Insurance benefits, or (b) long-term disability benefits from, or pursuant to a plan of the Company.

1.9    <u>Effective Date</u>.  The term "Effective Date" means January 1, 2012, the date upon which this Plan first shall be effective.

1.10    <u>Employee</u>.  The term "Employee" means any person employed by the Company, including any officer, who receives Compensation, other than retirement benefits under this Plan, and including any person who is a Leased Employee.  However, if Leased Employees constitute less than 20 percent of the Company's "nonhighly compensated work force" (as that term is defined in Section 414(n)(5)(C)(ii) of the Code), then the term "Employee" then shall not include any Leased Employees who are covered by a plan described in Section 414(n)(5)(B) of the Code which is maintained by the leasing organization.

1.11    <u>Entry Date</u>.  The term "Entry Date" shall mean the first day of each month of the Plan Year.

1.12    <u>ERISA</u>.  The term "ERISA" means Public Law No. 93-406, the Employee Retirement Income Security Act of 1974, as amended from time to time.

---

[1] This sentence was modified by Amendment Number Ten effective as of January 1, 2017.
[2] This sentence was modified by Amendment Number Four effective as of January 1, 2014.

71045293.4

1.13    ESOP Loan.  The term "ESOP Loan" means a loan or extension of credit made to the Plan by a disqualified person or a loan or extension of credit to the Plan which is guaranteed by a disqualified person.  It includes a direct loan of cash, a purchase-money transaction, and an assumption of the obligation of the Plan.  For purposes of this Plan, a "guarantee" includes an unsecured guarantee and the use of assets of a disqualified person as collateral for a loan, even though that use of assets may not be a guarantee under applicable state law.  An amendment of a loan in order to qualify the loan as an exempt loan is not a refinancing of the loan or the making of another loan.  For purposes of this Plan, the term "exempt loan" refers to a loan that satisfies the provisions of Section 54.4975-7(b) of the Treasury Department Regulations.  A "non-exempt loan" is one that fails to satisfy those provisions.

1.14    Highly Compensated Employee.   The term "Highly Compensated Employee" means any Employee who during a particular Plan Year:  (a) was a "5-percent owner" (as that term is defined in Section 416(i)(1) of the Code) at any time during the Plan Year or during the preceding Plan Year; or (b) for the preceding Plan Year (i) had compensation from the Company in excess of $115,000 (as adjusted each Plan Year to take into account any cost-of-living increase adjustment provided for that Plan Year under Section 415(d) of the Code), and (ii) was in the group of Employees consisting of the top 20 percent of the Employees when ranked on the basis of compensation paid by the Company during the preceding Plan Year.

1.15    Leased Employee.  The term "Leased Employee" means any person (other than an employee of the Recipient) who, pursuant to an agreement between the Recipient and any other Leasing Organization:  (a) has performed services for the Recipient (or for the Recipient and related persons determined in accordance with Section 414(n)(6) of the Code) on a substantially full-time basis for a period of at least one year; and (b) has performed these services under the primary direction and control of the Recipient.  For purposes of this Section 1.15, the terms "Recipient" and "Leasing Organization" shall have the meanings set forth in Section 414(n) of the Code.

1.16    Limitation Year.  The term "Limitation Year" means the calendar year ending with or within the Plan Year.

1.17    Normal Retirement Age.  The term "Normal Retirement Age" means the date on which a Participant attains age 55.

1.18    Other Investments Account.  The term "Other Investments Account" means the account established for a Participant by the Administrator pursuant to Section 7.1 and to which the Participant's share of the Company's contributions made in cash or in property other than Company Stock shall be allocated pursuant to Section 7.4.

1.19    Participant.  The term "Participant" means an Employee who becomes a participant in the Plan under the provisions of Section 3.1 or pursuant to Section 13.1.

1.20   Plan Year.  The term "Plan Year" means the twelve-month accounting year beginning January 1st and ending the following December 31st.

1.21   Post-Severance Compensation.  The term "Post-Severance Compensation" means salary compensation for services during the Employee's regular working hours, or compensation for services outside the Employee's regular working hours (such as overtime pay, commissions, bonuses or similar payments), provided that: (i) the payment would have been paid to the Employee prior to his or her separation from service if the Employee had continued in employment with the Company and (ii) the payments are paid to the Employee by the later of two and one-half months after the Employee's separation from service or the end of the Limitation Year that includes the Employee's separation from service.

1.22   Qualifying Employer Securities.   The term "Qualifying Employer Securities" means:  (a) common stock issued by the Company which is readily tradable on an established securities market; (b) common stock issued by the Company having a combination of voting power and dividend rights equal to or in excess of (i) that class of common stock of the Company having the greatest voting power, and (ii) that class of common stock of the Company having the greatest dividend rights; or (c) noncallable preferred stock if that stock is convertible at any time into stock which meets the requirements of clauses (i) and (ii) of this Section 1.22 and if the conversion is at a conversion price which is reasonable.

1.23   Qualified Military Service.  The term "Qualified Military Service" means any service performed in the "uniform services" (as defined in Title 38 of the United States Code) by an Employee who terminates his or her employment with the Company in order to perform this service and who is entitled to reemployment with the Company after he or she has completed this service pursuant to Title 38 of the United States Code.

1.24   Related Plan.   The term "Related Plan" means any other defined contribution plan (as defined in Section 415 of the Code) maintained by the Company or by any other employer that is a member of a Controlled Group.

1.25   Transfer Account.   The term "Transfer Account" means the account established for a Participant by the Administrator pursuant to Section 13-2 and to which shall be credited all amounts transferred by the Participant to this Plan from any other tax-qualified plan.

1.26   Trust Fund.  The term "Trust Fund" means all property held by the Trustee under the Trust Agreement.

1.27   Union Employee.  The term "Union Employee" means an Employee who is included in a unit of Employees covered by a collective bargaining agreement between Employee representatives and the Company, provided that:  (i) retirement benefits have been the subject of good faith bargaining between the Employee representatives and the

Company; and (ii) as a result of the negotiations, either the Employee is covered by another retirement plan to which the Company makes contributions or there has been no agreement between the Employee representatives and the Company for his or her coverage under this Plan.

      1.28   <u>Valuation Date</u>.  The term "Valuation Date" means the last day of the Plan Year.

71045293.4

## ARTICLE II.

## SERVICE COMPUTATIONS

2.1 <u>Service</u>.  The term "Service" means the period of employment of an Employee or Participant for which he or she receives credit pursuant to the provisions of this Article II.

2.2 <u>Hour of Service</u>.  The term "Hour of Service" means, with respect to any Employee or Participant:

(a) each hour for which he or she is directly or indirectly paid, or entitled to payment, by the Company for the performance of duties during the applicable computation period;

(b) each hour for which he or she has been awarded back pay or for which the Company has agreed to award him or her back pay, irrespective of mitigation of damages;

(c) each hour for which he or she is directly or indirectly paid, or entitled to payment, by the Company for reasons other than the performance of duties during the applicable computation period (such as for vacation, sickness, injury, or disability); and

(d) each hour for which he or she performs Qualified Military Service, provided that he or she is rehired by the Company after his or her performance of the Qualified Military Service is completed.

Hours of Service shall not be credited under more than one of the preceding subsections. Hours described in clause (a) above shall be credited to the Employee or Participant for the computation periods in which the duties were performed.  ~~Employees for whom the Company does not maintain records of their hours worked shall be credited with Hours of Service on the basis of a 45-hour workweek or, in the case of a partial workweek, on the basis of a ten-hour workday.~~  Hours described in clause (b) above shall be credited to the Employee or Participant for the computation periods to which the award or agreement pertains, rather than for the computation periods in which either payment is actually made or amounts payable to the Employee or Participant become due.  Hours described in clause (c) above shall be credited to the Employee or Participant for the computation periods during which the events giving rise to the payments occurred.  Hours of service shall be computed in accordance with paragraphs (b), (c), and (e) of Section 2530.200b-2 of the Department of Labor Regulations under ERISA and any successor regulations. Employees for whom the Company does not maintain records of their hours worked shall be credited with Hours of Service on the basis of a 45-hour workweek or, in the case of a partial workweek, on the basis of a ten-hour workday. Employees for whom the Company does maintain records of their hours works shall be credited with the greater of the number of

71045293.4

Hours of Service determined under this Section 2.2, generally, and the number of Hours of Service determined under the equivalencies set forth in the preceding sentence.[3] The provisions of this Section 2.2 shall be construed so as to resolve any ambiguities in favor of crediting an Employee or Participant with Hours of Service.

2.3    One-Year Break-in-Service.    (a)    General.    The term "One-Year Break-in-Service" means any Plan Year during which a Participant completes 500 or fewer Hours of Service with the Company.

(b)    Pregnancy or Birth or Adoption of a Child.    For purposes of determining whether a One-Year Break-in-Service has occurred, a Participant shall be given credit for the Hours of Service which normally would have been credited but for an absence from work for any period for any of the following reasons:  (i) by reason of the pregnancy of the Participant; (ii) by reason of the birth of a child of the Participant; (iii) by reason of the placement of a child with the Participant in connection with the adoption of the child by the Participant; or (iv) for purposes of caring for the child for a period beginning immediately following the birth or placement.  If the Administrator is unable to determine the hours which normally would have been credited to a Participant but for an absence of the kind described above, there shall be credited to the Participant eight Hours of Service per day of absence. However, the total number of hours treated as Hours of Service by reason of an absence of the kind described above shall not exceed 501.  The hours described in this Section 2.3(b) shall be treated as Hours of Service either: (i) only in the year in which the absence from work begins, if a Participant would be prevented from incurring a One-Year Break-in-Service in that year solely because the period of absence is treated as Hours of Service; or (ii) in any other case, in the immediately following year.

2.4    Year of Service.  The term "Year of Service" means any Plan Year during which an Employee or Participant has completed at least 1,000 Hours of Service with the Company; provided, however, that a Participant who is classified as a full-time, permanent employee of the Company shall be credited with a Year of Service for the Plan Year in which such employment commences regardless of the number of Hours of Service completed by the Participant during such Plan Year if the Participant, during the immediately preceding Plan Year, performed services for the Company as an intern (and was so classified on the Company's human resource systems) and accepted an offer of full time, permanent employment with the Company within fourteen (14) days of the date such offer was first made in writing to the Participant.[4]

---

[3] This paragraph was modified by Amendment Number Two effective as of January 1, 2013.

[4] This clause was added by Amendment Number One effective as of January 1, 2013 and then modified by Amendment Number Nine effective as of January 1, 2017. As modified by Amendment Number One, this clause read as: "provided, however, that a Participant who is classified as a full-time, permanent employee of the Company shall be credited with a Year of Service for the Plan Year in which such employment commences regardless of the number of Hours of Service completed by the Participant during such Plan Year if the Participant, during the immediately preceding Plan Year, performed services for the Company as an intern (and was so classified on the Company's human resource systems) and accepted an offer of full time,

2.5     Credit for Service.  Except as otherwise specifically provided below in this Section 2.5, each Employee and each Participant shall receive credit for each Year of Service for all purposes of the Plan, including Years of Service with the Company prior to the Effective Date:

(a)     Years of Service before a One-Year Break-in-Service shall be disregarded until the Participant completes a Year of Service after the break.

(b)     In the case of a Participant who does not have any nonforfeitable right to an accrued benefit derived from Company contributions, Years of Service before any One-Year Break-in-Service shall not be taken into account in computing that Participant's period of service if the number of consecutive One-Year Breaks-in-Service equals or exceeds five (5) years or the aggregate number of Years of Service before such Break-in-Service, whichever is greater.

(c)     If, at the time that a Participant first incurs a One-Year Break-in-Service, any portion of his or her Accounts is vested pursuant to Article IX, then Years of Service completed after a period of five consecutive One-Year Breaks-in-Service shall not be counted for purposes of determining the nonforfeitable percentage of the Participant's accrued benefit derived from Company contributions which were made before that period.

2.6     Service with Affiliated Companies.  For purposes of determining Hours of Service and Years of Service under this Article II and the vested portion of a Participant's Accounts under Article IX, credit shall be granted for service with any other entity which, together with the Company, is a member of a Controlled Group. Notwithstanding the foregoing, no such credit shall be granted for service performed for an entity for any period of time before that entity became a member of the Company's Controlled Group.[5]

---

permanent employment with the Company within thirty (30) days of the date such offer was first made in writing to the Participant."

[5] This sentence was added by Amendment Number Three effective as of January 1, 2013.

## ARTICLE III.

## PLAN PARTICIPATION

3.1 Eligibility for Participation. (a) ~~Employees other than Leased Employees and Union Employees~~Effective Date of Participation. Each Employee of the Company as of the Effective Date shall become a Participant in the Plan on the Effective Date. ~~Each~~Except as described in subparagraph (b) below, each[6] Employee of the Company hired after the Effective Date shall become a Participant in the Plan on the first day of the month immediately following the date on which he or she first becomes an Employee of the Company.

(b) ~~Leased, Union and Foreign~~Excluded Employees. Notwithstanding anything to the contrary contained in subparagraph (a) of this Section 3.1, an Employee will not be eligible to participate in this Plan if he or she (i) is a Leased Employee~~, if he or she is not permanently domiciled in the United States, or if he or she is a Union Employee~~; or (ii) is a Union Employee.[7] Effective as of January 1, 2015, Employees who are classified as interns in the Company's payroll system, including any interns who became Participants in the Plan prior to January 1, 2015, shall no longer be eligible to participate in the Plan.[8] In addition to the foregoing, an individual who provides, or is deemed to provide, services to the Company and based on an agreement or Company classification, is not treated by the Company as an Employee at the time such services are provided, or deemed to be provided (including but not limited to an individual classified as an independent contractor), will not be an Employee and will not be eligible to participate in the Plan, even if such individual is retroactively re-classified as an Employee by any court, the Internal Revenue Service or any other federal or state administrative agency.[9]

3.2 Subsequent Ineligibility of a Participant. If at any time after an Employee becomes a Participant any of the conditions described below in this Section 3.2 shall occur, then that Employee shall cease to be a Participant in the Plan for purposes of Section 7.5(b). If either of the conditions described in subsections (a) and (b) below shall occur, then the affected Participant's Accounts shall be reduced in the manner provided for in Section 9.4 as of the last day of the Plan Year in which the condition first occurs. The conditions which shall bring this Section 3.2 into effect are the following:

(a) the Participant incurs a One-Year Break-in-Service and receives or is deemed to receive a distribution of the vested portions of the balances credited to his or her Accounts;

---

[6] This subsection was modified by Amendment Number Seven effective as of January 1, 2016.
[7] This sentence was modified by Amendment Number Seven effective as of January 1, 2016.
[8] This sentence was modified by Amendment Number Seven effective as of January 1, 2016.
[9] This sentence was added by Amendment Number Eight effective as of January 1, 2016.

(b)     the Participant incurs five consecutive One-Year Breaks-in-Service prior to receiving a distribution of the vested portions of the balances credited to his or her Accounts; or

(c)     the Participant becomes ~~a Leased~~an Employee~~; or(d)        the Participant becomes a Union Employee.~~ excluded from participating in the Plan as described in Section 3.1(b).[10]

If ~~either of the conditions~~a Participant's employment classification shall change as described in ~~clauses (c) and (d) of the preceding sentence shall occur~~clause (c) above,[11] the affected Employee shall remain a Participant if he or she still has a balance credited to his or her Accounts under the Plan.  The Participant then will continue to be credited with vesting service, but shall not receive any allocation of Company contributions or of forfeitures.

---

[10] Subsection (c) was modified and subsection (d) was deleted by Amendment Number Seven effective as of January 1, 2016.
[11] This sentence was modified by Amendment Number Seven effective as of January 1, 2016.

71045293.4

# ARTICLE IV.

## ANNUAL COMPANY CONTRIBUTIONS

4.1     <u>Annual Company Contributions</u>.  Subject to Section 4.3, for any Plan Year the Company may pay over to the Trustee the amount, if any, as an annual contribution to the Plan for that year as is determined by resolution of the Board of Directors of the Company.  Payment of all contributions shall be conditioned on the initial qualification of the Plan under Section 401(a) of the Code and on deductibility of the contributions under Section 404 of the Code.  However, for any year during which an ESOP Loan is outstanding, the Company shall pay over to the Trustee, as contributions to the Plan for that year, no less than the amounts necessary to enable the Trustee to pay any maturing obligations under any outstanding ESOP Loan. For the Plan Year ending December 31, 2014, the Company shall contribute an additional cash amount as determined by the Board of Directors of the Company (the "2014 Additional Contribution").[12]

4.2     <u>Manner of Payment</u>.  The Company's contributions may be made in cash or in shares of Company Stock.  Contributions shall be made in cash to the extent necessary to enable the Trustee to pay any maturing obligations under any outstanding ESOP Loan.

4.3     <u>Limitation on Amount of Annual Company</u>.  In no event shall the amount of the Company's contributions under the Plan for any Plan Year exceed the maximum amount allowable as a deduction in computing its taxable income for that year for federal income tax purposes.

4.4     <u>When Contributions Made</u>.  The Company's contributions for any Plan Year shall be due by the last day of that Plan Year and shall be paid over to the Trustee not later than the time prescribed by law for filing the Company's federal income tax return for its taxable year ending with or within each Plan Year (including any extensions of the filing deadline).  However, for any year during which an ESOP Loan is outstanding, the Company's contributions shall be paid at such time as is necessary to enable the Trustee to timely pay any maturing obligations under the outstanding ESOP Loan.

4.5     <u>Special Rules for Years in Which the Plan is Top Heavy</u>.  (a)<u>Determination of "Top-Heavy" Status</u>.  In general, the Plan will be a "top-heavy plan" for any Plan Year if, as of the last day of the preceding Plan Year or, in the case of the first Plan Year, the last day of that year (the "determination date"), the present value of accrued benefits of Participants who are "key employees" (as defined in Section 416(i)(1) of the Code) under this Plan and under any plan included in the Aggregation Group, as defined in subsection (b), exceeds 60 percent of the present value of accrued benefits of all Participants under this Plan and under any plan included in the Aggregation Group. In making this determination, the following special rules shall apply:

---

[12] This sentence was added by Amendment Number Six effective for the Plan Year ending December 31, 2014.

(i)     A Participant's accrued benefits shall be increased by the aggregate distributions, if any, made with respect to the Participant during the one-year period ending on the determination date, even if the Plan has terminated. However, in the case of a distribution made for a reason other than termination of employment, death, or disability, this provision shall be applied by substituting "five-year period" for "one-year period."

(ii)     The accrued benefits of a Participant who was previously a key employee, but who no longer is a key employee, shall be disregarded.

(iii)     Benefits paid on account of death shall be treated as distributions to the extent the benefits do not exceed the present value of the accrued benefits of the Participant determined immediately prior to death.

(iv)     The accrued benefits of a Participant who has not performed services for the Company during the one-year period ending on the determination date shall be disregarded.

(b)     Aggregation Group.  The term "Aggregation Group" means (i) each tax-qualified plan sponsored by a member of the Controlled Group in which at least one Key Employee participates or participated at any time during the Plan Year containing the determination date or any of the four preceding plan years (regardless of whether the Plan has terminated), and (ii) any other plan sponsored by any member of the Controlled Group which enables any plan described in subclause (i) to meet the requirements of Code Sections 401(a)(4) or 410.  In addition, the term "Aggregation Group" shall include any plan designated by the Company as being part of the group if the group would continue to meet the requirements of Code Sections 401(a)(4) and 410 with that plan being taken into account.

(c)     Key Employee.  In general, a "Key Employee" is an Employee or a former Employee who at any time during the Plan Year is:

(i)     an officer of the Company receiving annual Compensation greater than $160,000, adjusted each twelve-month period to take into account any cost-of-living increase adjustment provided for that period under Section 416(h) of the Code;

(ii)     a five-percent owner of the Company; or

(iii)     a one-percent owner of the Company receiving annual Compensation from the Company of more than $150,000.

(d)     Minimum Employer Contribution.  For any Plan Year in which the Plan is a top-heavy plan, the sum of the Company's contributions plus forfeitures, if any, allocated to each Participant who is not a Key Employee shall not be less than the

12

"applicable percentage" of the Participant's Compensation for that year.  For purposes of this Section 4.5(d), the term "applicable percentage" means the lesser of (i) three percent, or (ii) the maximum amount of the Company's contributions and forfeitures allocated in that year to any Key Employee (expressed as a percentage of the key employee's Compensation).

       (e)     <u>No Duplication of Benefits</u>.  If the Company maintains more than one plan, the minimum amount of the Company's contributions otherwise required under Section 4.5(d) may be reduced in accordance with regulations of the Secretary of the Treasury to prevent inappropriate duplication of minimum contributions or benefits.

## ARTICLE V.

## INVESTMENT OF TRUST ASSETS

5.1    Investment Policy.  Assets held in the Trust Fund shall be invested by the Trustee primarily in Company Stock. Contributions made by the Company to the Plan and other assets of the Trust Fund may be used to acquire shares of Company Stock from any shareholder of the Company or from the Company.  The Trustee also may invest assets of the Trust Fund in other properties, as the Trustee deems appropriate for the Trust Fund, and as provided in Article II of the Trust Agreement.

5.2    Sales of Company Stock.  Subject to the provisions of the Trust Agreement, the Trustee may sell shares of Company Stock to any person, including the Company.  Any sale must be made at a price not less than the fair market value of the shares sold as of the date of the sale, as determined by the Trustee based upon a valuation by an independent appraiser.  The Trustee may not sell shares of Company Stock in a sale that would be a non-exempt "prohibited transaction" within the meaning of the Code or ERISA.

5.3    Borrowing to Purchase Company Stock.  Subject to the provisions of the Trust Agreement, the Trustee shall have the power to borrow funds for the purpose of purchasing Company Stock or for the purpose of repaying all or any portion of any outstanding indebtedness incurred by the Trustee to purchase Company Stock, subject to the following conditions:

(a)    The loan must be for a specific term.

(b)    The rate of interest payable on the loan may be fixed or variable, but the rate must not exceed a reasonable rate of interest taking into account all relevant factors, including the amount and duration of the loan, the security for and any guarantee of the loan, the creditworthiness of the Plan and of any guarantor of the loan, and the interest rate prevailing for comparable loans.

(c)    Within a reasonable time after receipt of the loan proceeds, the Trustee shall use the proceeds to purchase Company Stock or to repay all or any portion of the loan or of any prior outstanding loan that has been used to acquire Company Stock.

(d)    The only assets of the Plan which may be pledged as collateral for the loan are shares of Company Stock that were acquired either with the loan proceeds or with the proceeds of any prior loan, to the extent that the prior loan is repaid with the loan proceeds. Any shares of Company Stock which are pledged as collateral for a loan shall be released from the pledge and allocated to the accounts of the Participants in the manner provided for in Article VI of the Plan.

(e)    The loan agreement shall provide that no person entitled to payment under the agreement shall have any right to assets of the Plan other than:  (i) collateral

14

given for the loan, in accordance with subparagraph (d) above; (ii) contributions made by the Company to the Plan to enable the Trustee to meet its obligations under the loan agreement (other than contributions of Company Stock); and (iii) earnings attributable to the shares of Company Stock pledged as collateral to secure the loan and earnings attributable to the contributions made by the Company to the Plan to enable the Trustee to meet its obligations under the loan agreement (other than contributions of Company Stock).

(f)     Except as provided in subparagraph (e) above, the loan must be without recourse against the Plan.

(g)     The payments made by the Trustee during any Fiscal Year on all outstanding indebtedness incurred by the Trustee for the purpose of acquiring shares of Company Stock shall not exceed an amount equal to the sum of (a) all contributions made by the Company to the Plan for the purpose of enabling the Trustee to meet its obligations under the loan agreement, plus (b) all earnings on those contributions and all earnings on the shares of Company Stock pledged as collateral to secure the loans in accordance with subparagraph (d) above during or prior to the applicable Fiscal Year, less (c) all prior payments made on the loans.

(h)     The loan agreement must provide that the value of the Plan assets to be transferred in satisfaction of the loan in the case of a default shall not exceed the amount of the default.  If the lender is a "disqualified person" (as that term is defined in Section 4975(e) of the Code) or is a "party in interest" to the Plan (as that term is defined in Section 3(14) of ERISA), the loan agreement must provide for a transfer of Plan assets upon a default only upon and to the extent of the failure of the Plan to meet the payment schedule set forth in the loan agreement.

(i)     Except as provided in Sections 11.2 and 11.3 of the Plan, Company Stock acquired with the proceeds of a loan shall not be subject to a put, call, or other option and shall not be subject to a buy-sell or similar arrangement, either while the Company Stock is held in the Trust Fund or after it is distributed to or on account of any Participants.

(j)     Employer securities acquired with the proceeds of an exempt loan may but need not be subject to a right of first refusal.  Employer securities subject to a right of first refusal must be stock, an equity security, or a debt security convertible into stock or into an equity security.  Also, the securities must not be publicly traded at the time the right is exercised.  The right of first refusal must be in favor of the Company, the Plan, or both in any order of priority.  The selling price and other terms under the right must not be less favorable to the seller than the greater of (i) the value of the security determined under Section 54.4975-11(d)(5) of the Treasury Regulations, or (ii) the purchase price and other terms offered by a buyer, other than the Company or the Plan, making a good faith offer to purchase the security.  The right of first refusal must lapse no later than 14 days after the security holder gives written notice to the holder of the right that an offer by a third party to purchase the security has been received.

71045293.4

(k)     Notwithstanding any other provision in this Plan to the contrary, the Plan is prohibited from obligating itself to acquire Company Stock from any particular security holder at an indefinite time determined upon the happening of an event such as the death of the holder.

(l)     If securities acquired with an ESOP Loan that are available for distribution consist of more than one class of stock, a distributee must receive substantially the same proportion of stock from each class; and if more than one class of stock is allocated to the Company Stock Account of a Participant, the Plan must forfeit the same proportion of each class.

5.4     <u>Valuation of Company Stock</u>.  Valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities.  For purposes of the Plan, fair market value means the value of any Plan assets as determined by the Trustee in accordance with the Code and ERISA.  In the case of a transaction between the Plan and a disqualified person, value must be determined as of the date of the transaction.  For all other purposes, value must be determined as of the most recent Valuation Date under the Plan.  All valuations of employer securities which are not readily tradable on an established market are to be made with an independent appraiser who meets requirements similar to the requirements prescribed under Section 170(a)(1) of the Code.

71045293.4

## ARTICLE VI.

## SUSPENSE ACCOUNT FOR UNALLOCATED SHARES

6.1    Suspense Account.    The Administrator shall establish and maintain a "Suspense Account," to which it shall allocate all shares of Company Stock that the Trustee acquires with the proceeds of an ESOP Loan.  These shares shall be released from the Suspense Account at the time and in the manner provided for in Section 6.2 and then shall be allocated to Participants' Company Stock Accounts in the manner provided for in Article VII.

6.2    Release of Company Stock from Suspense Account.    For each Plan Year, there shall be released from the Suspense Account that percentage of the shares of Company Stock allocated to the Suspense Account equal to a fraction, the numerator of which is the amount of principal and interest paid on any ESOP Loan outstanding for a particular Plan Year, and the denominator of which is the sum of the numerator plus the principal and interest to be paid for all future Plan Years.  If the rate of interest payable under the ESOP Loan is variable, the interest rate to be paid in future years shall be assumed to be equal to the interest rate applicable as of the last day of the Plan Year for which a calculation is being made.

17

## ARTICLE VII.

## PARTICIPANTS' ACCOUNTS AND ANNUAL ADJUSTMENTS

7.1     Accounts for Participants.  The Administrator shall establish and maintain a Company Stock Account and an Other Investments Account for each Participant.  If the Plan receives the account balances of a Participant in a tax-qualified plan or trust in accordance with Section 13.2, the Administrator shall also establish and maintain a Transfer Account in the name of that Participant.

7.2     Charges to Accounts.  When a Valuation Date occurs, any distributions made to or on behalf of any Participant or beneficiary since the last preceding Valuation Date shall be charged to the proper Accounts maintained for that Participant or beneficiary.

7.3     Company Stock Account.  Subject to the provisions of Sections 7.5, 7.6, and 7.7, as of the last day of each Plan Year, the Administrator shall credit to each Participant's Company Stock Account:  (a) the Participant's allocable share of Company Stock purchased by the Trustee or contributed by the Company to the Trust Fund for that year; (b) the Participant's allocable share of the Company Stock that is released from the Suspense Account for that year; (c) the Participant's allocable share of any forfeitures of Company Stock arising under the Plan during that year; and (d) any stock dividends declared and paid during that year on Company Stock credited to the Participant's Company Stock Account.

7.4     Other Investments Account.  As of the last day of each Plan Year, the Administrator shall credit to each Participant's Other Investments Account:  (a) the Participant's allocable share of any contribution for that year made by the Company in cash or in property other than Company Stock that is not used by the Trustee to purchase Company Stock or to make payments due under an ESOP Loan agreement; (b) the Participant's allocable share of any forfeitures from the Other Investments Accounts of other Participants arising under the Plan during that year; (c) any cash dividends or cash distributions paid during that year on Company Stock credited to the Participant's Company Stock Account, other than dividends or distributions which are paid directly to the Participant and other than dividends or distributions which are used to repay an ESOP Loan; and (d) the share of the net income or loss of the Trust Fund properly allocable to that Participant's Other Investments Account, as provided in Section 7.8.

7.5     Allocations.  (a)  Eligibility.  Subject to the provisions of Sections 7.6 and 7.7, as of the last day of each Plan Year, the Company's contributions for that year, the shares of Company Stock that are released from the Suspense Account for that year, and the forfeitures arising under the Plan during that year shall be allocated among Participants who either: (i) are credited with a Year of Service for that Plan Year and were employed by the Company on the last day of that year; or (ii) died, retired, or became Disabled on a Retirement Date (as defined in Section 8.3) during that Plan Year.  However, a Participant who is not a "key employee" shall be eligible to share in allocations of Company

18

contributions and forfeitures for any Plan Year during which the Plan is "top heavy," regardless of whether he or she is credited with a Year of Service for that Plan Year. For purposes of the preceding sentence, the terms "key employee" and "top heavy" shall have the meanings set forth in Section 416 of the Code. The 2014 Additional Contribution shall be allocated among the Other Investments Accounts of the Participants listed on Appendix A to the Plan in the respective amounts specified on such Appendix.[13]

(b)     Allocation Formula. The portion of the Company's contribution for any Plan Year that is not used to pay down an ESOP Loan, the shares of Company Stock released from the Suspense Account for that year by reason of Company contributions, and forfeitures arising under the Plan during that year shall be allocated to the eligible Participants in the proportion that each Participant's total points earned for that year bears to the total points earned by all Participants who are eligible to share in the allocations for that year. For purposes of applying this allocation formula, a Participant shall be awarded ten points for each Year of Service, but not to exceed ten Years of Service, and one point for each full $1,000 of compensation received during the applicable Plan Year. Furthermore, for purposes of applying this allocation formula, a Participant shall be awarded five points for each Year of Service performed, prior to the date of acquisition, for an entity the stock or assets of which have been acquired by the Company; provided, however, such predecessor Year(s) of Service shall be determined by taking into account only service performed by the Participant on or after his or her most recent hire date as shown in the records of entity of which the stock or assets where acquired by the Company.[14]

(c)     Forfeitures Used to Pay Plan Expenses. Notwithstanding any other provision of the Plan, forfeitures arising under the Plan may be used to pay Plan expenses prior to being allocated among Participants

7.6     Limitation on Allocations to Participants. (a) General. Notwithstanding any other provisions of the Plan to the contrary, the Annual Additions credited to a Participant's Accounts and credited to the accounts for that Participant under a Related Plan for any Limitation Year, other than allocations of earnings and losses of the Trust Fund, shall not exceed an amount equal to the lesser of:

(i)     $50,000, adjusted each Limitation Year to take into account any cost-of-living increase adjustment provided for that year under Section 415(d) of the Code; or

---

[13] This sentence was added by Amendment Number Six effective for the Plan Year ending December 31, 2014.

[14] This sentence was added by Amendment Number Three effective as of January 1, 2013, and was further modified by Amendment Number Eleven effective as of October 17, 2017. The sentence added by Amendment Number Three read as: "Furthermore, for purposes of applying this allocation formula, a Participant shall be awarded five points for each Year of Service performed, prior to the date of acquisition, for an entity the stock or assets of which have been acquired by the Company."

71045293.4

(ii)  100 percent of the Compensation paid to the Participant by the Company and by any member of a Controlled Group in that Limitation Year.

The maximum amount that may be credited to a Participant's Company Stock and Other Investments Accounts in any Limitation Year, as determined pursuant to the preceding provisions of this Section 7.6(a), shall be reduced to the extent necessary to comply with the provisions of Section 415 of the Code, which are incorporated in this Plan by reference.

(b)  <u>Special Definition of Compensation</u>.  For purposes of this Section 7.6, the term "Compensation" shall include only those items specified in Section 1.415(c)-2(b) of the Treasury Regulations and shall exclude all items listed in Section 1.415(c)-2(c) of the Treasury Regulations, except that the term "Compensation" shall include earnings which are not currently includible in a Participant's gross income for federal income tax purposes by reason of Section 125, 132(f), 402(e)(3), 402(h), or 403(b) of the Code and shall include Post-Severance Compensation.  For purposes of determining the limitations of this subsection (b), any Participant who terminates his or her employment with the Company in order to perform Qualified Military Service and who subsequently is rehired by the Company upon the completion of his or her Qualified Military Service shall be deemed to have received Compensation equal to the Compensation that the Participant would have received if he or she had been employed by the Company during the period of his or her Qualified Military Service.

(c)  <u>Definition of "Annual Additions</u>."  (i)  The term "Annual Additions" means the sum of: (A) a Participant's allocable share of Company contributions and forfeitures under this Plan and under any Related Plan; plus (B) a Participant's voluntary employee contributions to any Related Plan.  Shares of Company Stock that are released from the Suspense Account during any Limitation Year shall be valued at the lesser of:  (A) a Participant's allocable share of Company contributions for that year that are used to repay the ESOP Loan; or (B) the fair market value of the Company Stock that is allocated to the Participant's Company Stock Account for that year.

(ii)  Annual Additions shall not include: (A) the direct transfer of a benefit or employee contributions from a qualified plan to this Plan; (B) rollover contributions (as described in Section 401(a)(31), 402(c)(1), 403(a)(4), 403(b)(8), 408(d)(3) and 457(e)(16) of the Code); (C) earnings or losses of the Trust fund; (D) repayments of loans made to a Participant from the Plan; or (E) repayments of amounts described in Section 411(a)(7)(B) of the Code (in accordance with Sections 411(a)(7)(C) of the Code) and 411(a)(3)(D) of the Code, repayments of contributions to a governmental plan (as defined in Section 414(d) of the Code) as described in Section 415(k)(3) of the Code, or Company restorations of benefits that are required pursuant to such repayments. Annual Additions also shall not include restorative payments, which shall include:  (A) payments made to restore losses to the Plan resulting from actions by a fiduciary for which there is reasonable risk of liability for breach of a fiduciary duty under ERISA or under other applicable federal or state laws, where similarly situated Participants are treated

20

similarly with respect to the payments; (B) payments made to restore some or all of the Plan's losses due to an action (or a failure to act) that creates a reasonable risk of liability for a breach of fiduciary duty (other than a breach of fiduciary duty arising from failure to remit contributions to the Plan); and (C) payments made pursuant to a Department of Labor order, the Department of Labor Voluntary Fiduciary Correction Program, or a court-approved settlement to restore losses to the Plan on account of a breach of fiduciary duty (other than a breach of fiduciary duty arising from failure to remit contributions to the Plan.)  Neither payments made to the Plan to make up for losses due merely to market fluctuations nor other payments that are not made on account of a reasonable risk of liability for breach of a fiduciary duty under ERISA shall be deemed to be restorative payments, and those payments will be deemed to constitute contributions that are Annual Additions.

(d)     <u>Limitations on Accounts of Highly Compensated Employees</u>.  If the limitations of subsection (a) would be exceeded in any Limitation Year for any Participant but for the application of this subsection (d), then no more than one-third of the Company contributions for that Limitation Year which are applied to the payment of principal or interest on an ESOP Loan shall be allocated to the Accounts of Highly Compensated Employees.  Any amount in excess of one-third of the Employer contributions that otherwise would be allocated to the Accounts of Highly Compensated Employees shall be allocated so that no more than one-third of the contributions used for ESOP Loan payments made in accordance with the terms of the Plan shall be allocated to the Accounts of Highly Compensated Employees, with the remaining contributions to be made to non-Highly Compensated Employees in the manner specified under Section 7.5(b).  Such one-third limit on allocations to the Accounts of Highly Compensated Employees shall be applied prior to the allocations actually being made.  The provisions of this Section 7.6(d) shall not apply if the Company is an S Corporation.

(e)     <u>Exclusion of Certain Amounts in Computing Allocations</u>.  Provided that no more than one-third of the Company contributions for a Limitation Year which are applied to the payment of principal or interest on an ESOP Loan are allocated to the Accounts of Highly Compensated Employees, the limitations of subsection (a) shall not apply for that Limitation Year to either Company contributions used to pay interest on an ESOP Loan or forfeitures of employer securities that were purchased with the proceeds of an ESOP Loan.  This Section 7.6(e) shall not apply for any Plan Year during which the Company is an "S corporation" for federal income tax purposes.

(f)     <u>Related Plans</u>.  If the limitations of Section 7.6(a) shall apply to the Accounts of any Participant for any Limitation Year, then the amounts credited to his or her accounts under any Related Plan shall be reduced to the extent required to bring the total amount allocated to his or her accounts under this Plan and under any Related Plans within the limit set forth in Section 7.6(a).  If after the reduction in the amounts credited to a Participant's accounts under any Related Plan required by this Section 7.6(f) the limitations of Section 7.6(a) still shall be exceeded, then (i) the amount credited to the

21

Participant's Accounts under this Plan shall be reduced to the extent required by Section 7.6(a), and (ii) the amount in excess of the limit set forth in Section 7.6(a) shall be an "excess amount" and shall be allocated as provided in Section 7.6(g).

(g)  Allocations of Excess Amounts.  Subject to the limitations of this Section 7.6, the portions of any Company contributions and of any forfeitures which have been allocated to a Participant under this Plan for a Limitation Year, but which cannot be credited to his or her Accounts because of the limitations imposed by this Section 7.6 (the "excess amounts"), shall be allocated among and credited to the Accounts of the remaining Participants entitled to share in the Company's contribution and forfeitures for that year, in accordance with Sections 7.3, 7.4, and 7.5.  If the Annual Additions allocated to a Participant's Account exceed the maximum permissible allocation under Section 415 of the Code, then such excessive Annual Additions shall be corrected as allowed under applicable guidance that is issued by the Internal Revenue Service, including the Employee Plan Compliance Resolution System.

(h)  Dividend Recharacterization.  If any dividend or distribution paid on Company Stock shall be recharacterized to be a Company contribution to the Plan for any Limitation Year, and if this recharacterization would cause an allocation to a Participant's Accounts to exceed the limits allowed under Section 415 of the Code for that Limitation Year, then the excess amount shall be corrected as allowed under applicable guidance that is issued by the Internal Revenue Service including the Employee Plan Compliance Resolution System.

7.7  Special Limitations for Participants Who Sell Their Stock.  (a) General.  If any person sells any shares of Company Stock to the Trustee and elects to have the federal income tax treatment of the sale determined under the provisions of Section 1042 of the Code ("Section 1042 election"), then during the nonallocation period no portion of the assets of the Plan attributable to (or allocable in lieu of) Company Stock acquired by the Plan in a sale to which Section 1042 applies may accrue or be allocated, directly or indirectly, under any Plan of the Company meeting the requirements of Section 401(a) of the Code for the benefit of:  (i) any taxpayer who makes a Section 1042 election; (ii) any individual who is related to any taxpayer who has made a Section 1042 election within the meaning of Section 267(b) of the Code, or (iii) any other person who owns after application of Section 318(a) of the Code: (A) more than 25 percent of any class of outstanding stock of the Company or of another corporation which issued the employer securities with respect to which the Section 1042 election was made; (B) more than 25 percent of any corporation which is a member of the same controlled group of corporations (within the meaning of Section 409(l)(4) of the Code) as any corporation referred to in clause (A); or (C) more than 25 percent of the total value of any class of outstanding stock of any corporation referred to in clauses (A) or (B).  For purposes of clause (C) of the preceding sentence, Section 318(a) of the Code shall be applied without regard to the employee-trust exception.  An election under Section 1042 may not be made if the Company is an S Corporation.  For purposes of this Section 7.7, the term "nonallocation period" means the

22

period of time beginning on the date of the purchase by the Trustee of Company Stock with respect to which a Section 1042 election has been made and ending on the later of (A) the date which is ten years after the date of the purchase, or (B) the date of the allocation of shares of Company Stock attributable to the final payment of any ESOP Loan incurred in connection with the purchase.

(b)     Lineal Descendants.  Notwithstanding the provisions of Section 7.7(a)(i) to the contrary, shares of Company Stock which the Trustee has purchased in a Section 1042 transaction may be allocated to the seller's lineal descendants.  However, the aggregate amount of Section 1042 Stock that may be allocated to the accounts of all lineal descendants of the seller may not exceed five percent of the Company Stock held by the Plan which is attributable to sales to the Trustee by any persons related to the seller's lineal descendants (within the meaning of Section 267(c)(4) of the Code) in transactions to which Section 1042 of the Code applied.

7.8     Special Limitations for Disqualified Persons.  (a)     General. Notwithstanding anything in this Plan to the contrary, if the Company Stock is stock of an S Corporation, then there may be no Impermissible Allocation or Impermissible Accrual during a Nonallocation Year.

(b)     S Corporation.  For purposes of this Section 7.8, the term "S Corporation" means a "small business corporation," as defined in Section 1361(a) of the Code, for which an election under Section 1362 of the Code is in effect.

(c)     Impermissible Allocation.  For purposes of this Section 7.8, the term "Impermissible Allocation" means: (i) any contribution or other annual addition (within the meaning of Section 415(c)(2) of the Code) made with respect to the Account of a Disqualified Person that otherwise would have been added to the Disqualified Person's account for a Nonallocation Year and invested in Company Stock but for the provisions of Section 7.8(a); or (ii) any other accrual of additional benefits, directly or indirectly, for the benefit of a Disqualified Person under this Plan or under any other tax-qualified plan of the Company, including a release and allocation from a suspense account, that otherwise would have been added to the Disqualified Person's account for a Nonallocation Year and invested in Company Stock but for the provisions of Section 7.8(a).

(d)     Impermissible Accrual.  For purposes of this Section 7.8, the term "Impermissible Accrual" means the holding by the Plan of Company Stock, and any assets attributable to Company Stock, for the benefit of a Disqualified Person during a Nonallocation Year.  For this purpose, assets attributable to Company Stock include any distributions, within the meaning of Section 1368 of the Code, made on Company Stock allocated to a Disqualified Person's Company Stock Account, plus any proceeds from the sale of Company Stock allocated to a Disqualified Person's Account, and earnings on either distributions or sale proceeds, whether attributable to current or prior year contributions.

71045293.4

        (e)     <u>Nonallocation Year</u>.  For purposes of this Section 7.8, the term "Nonallocation Year" means any Plan Year, if at any time during that Plan Year:

        (i)     the Plan holds Company Stock that is stock of an S Corporation; and

        (ii)     Disqualified Persons own or are deemed to own at least 50 percent of the outstanding shares of the Company's stock.

        (f)     <u>Disqualified Person</u>.  For purposes of this Section 7.8, the term "Disqualified Person" means:

        (i)     any person who, together with the members of his or her family, owns at least 20 percent of the total number of Deemed-Owned Shares of the Company; or

        (ii)     (in the case of a person not described in clause (i) above, the number of Deemed-Owned Shares of that person is at least ten percent of the total number of Deemed-Owned Shares of the Company.

In the case of a Disqualified Person described in clause (i) of this subsection (f), any member of that person's family who holds Deemed-Owned Shares shall be treated as a Disqualified Person if not otherwise treated as a Disqualified Person under clause (i) of this subsection (f).

        (g)     <u>Attribution of Ownership</u>.  For purposes of this Section 7.8, the rules of Section 318(a) of the Code shall apply for purposes of determining ownership except that, in applying Section 318(a)(1) of the Code:  (i)  the members of an individual's family shall include persons described in subsection (i) below; and (ii) Section 318(a)(4) of the Code, regarding options, shall not apply.  In addition, notwithstanding the employee trust exception in Section 318(a)(3)(B)(i) of the Code, an individual shall be treated as owning Deemed-Owned Shares of the individual.  Solely for purposes of applying subsection (j) below, this subsection (g) shall be applied after the attribution rules of subsection (j) below have been applied.

        (h)     <u>Deemed-Owned Shares</u>.  For purposes of this Section 7.8, the term "Deemed-Owned Shares" means, with respect to any person --

        (i)     the Company Stock owned by the Plan which is allocated to him or her under the Plan; and

        (ii)     his or her share of the Company Stock which is held by the Plan but which is not allocated under the Plan to the Participants.

For purposes of clause (ii) of the preceding sentence, a person's share of unallocated Company Stock held by the Plan is the amount of the unallocated stock that would be allocated to that person if the unallocated stock were allocated to all Participants in the same proportions as the most recent stock allocation under the Plan.

       (i)    <u>Member of the Family</u>.  For purposes of this Section 7.8, the term "member of the family" means, with respect to any individual:

       (i)    his or her husband or wife;

       (ii)    (any ancestor or lineal descendant of the individual or of the individual's husband or wife;

       (iii)    any brother or sister of the individual or of the individual's husband or wife and any lineal descendant of any brother or sister; and

       (iv)    the husband or wife of any individual described in clauses (ii) and (iii) above.

A husband or wife of an individual who is legally separated from that individual under a decree of divorce or separate maintenance shall not be treated as that individual's husband or wife for purposes of this subsection (i).

       (j)    <u>Synthetic Equity</u>.  For purposes of this Section 7.8, the term "Synthetic Equity" means any stock option, warrant, restricted stock, deferred issuance stock right, or similar interest or right that gives the holder the right to acquire or receive stock of the Company in the future.  Except to the extent provided in regulations issued by the Treasury Department, the term "Synthetic Equity" also includes stock appreciation rights, phantom stock units, or similar rights to future cash payments based on the value of the Company's stock or on the appreciation in the value of the Company's stock.  Synthetic Equity includes rights to future payments, payable in cash or in any form other than stock of the Company, from a Sponsoring Employer that is based on the value of the stock of the Company or appreciation in the value of the Company's stock.  Thus, Synthetic Equity includes: (i) stock appreciation rights with respect to Company stock that is payable in cash; (ii) phantom stock units with respect to stock of the Company that is payable in cash; (iii) rights to acquire assets of the Company or of a related entity, if certain conditions are met; and (iv) nonqualified deferred compensation for services rendered to a Sponsoring Employer.

       (k)    <u>Synthetic Equity Treated as Deemed-Owned Shares</u>.  Except to the extent provided otherwise in Treasury Department Regulations, for purposes of subsections (e), (f), and (g) above, in the case of a person who owns Synthetic Equity, the shares of stock of the corporation on which the Synthetic Equity is based shall be treated as outstanding stock of that corporation and Deemed-Owned Shares of that person if that treatment of the Synthetic Equity of one or more persons results in:

(i)      the treatment of any person as a Disqualified Person; or

(ii)     the treatment of any Plan Year as a Nonallocation Year.

For purposes of this subsection (k), Synthetic Equity shall be treated as owned by a person in the same manner as stock is treated as owned by a person under Section 318(a)(2) and 318(a)(3) of the Code. If without regard to this subsection (k), a person is treated as a Disqualified Person or a Plan Year is treated as a Nonallocation Year, then this subsection (k) shall not be construed to result in the person or Plan Year not being so treated.

(l)      <u>Special Definition of "Company Stock"</u>. For purposes of this Section 7.8, the term "Company Stock" shall have the same meaning as the term "Qualifying Employer Securities."

(m)     <u>Use of Triennial Calculations</u>. The number of Deemed-Owned Shares applicable to Synthetic Equity that is subject to Section 1.409(p)-1(f)(4)(iii) of the Treasury Regulations (the "Synthetic Equity Shares") shall be determined as of the first day of a three-year period (the "Determination Period"), and the number of Synthetic Equity Shares that is determined on the first day of the Determination Period shall remain fixed for the remainder of the Determination Period. The first Determination Period shall begin on January 1, 2013 (the "Initial Determination Date"), and a new Determination Period shall begin every third anniversary of the Initial Determination Date (the "Determination Anniversary Date"). The number of Synthetic Equity Shares shall be re-determined as of every Determination Anniversary Date.

7.9    <u>Transfer to Avoid Nonallocation Year</u>. (a) <u>Non-ESOP Portion of Plan</u>. Assets transferred under the Plan in accordance with this Section 7.9 shall be held in a portion of the Plan that is not an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code. Amounts held in the portion of the Plan that is not an ESOP (the "Non-ESOP Portion") shall be held in accounts that are separate from the accounts for the amounts held in the remainder of the Plan (the "ESOP Portion"). The statements provided to Participants and beneficiaries to show their interests in the Plan shall separately identify the amounts held in each portion of the Plan. Except as specifically set forth in this Section 7.9, all of the terms of the Plan apply to any amount held under the Non-ESOP Portion of the Plan in the same manner and to the same extent as to any other amount held under the Plan.

(b)     Transfers from ESOP to Non-ESOP Portion of Plan. (i) In the case of any anticipated event that the Plan Administrator determines would cause a Plan Year to become a Nonallocation Year (a "Nonallocation Event"), shares of Company Stock held in the Plan shall be transferred before the date of the Nonallocation Event from the ESOP Portion of the Plan to the Non-ESOP Portion of the Plan, as provided in subsection (ii) below. Actions that may cause a Nonallocation Event include, but are not limited to, the following: a contribution to the Plan in the form of shares of Company Stock; a distribution from the Plan in the form of shares of Company Stock; a change of investment within a

Plan Account of a Disqualified Person that alters the number of shares of Company Stock held in his or her Account; or the issuance by any of the Sponsoring Employers of Synthetic Equity. A Nonallocation Event will occur only if the event would result either in –

         (A)    Disqualified Persons owning at least 50 percent of the number of outstanding shares of Company Stock (including Deemed-Owned Shares); or

         (B)    Disqualified Persons owning at least 50 percent of the sum of (I) the number of outstanding shares of Company Stock (including Deemed-Owned Shares), plus (II) the number of shares of Synthetic Equity in the Company owned by Disqualified Persons.

         (ii)    Before a Nonallocation Event occurs, the Plan Administrator shall determine the extent to which a transfer is required to be made and shall take steps to ensure that all action necessary to implement the transfer are taken before the Nonallocation Event occurs. Except as provided for in subsection (iii) below, the total number of shares transferred, shall be charged against the Accounts of Participants who are Disqualified Persons by (A) first reducing the Company Stock Account of the Participant to whose Account is credited the largest number of shares of Company Stock (including Synthetic Equity) to the extent necessary for that Participant not to be a Disqualified Person, and thereafter by (B) reducing the Company Stock Accounts of each succeeding Participant to whose Accounts the largest number of shares of Company Stock are credited (including Synthetic Equity) to the extent necessary for that Participant not to be a Disqualified Person. Immediately following the transfer, the number of transferred shares charged against any Participant's account in the ESOP Portion of the Plan shall be credited to an account established for that Participant in the Non-ESOP Portion of the Plan.

         (iii)    Notwithstanding the provisions of subsection (ii) above, the number of shares transferred shall be charged against the Accounts of Participants who are Disqualified Persons by (A) first reducing the Company Stock Account of the Participant credited with the fewest shares of Company Stock (including Synthetic Equity) who is a Highly Compensated Employee, to the extent necessary for the Participant not to be a Disqualified Person, and thereafter by (B) reducing the Company Stock Account of each other Participant who is a Highly Compensated Employee, in order of who has the fewest shares of Company Stock (including Synthetic Equity) allocated to his or her Company Stock Account, to the extent necessary for that Participant not to be a Disqualified Person. A transfer under this subsection (iii) will be made only to the extent that the transfer results in fewer shares being transferred than in a transfer under subsection (ii), above.

         (iv)    If two or more Participants described in subsection (iii) have the same number of shares, the account of the Participant with the longest service shall be reduced first.

(v) Beneficiaries of the Plan shall be treated as Participants for purposes of this Section 7.9.

(c) <u>Income Taxes</u>. If the Trust owes income taxes on unrelated business taxable income under Section 512(e) of the Code with respect to shares of Company Stock held in the Non-ESOP Portion of the Plan, the income tax payments made by the Trustee shall be charged against the accounts of each Participant or beneficiary who has an account in the Non-ESOP Portion of the Plan, in proportion to the ratio of the shares of Company Stock in each Participant's or Beneficiary's account in the Non-ESOP Portion of the Plan to the total shares of Company Stock in the Non-ESOP Portion of the Plan. The Company shall purchase shares of Company Stock from the Trustee with cash (based on the fair market value of the shares so purchased) from each account to the extent necessary for the Trustee to make the income tax payments.

7.10 <u>Adjusting to Value of Trust Fund</u>. As of each Valuation Date, the Administrator shall determine: (i) the net worth of that portion of the Trust Fund which consists of properties other than Company Stock (the "Investment Fund"); and (ii) the increase or decrease in the net worth of the Investment Fund since the last Valuation Date. The net worth of the Investment Fund shall be the fair market value of all properties held by the Trustee under the Trust Agreement other than Company Stock, net of liabilities other than liabilities to Participants and their beneficiaries. The Administrator shall allocate to the Other Investments Account of each Participant that percentage of the increase or decrease in the net worth of the Investment Fund equal to the ratio which the balance credited to the Participant's Other Investments Account bears to the total amount credited to all Other Investments Account. This allocation shall be made after application of Section 7.2, but before application of Sections 7.4, 7.5, and 7.6.

7.11 <u>Participant Statements</u>. Each Plan Year, the Administrator will provide each Participant with a statement of his or her Account balances as of the most recent Valuation Date. This statement shall show the value of the Company Stock credited to a Participant's Company Stock Account, which value shall be determined by an independent appraiser.

## ARTICLE VIII.

## RETIREMENT DATES

8.1     <u>Normal Retirement Date</u>.  The term "Normal Retirement Date" means the date on which a Participant's employment with the Company is terminated for any reason on or after the date on which he or she attains age Normal Retirement Age.

8.2     <u>Disability Retirement Date</u>.  The term "Disability Retirement Date" means the date that a Participant becomes Disabled.

8.3     <u>Retirement Date</u>.  The term "Retirement Date" means a Participant's Normal Retirement Date or Disability Retirement Date, as the case may be.

71045293.4

# ARTICLE IX.

## VESTING OF ACCOUNT BALANCES

9.1     Vesting on Retirement.  If a Participant attains Normal Retirement Age, the balances credited to his or her Accounts will be fully vested and will be distributed to him or her, or for his or her benefit, as provided in Article X.

9.2     Vesting on Disability.   If a Participant becomes Disabled while in the employ of the Company, the balances credited to his or her Accounts will be fully vested and will be distributed to him or her, or for his or her benefit, as provided in Article X.

9.3     Vesting on Death.   If a Participant dies while in the employ of the Company, the balances credited to his or her Accounts will be fully vested and will be distributed to or for the benefit of his or her beneficiary, as provided in Article X.  If a Participant dies while performing qualified military service for a period of longer than 30 days, that Participant's beneficiary shall be eligible for any additional benefits that would have been provided under the Plan if the Participant had resumed employment on the day prior to his or her death and then terminated employment due to death (other than benefits accruals relating to the period of qualified military service).

9.4     Vesting on Other Termination.  (a) Schedule.  A Participant shall have a vested and nonforfeitable right to a percentage of the balances credited to his or her Company Stock and Other Investments Accounts, as determined in accordance with the schedule set forth below.  If either of the conditions described in subsections (a) and (b) of Section 3.2 shall occur, then the balances credited to the Participant's Company Stock and Other Investments Accounts shall be reduced, as of the last day of the Plan Year in which the condition first occurs, to an amount equal to that percentage of the balances credited to the Participant's Company Stock and Other Investments Accounts as is determined in accordance with the following schedule, as applicable[15]:

| Number of Completed Years of Service | Percentage |
|---|---|
| One Year | one-third |
| Two years | two-thirds |
| Three years | 100% |

| Number of Completed Years of Service | Percentage |
|---|---|
| | |

---

[15] This section was modified by Amendment Number Seven effective as of September 30, 2015 and again by Amendment Number Twelve effective as of January 1, 2020.

|  | Category (III) | Category (II) | Category (I) |
|---|---|---|---|
| One Year | 0% | 0% | One-third |
| Two Years | 25% | 25% | Two-thirds |
| Three Years | 50% | 100% | 100% |
| Four Years | 75% | 100% | 100% |
| Five Years or more | 100% | 100% | 100% |

For purposes of the vesting schedule above:

  (i) The vesting percentages in Category (III) of the above table shall apply to any Participant whose first day of Service is on or after January 1, 2020, and to all amounts credited to such Participant's Company Stock and Other Investments Accounts.

  (ii) The vesting percentages in Category (II) of the above table shall apply to any Participant whose first day of Service was prior to January 1, 2020 and who became a Participant in the Plan on or after October 1, 2015, and to all amounts credited to such Participant's Company Stock and Other Investments Accounts.

  (iii) The vesting percentages in Category (I) of the above table shall apply to any Participant whose first day of Service was prior to January 1, 2020 and who became a Participant in the Plan prior to October 1, 2015, and to all amounts credited to such Participant's Company Stock and Other Investments Accounts.

The vesting percentages with respect to Participants who entered the Plan prior to January 1, 2020, but as of December 31, 2019 no longer have an Account in the Plan were determined in accordance with the provisions of the Plan in effect at such time.

  (b)  Vesting and Forfeitures. The vested percentage of the balances credited to the Participant's Accounts will be distributed to him or her for his or her benefit as provided in Article X. The portions of the balances credited to the Participant's Company Stock and Other Investments Accounts which he or she is not entitled to receive by reason of the application of the schedule set forth in subparagraph (a) of this Section 9.4 will be "forfeitures" and will be allocated and credited in accordance with Section 7.5. Forfeitures shall first be charged against a Participant's Other Investments Account. If the amount forfeited exceeds the amount credited to the Participant's Other Investments Account, the balance then shall be charged against his or her Company Stock Account.

  9.5  Determination of Account Balances. All determinations of the balances credited to the Accounts of Participants required pursuant to this Article IX shall be made as of the last day of the Plan Year during which the event giving rise to the determination occurs. All Other Investments and Transfer Accounts shall continue to share in the

changes in the value of the Investment Fund, pursuant to Section 7.10, until they are distributed.

9.6 <u>Reinstatement of Forfeitures</u>. This Section 9.6 shall apply if the following events shall occur: (a) a Participant separates from service with less than a 100-percent vested interest in the balances credited to his or her Company Stock and Other Investments Accounts; (b) the Participant receives a distribution of his or her vested interest in these Accounts prior to incurring five consecutive One-Year Breaks-in-Service; (c) the Participant returns to service with the Company before incurring five consecutive One-Year Breaks-in-Service; and (d) the Participant repays to the Trustee the full amount that was distributed from his or her Accounts. Upon repayment by the Participant of the amounts that were distributed from his or her Accounts: (i) there shall be restored to the Participant's Company Stock Account that number of Shares that have a value equal to the value of the Shares that previously were forfeited from his or her Company Stock Account (determined as of the date of the forfeiture); and (ii) there shall be restored to the Participant's Other Investments Account the amount that was forfeited from that Account. Any reinstatement of forfeited amounts under this Section 9.6 shall be made from amounts forfeited under Section 9.4 or from additional contributions by the Company. Neither Section 7.6 (which imposes limitations on allocations to Participants) nor Section 4.3 (which imposes limitations on contributions by the Company) shall apply to a reinstatement under this Section 9.6.

71045293.4

**ARTICLE X.**

**DISTRIBUTION OF PLAN BENEFITS**

10.1 <u>Method of Distribution</u>. [16] ~~Subject to the~~Effective with respect to distributions commencing on or after October 4, 2019, and subject to all other applicable provisions of this Article X, distribution of the balances credited to a Participant's Accounts, determined as of the most recent Valuation Date preceding the distribution date, will be made by the Trustee in a single lump sum. Prior to October 4, 2019, distributions were made by either of the following methods, as directed by the Company:

(a) for account balances of $25,000 or less, by payment in a lump sum; or

(b) for account balances of more than $25,000, by payment in a series of substantially equal annual or more frequent installments over a period not to exceed five years. However, the period over which installments ~~may be~~were paid may ~~be~~have been extended by one year for each $200,000 or fraction thereof by which the balances credited to the Participant's Accounts ~~exceeds~~exceeded $1,015,000 (but the period over which installments may be paid ~~may~~could not be extended by more than four years). The $200,000 and $~~1,0105,000~~1,015,000 amounts ~~will be~~are adjusted each year, as applicable, to take into account any cost-of-living increase adjustment provided for that year under Section 409(o) of the Code. Notwithstanding the foregoing, in the event that this Section 10.1 is amended in such a manner that distributions commencing after October 4, 2019 will be paid in the form of annual installments over five years, the extension for large balances described in this paragraph shall be applied so that the period over which installments may be paid may not be extended by more than five years.

Notwithstanding the foregoing, with respect to any Participant who commenced installment distributions prior to October 4, 2019 and has an unpaid vested balance in his or her Accounts, distribution of such remaining balance shall, at the election of the Participant, continue in the form of annual installments in accordance with paragraph (b) or be paid in a single lump sum. Any such elected lump sum distribution shall be paid as soon as administratively feasible after the Participant's election based on the value of the Participant's vested Accounts as of the Valuation Date immediately preceding the date of the distribution.

10.2 <u>Form of Distribution</u>. (a) <u>Company Stock Account</u>. (i) <u>Restricted Company Stock Ownership</u>. For so long as either the Company is an "S corporation" for federal income tax purposes or the articles of incorporation or the by-laws of the Company restrict the ownership of substantially all outstanding shares of stock of the Company to current employees of the Company and to the Trust, then distribution of the balance credited to a Participant's Company Stock Account shall be made in the form of either (A)

---

[16] This Section was modified by Amendment Number Twelve effective as of October 4, 2019.

cash, or (B) Company Stock, subject to the requirement that the Company Stock be immediately sold to the Company or back to the Trust at a price equal to its fair market value. Fair market value shall be determined under a fair valuation formula, as described in Code Section 409(h)(1)(B), that meets the requirements of Section 5.4 hereunder.[17] Provided, however, if the Company is an "S Corporation" for federal income tax purposes, any distributions of Company Stock in accordance with the provisions of Code Section 409(h)(2) (as described herein) shall be limited in time, number and manner so as not to violate the eligible shareholder and maximum shareholder rules of Code Section 1361(b).[18] Payment for any Company Stock immediately sold to the Company or back to the Trust pursuant to this paragraph shall commence within 30 days after distribution and may be made either in a lump sum or, if the Company Stock was distributed in a lump sum, in substantially equal periodic installments no less frequently than annually over a period not exceeding five years, with adequate security provided and interest payable at a reasonable rate on any unpaid installment balance (as determined by the Company).[19]

(ii)     Unrestricted Company Stock Ownership.  If the Company is not an "S corporation" for federal income tax purposes and if neither the articles of incorporation nor the by-laws of the Company restrict ownership of substantially all outstanding shares of the stock of the Company to current employees of the Company and to the Trust, then the distribution of the balance credited to a Participant's Company Stock Account shall be made in cash or in whole shares of Company Stock, in cash, or partly in each, as elected by the Participant.  Before making any distribution to a Participant from his or her Company Stock Account in cash, the Administrator shall notify the Participant of his or her right to demand that the amounts credited to his or her Company Stock Account be distributed in the form of Company Stock.  If the Participant makes this demand, the Trustee shall distribute the Participant's benefits entirely in whole shares of Company Stock, except that the value of any fractional share shall be paid in cash.

(b)     Other Investments and Transfer Accounts.  Distributions of the balances credited to a Participant's Other Investments and Transfer Accounts shall be made in cash or in property, or partly in each, as determined by the Trustee.  Subject to the provisions of Section 10.2(a)(i), a Participant will have the right to elect to receive his or her distribution in the form of Company Stock from any of his or her Accounts.

10.3     Distributions After Death.  If a Participant dies before the entire balance credited to his or her Accounts has been distributed, the remaining balance shall be payable in full upon the death of the Participant to the Participant's surviving spouse. However, the remaining balance may be paid to a beneficiary designated by the Participant in accordance

---

[17] This sentence was added by Amendment Number Seven effective as of January 1, 2016 and was modified by Amendment Number Twelve effective as of October 4, 2019. As modified by Amendment Number Seven, this sentence read as: "Fair market value shall be determined under a fair valuation formula, as described in Code Section 409(h)(1)(B)."
[18] This sentence was added by Amendment Number Seven effective as of January 1, 2016.
[19] This sentence was added by Amendment Number Twelve effective as of October 4, 2019.

with Section 10.12 if either one of the following conditions is satisfied: (a) the surviving spouse of the deceased Participant has consented in writing to the payment of the balances credited to the Participant's Accounts to the beneficiary and the spouse's consent acknowledges the effect of the consent and has been witnessed by the Administrator or by a notary public; or (b) it is established to the satisfaction of the Administrator that the consent could not be obtained because the Participant was not married, because the Participant's spouse cannot be located, or because of any other circumstances that the Secretary of the Treasury may prescribe by regulation. Any consent by a spouse under this Section 10.3, or any establishment that the consent of a spouse cannot be obtained, shall be effective only with respect to that spouse. Any consent by a spouse under this Section 10.3 must acknowledge the beneficiary designated by the Participant, including any class of beneficiaries or any contingent beneficiaries; and the Participant may not subsequently change beneficiaries without the consent of his or her spouse. Any consent by a spouse pursuant to this Section 10.3 shall be irrevocable. If there is no surviving spouse upon the death of a Participant, the balances credited to the Participant's Accounts shall be paid to the beneficiary designated by the Participant in accordance with Section 10.12.

10.4    Time of Distribution. (a) Other Investments and Transfer Accounts. The distribution of the balances credited to a Participant's Other Investments Account shall be made or commence within one year after the close of the Plan Year in which he or she terminates employment with the Company.

(b)    Company Stock Account. If a Participant separates from service by reason of death, Disability or attainment of Normal Retirement Age, distribution of the balance credited to his or her Company Stock Account shall be made or commence within one year after the close of the Plan Year in which he or she terminates employment with the Company. If a Participant's service with the Company is terminated for any reason other than death, Disability, or retirement following the attainment of Normal Retirement Age, distribution of the balance credited to his or her Company Stock Account shall be made or commence as soon as practicable following the receipt of appropriate election forms within thirty (30) days (or such other period designated by the Administrator) after receiving such election forms and, in any case,[20] not later than one year after the close of the Plan Year which is the fifth Plan Year following the Plan Year in which the Participant's employment with the Company is terminated (unless the Participant is reemployed by the Company before distributions are required to be made or commence). If a Participant becomes actively employed by the Company at any time while installment distributions are being made, the installment distributions shall continue to be made in accordance with Sections 10.1 and 10.2 of the Plan.

(c)    Company Stock Accounts of Inactive Participants. In any year that a Participant who has terminated employment with the Employer or who has had an Account established as an Alternate Payee ("Inactive Participant") has shares of Company

---

[20] This sentence was modified by Amendment Number Twelve effective as of October 4, 2019.

Stock in his Account, the Administrator shall determine the total amount of cash and liquid assets held within the Plan that should remain available for the purpose of paying current and future distributions, implementing Participants' current and future diversification elections, paying legitimate expenses of Plan administration, and any other reasonable and proper obligations of the Plan. In the event the Administrator determines that, in a particular year, a portion of the cash and liquid assets held within the Plan exceeds the amount reasonably necessary to satisfy the foregoing obligations, the Administrator shall, on a nondiscriminatory basis, exchange such portion of the cash or other liquid assets held in the Accounts of Participants who are actively employed by the Employer ("Active Participants") for the shares of Company Stock held in the Inactive Participants' Accounts, at an exchange rate determined based on the most recent appraised fair market value of Company Stock. Such exchange shall be made pro rata based on the amount of assets, other than Company Stock, allocated to the Accounts of the Active Participants. In the event that there is not sufficient cash or other liquid assets in the Active Participants' Accounts to exchange for all of the shares of Company Stock in the Inactive Participants' Accounts, the exchange shall be pro rata based upon the amount of Company Stock in the Inactive Participants' Accounts. Subject to the requirements of Section 14.3, the proceeds of any exchange implemented pursuant to this Section 10.4(c) and allocated to the Account of an Inactive Participant shall be transferred as soon as reasonably practicable to an account existing or established on behalf of such Participant in the West Monroe Partners, LLC 401(k) Plan.[21]

(d)     Deferral of Distribution. A Participant whose Vested Account balances exceed $1,000balance exceeds $5,000 may elect to defer distribution of his or her benefits until the time specified below in Section 10.5. No distribution of theIf a Participant's Vested Account balances thatbalance does not exceed $1,000 shall be made to a Participant without his or her consent5,000, such balance shall be distributed to the Participant in a lump sum payment, or if directed by the Participant, in a Direct Rollover distribution, as soon as administratively practicable following the end of the Plan Year in which the Participant terminated employment with the Company. If a Participant's Vested Account balance exceeds $1,000, but is equal to or less than $5,000, and if the Participant does not elect a Direct Rollover distribution, or to receive the distribution directly, the Plan Administrator will provide the distribution in the form of a Direct Rollover to an individual retirement account designated by the Plan Administrator.[22]

(e)     Special Rules. Notwithstanding anything to the contrary set forth in paragraphs (a), (b), or (c) of this Section 10.4, unless a Participant elects otherwise, the distribution of his or her benefits shall commence not later than the sixtieth day after the close of the Plan Year in which the later of the following events occur: (i) the attainment of Normal Retirement Age by the Participant; (ii) the tenth anniversary of the year in which

---

[21] This sentence was added by Amendment Number Four effective as of January 1, 2014 and then modified by Amendment Number Five effective as of January 1, 2014.
[22] This subsection was modified by Amendment Number Four effective as of January 1, 2014.

71045293.4

the Participant commenced participation in the Plan; or (iii) the termination of the Participant's service with the Company.

10.5  <u>Minimum Distribution Requirements</u>. (a) <u>Definitions</u>.  For purposes of this Section 10.5, the following terms shall have the meanings set forth below.

(i)  <u>Designated Beneficiary</u>.  The term "Designated Beneficiary" means the individual who is designated as the beneficiary of a Participant under Section 10.12 and who is the Participant's "designated beneficiary" within the meaning of Section 401(a)(9) of the Code and Section 1.401(a)(9)-1, Q&A-4, of the Treasury Regulations.

(ii)  <u>Distribution Calendar Year</u>.  The term "Distribution Calendar Year" means a calendar year for which a minimum distribution is required under the terms of this Article X or under Section 401(a)(9) of the Code. For distributions beginning before a Participant's death, the first Distribution Calendar Year shall be the calendar year which contains the Participant's Required Beginning Date.  For distributions beginning after a Participant's death, the first Distribution Calendar Year shall be the calendar year in which distributions are required to commence under Section 10.5(c).

(iii)  <u>Required Beginning Date</u>.  The term "Required Beginning Date" means:  (A) for any Participant other than a "five-percent owner" of the Company (as that term is defined in Section 416(i)(1)(B)(i) of the Code), April 1st of the calendar year immediately following the calendar year in which the Participant terminates employment after attaining age 70½; (B) for any Participant who is a "five-percent owner" of the Company, April 1st of the calendar year immediately following the calendar year in which he or she attains age 70½, regardless of whether he or she has terminated employment with the Company; and (C) for any Participant who dies before distributions from his or her Accounts commence, the latest of the dates specified in Section 10.5(c).  Distributions to a Participant shall be made in accordance with Section 401(a)(9) of the Code and the regulations thereunder.

(b)  <u>Commencement of Distributions</u>.  Notwithstanding anything to the contrary set forth in paragraph (a), (b), or (c) of Section 10.4, distribution of a portion of the balances credited to a Participant's Accounts equal to the minimum distribution required by Section 401(a)(9) of the Code and by subsection (d) or (e) of this Section 10.5 (the "Required Minimum Distribution") shall be made no later than the Participant's Required Beginning Date in the Participant's first Distribution Calendar Year, except that if the Participant dies before his or her Required Beginning Date, then the Required Minimum Distribution shall be made on or before December 31st of the Distribution Calendar Year in which his or her Required Beginning Date occurs.  Required Minimum Distributions in Distribution Calendar Years after the Participant's first Distribution Calendar Year shall be made on or before December 31st of each year.

(c)     Death of Participant Before Distributions Are Made or Commence.
If a Participant dies before distributions from his or her Accounts commence, then the
balances credited to the Participant's Accounts shall be distributed, or shall commence to
be distributed, no later than the latest of the following dates:

(i)     if the Participant's surviving spouse is his or her sole
Designated Beneficiary, then distributions to the surviving spouse will commence
by December 31st of the calendar year immediately following the calendar year in
which the Participant died, or by December 31st of the calendar year in which the
Participant would have attained age 70½, if later;

(ii)    if the Participant's surviving spouse is not his or her sole
Designated Beneficiary, then distributions to the Designated Beneficiary will
commence by December 31st of the calendar year immediately following the
calendar year in which the Participant died;

(iii)   if there is no Designated Beneficiary as of September 30th of
the calendar year following the calendar year in which the Participant died, then the
balances credited to the Participant's Accounts will be distributed by December
31st of the calendar year that includes the fifth anniversary of the Participant's
death; and

(iv)    if the Participant's surviving spouse is the Participant's sole
Designated Beneficiary and the surviving spouse dies after the Participant but
before distributions from the Participant's Accounts to the surviving spouse
commence, then the provisions of this Section 10.5(c), other than Section
10.5(c)(i), shall apply as if the surviving spouse was the Participant.

(d)     Required Minimum Distributions During Participant's Lifetime.
During a Participant's lifetime, the minimum amount that shall be distributed for each
Distribution Calendar Year is the lesser of:

(i)     the quotient obtained by dividing (A) the balances credited
to the Participant's Accounts, by (B) the number of calendar years in the
distribution period, as set forth in the Uniform Lifetime Table in Section
1.401(a)(9)-9 of the Treasury Regulations, determined by reference to the
Participant's age as of the Participant's birthday in the Distribution Calendar Year;
or

(ii)    if the Participant's sole Designated Beneficiary for the
Distribution Calendar Year is the Participant's spouse, then the quotient obtained
by dividing (A) the balances credited to the Participant's Accounts, by (B) the
number of calendar years in the distribution period, as set forth in the Joint and Last
Survivor Table in Section 1.401(a)(9)-9 of the Treasury Regulations, determined

by reference to the age of the Participant and the age of the spouse as of their respective birthdays in the Distribution Calendar Year.

Required minimum distributions shall be determined under this Section 10.5(d) beginning with the first Distribution Calendar Year and up to and including the Distribution Calendar Year that includes the Participant's date of death.

(e) <u>Required Minimum Distributions After Participant's Death</u>. (i) If the Participant dies on or after the date distributions commence from his or her Accounts and there is a Designated Beneficiary, then the minimum distribution for each Distribution Calendar Year after the calendar year of the Participant's death shall be equal to the quotient obtained by dividing (A) the balances credited to the Participant's Accounts, by (B) the greater of the remaining life expectancy of the Participant or the remaining life expectancy of the Participant's Designated Beneficiary, determined as set forth below and pursuant to the Single Life and Joint Survivor Annuity Tables set forth in Section 1.401(a)(9)-9 of the Treasury Regulations.

(ii) The Participant's remaining life expectancy equals the number of years of the Participant's remaining life expectancy in the year of his or her death, calculated using the age of the Participant in that year, minus the number of calendar years that have expired subsequent to his or her death.

(iii) If the Participant's surviving spouse is the Participant's sole Designated Beneficiary, the remaining life expectancy of the surviving spouse shall be calculated for each Distribution Calendar Year after the calendar year of the Participant's death by reference to the surviving spouse's age as of the spouse's birthday in the applicable calendar year. For Distribution Calendar Years after the calendar year of the surviving spouse's death, the remaining life expectancy of the surviving spouse shall equal the number of years of the surviving spouse's life expectancy in the year of his or her death, calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death, minus the number of calendar years subsequent to his or her death.

(iv) If the Participant's surviving spouse is not the Participant's sole Designated Beneficiary, then the Designated Beneficiary's remaining life expectancy shall be equal to the number of years of the Designated Beneficiary's life expectancy, calculated using the age of the Designated Beneficiary in the calendar year following the calendar year of the Participant's death, minus the number of calendar years that have expired subsequent to the Participant's death.

(f) <u>No Designated Beneficiary</u>. If the Participant dies on or after the date distributions commence from his or her Accounts and there is no Designated Beneficiary as of September 30th of the calendar year following the calendar year of the Participant's death, then the minimum amount that will be distributed to the Participant's executor or administrator for each Distribution Calendar Year after the calendar year of the

Participant's death shall be an amount equal to the quotient obtained by dividing (i) the balances credited to the Participant's Accounts, by (ii) the difference between (A) the Participant's remaining life expectancy, determined pursuant to the Uniform Lifetime Table in Section 1.401(a)(9)-9 of the Treasury Regulations, based on the Participant's age in the calendar year of his or her death, and (B) the number of calendar years subsequent to the Participant's death.

(g)     Required Minimum Distribution if Participant Dies Before Distributions Commence. (i) Participant Survived by Designated Beneficiary.  If the Participant dies before the date distributions from his or her Accounts commence and there is a Designated Beneficiary, then the minimum amount that will be distributed for each Distribution Calendar Year after the calendar year of the Participant's death shall be equal to the quotient obtained by dividing (A) the balances credited to the Participant's Account, by (B) the remaining life expectancy of the Participant's Designated Beneficiary, determined as provided in Section 10.5(e).

(ii)     Death of Surviving Spouse Before Distributions to Surviving Spouse Are Required to Commence.  If the Participant dies before the date distributions from the Participant's Accounts commence, the Participant's surviving spouse is the Participant's sole Designated Beneficiary, and the surviving spouse dies before distributions from the Participant's Accounts are required to commence to the surviving spouse under Section 10.5(c)(i), then this Section 10.5(g) will apply as if the surviving spouse was the Participant.

(h)     Forms of Distribution.  Unless distributions commence from an annuity contract or are paid in a lump sum on or before the Required Beginning Date, as of the first Distribution Calendar Year distributions will be made in accordance with Sections 10.5(d) and 10.5(e).

10.6     Diversification of Company Stock Account.  A Participant who is an active Employee of the Company, who has attained age 50, and who has completed at least ten years of participation in the Plan shall be notified of his or her right to elect to direct the transfer of a portion of the number of shares credited to his or her of Company Stock Account to an account in his or her name in another tax-qualified plan maintained by the Company, to be invested at the direction of the Participant among three or more investment funds consisting of differing types of properties and offering different degrees of risk and potential reward.  An election to transfer shares must be made on a form prescribed by the Administrator and filed with the Administrator within the 90-day period immediately following the close of any Plan Year within the "Election Period."  The "Election Period" is the period of eleven consecutive Plan Years beginning with the Plan Year in which the Participant first becomes eligible to make a transfer.  For each of the first ten Plan Years in the Election Period, the Participant may elect to transfer that number of shares which does not exceed: (a) 25 percent of the number of shares of Company Stock credited to his or her Company Stock Account (including shares of Company Stock acquired by or contributed

40

to the Plan that have ever been allocated to the Participant's Account on or before the most recent allocation date), without reduction for any shares of Company Stock distributed pursuant to Section 10.14, less (b) all shares previously transferreddiversified[23] pursuant to this Section 10.6.  In the case of the last Plan Year in the Election Period, the preceding sentence shall be applied by substituting "50 percent" for "25 percent."  Any amount which a Participant elects to transfer to another tax-qualified plan maintained by the Company under this Section 10.6 shall be transferred to that plan within 90 days after the 90-day period in which the election may be made.

     10.7    Rollover Distributions.   (a)    Election.   A distributee may elect, in accordance with the administrative rules and procedures prescribed by the Administrator, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

     (b)    Definitions.   (i)    Eligible Rollover Distributions.   An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: (A) any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; (B) any distribution to the extent the distribution is required under Section 401(a)(9) of the Code; or (C) any distribution that is made on account of a hardship.

     (ii)    Eligible Retirement Plan.   An "eligible retirement plan" is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, a qualified trust described in Section 401(a) of the Code that accepts the distributee's eligible rollover distribution, an annuity contract described in Section 403(b) of the Code, a "Roth IRA" under Section 408A of the Code, or an eligible plan under Section 457(b) of the Code which is maintained by a state, by a political subdivision of a state, or by any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into that plan from this Plan.  The definition of eligible retirement plan shall also apply in the case of a distribution to a surviving spouse or to a spouse or former spouse who is the alternative payee under a "qualified domestic relation order," as that term is defined in Section 414(p) of the Code.

     (iii)    Distributee.   A "distributee" includes (a) an Employee or former Employee; (b) an Employee or former Employee's surviving spouse and the Employee or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as that term is defined in Section 414(p) of the Code;

---

[23] This sentence was modified by Amendment Number Twelve effective as of January 1, 2020.

and (c) a nonspouse beneficiary of an Employee or former Employee. However, a "distributee" who is a nonspouse beneficiary of an Employee or former Employee may only direct a trustee-to-trustee transfer of a direct rollover to an individual retirement account described in Code Section 408(a) or to an "inherited" individual retirement annuity described in Code Section 408(b), which shall be treated as an inherited individual retirement account in accordance with the provisions of Code Section 402(c)(11).

(iv)     Direct Rollover. A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

10.8     Dividends and Distributions on Company Stock. (a) Until an ESOP Loan is repaid in full, any cash dividends or distributions received by the Trustee with respect to Company Stock purchased with the proceeds of such ESOP Loan shall be used to repay that ESOP Loan. In no event may cash dividends or distributions with respect to Company Stock be applied to repayment of an ESOP Loan other than the ESOP Loan the proceeds of which were utilized to purchase such Company Stock. If dividends or distributions on Company Stock held in the Plan are used to repay an ESOP Loan, then the shares of Company Stock that are released from the Suspense Account by reason of the dividends or distributions shall be allocated to Participants' Company Stock Accounts on the following basis:

(i)     first, shares of Company Stock with a fair market value at least equal to the dividends or distributions paid with respect to the Company Stock allocated to the Participants' Accounts shall be allocated among the Company Stock Accounts of the Participants in proportion to the number of shares of Company Stock allocated to their Accounts as of the record date of the dividends or distributions; and

(ii)     then any remaining shares of Company Stock which are released from the Suspense Account by reason of dividends or distributions paid on those shares shall be allocated as provided in Section 7.5(b).

(b)     If so determined by the Board of Directors of the Company and provided that the Company is at the time a C corporation, any cash dividends received by the Trustee on Company Stock allocated to the Company Stock Accounts of Participants which are not required to be used to repay an ESOP Loan may be paid currently (or within 90 days after the end of the Limitation Year in which the dividends are paid to the Trustee) in cash by the Trustee to the Participants (or to their beneficiaries), in proportion to the amounts of Company Stock allocated to their Company Stock Accounts as of the record date of the dividends. Alternatively, the Company may pay the dividends directly to Participants or beneficiaries. Any distribution of cash dividends will be limited to dividends on shares of Company Stock which are then vested.

(c)     If so determined by the Board of Directors of the Company, any cash dividends received by the Trustee on Company Stock allocated to the Suspense

42

Account which are not required to be used to repay an ESOP Loan may be allocated to the Participants' Other Investments Accounts, as provided in Article VII, or may be distributed to the Participants as provided for in subparagraph (b) of this Section 10.8.

10.9 <u>Distributions To Persons Under Disability</u>. Notwithstanding any provisions of this Article X to the contrary, if a Participant, surviving spouse, or beneficiary is declared incompetent and a conservator or other person legally charged with the care of his or her person or of his or her estate is appointed, then any benefits to which that Participant, surviving spouse, or beneficiary is entitled shall be paid to the conservator or other person. Except as provided above in this Section 10.9, when the Administrator, in its sole discretion, determines that a Participant, surviving spouse, or beneficiary is unable to manage his or her financial affairs, the Administrator may direct the Trustee to make distributions to any person for the benefit of the Participant, surviving spouse, or beneficiary.

10.10 <u>Benefits may not be Assigned or Alienated</u>. The benefits payable to any person under this Plan may not be voluntarily or involuntarily assigned or alienated. However, the provisions of this Section 10.10 shall not apply to: (a) the creation, assignment, or recognition of a right to any benefit payable with respect to a Participant pursuant to a "qualified domestic relations order," as that term is defined in Section 414(p) of the Code; or (b) offsets against a Participant's benefits authorized under Section 401(a)(13)(C) of the Code.

10.11 <u>No Guarantee of Benefits</u>. The benefits provided under the Plan for any Participant shall be paid solely from that Participant's Accounts.

10.12 <u>Beneficiaries</u>. Subject to the provisions of Section 10.3, each Participant may designate any legal or natural person to receive any benefits payable under the Plan on account of his or her death. Each designation by a Participant shall be in writing and shall be filed with the Administrator in the form that the Administrator requires. If a Participant dies while performing qualified military service for a period of longer than 30 days, that Participant shall be treated as if he or she had resumed employment on the day prior to his or her death and then terminated employment due to death for purposes of determining the method pursuant to which that Participant's Account balances shall be distributed to his or her beneficiary. Subject to the provisions of Section 10.3, a beneficiary may change or revoke a direction as to the manner in which his or her benefits are to be paid, or may make a direction if none has been made, at any time prior to the payment of his or her benefits by the Trustee. Subject to the provisions of Section 10.3, and provided that payment of benefits has not already commenced, a Participant may change his or her beneficiary designation at any time and from time to time without the consent of or notice to any person previously designated by him or her by a writing filed with the Administrator. If no person has been designated by a Participant, or if all persons so designated predecease the Participant or die prior to complete distribution of his or her benefits, then the Administrator shall direct the Trustee to distribute the Participant's benefits to the

71045293.4

Participant's executor or administrator.  In no event may the beneficiary of a deceased Participant designate a beneficiary.

10.13   <u>Participant's Consent to a Distribution</u>.  Notwithstanding anything to the contrary set forth in Section 10.4, no distributions shall be made or commence to a Participant without his or her written consent, unless the entire balance credited to the Participant's Accounts is $1,000 or less or unless the distribution is required to be made or commence in accordance with the minimum-distribution requirements set forth in Section 10.5.  The Administrator shall furnish a written explanation of the distribution options available under the Plan, including a rollover distribution, to each Participant who is entitled to receive a distribution under this Article X within 30 to 180 days prior to the distribution.  A distribution may be made or commence less than 30 days after the explanation is given to the Participant only if the Participant is advised that he or she has at least 30 days in which to elect a distribution and the Participant elects a distribution.

10.14   <u>In-Service Distribution.</u>[24]

(a)   Special 2020 One-Time In-Service Distribution Right. During a 30-day period beginning on a date specified by the Administrator and communicated to Participants, which date shall be as soon as administratively feasible following the determination of the value of the Company Stock as of December 31, 2019 and in any event no later than September 1, 2020 (the "2020 Election Window"), the Company shall offer eligible Participants an opportunity, on a non-discriminatory basis and in accordance with the provisions of Code Section 401(a)(4) and the regulations promulgated thereunder, to make a special one-time election for an in-service withdrawal from his or her vested Company Stock Account, as described below, to be administered in accordance with the provisions described below and procedures to be established by the Administrator:

(i)   Any active Participant who is fully vested in his or her Accounts, and who has shares of Company Stock credited to his or her Company Stock Account as of December 31, 2019 shall have the right, during the 2020 Election Window, to make an election to receive a distribution of up to 25 percent (25%) of the shares of Company Stock allocated to his or her Company Stock Account based on the value of such Company Stock as of December 31, 2019.

(ii)   A Participant's in-service distribution election made pursuant to this Section 10.14(a) shall be provided to the Administrator, in writing, on a form provided by the Administrator, no later than the close of the 2020 Election Window and shall be effective as soon as administratively practicable following the close of the 2020 Election Window.

(iii)   A Participant's in-service distribution election made during the 2020 Election Window pursuant to this Section 10.14(a) shall be accomplished

_____

[24] This Section was added by Amendment Number Twelve effective as of January 1, 2020.

by a single cash distribution of an amount equal to the value, determined as of December 31, 2019, of the number of vested shares of Company Stock in the Participant's Company Stock Account, as elected by the Participant, to be distributed, or a distribution of such shares of Company Stock elected hereunder, subject to the requirement that the Company Stock be immediately sold to the Company or back to the Trust at a price equal to its fair market value. Fair market value shall be determined as described in Section 10.2(a)(i) hereof.

(iv)     Notwithstanding anything herein to the contrary, the maximum amount, in the aggregate, eligible to be distributed pursuant to this Section 10.14(a) shall be $5,000,000. In the event that Participants otherwise eligible to receive an in-service distribution under this Section 10.14(a) request such in-service distributions that in the aggregate would exceed $5,000,000 (the "Overall 2020 Special In-Service Distribution Cap"), then each in-service distribution election made by Participants during the 2020 Election Window shall be proportionately reduced so that the aggregate in-service distribution elections made by all Participants does not exceed the Overall 2020 Special In-Service Distribution Cap.

## ARTICLE XI.

## SHAREHOLDER RIGHTS AND RESTRICTIONS

11.1    Voting of Company Stock.  Except as otherwise provided below in this Section 11.1, the Trustee shall vote the shares of Company Stock held in the Trust Fund with respect to all matters as directed by the Board of Directors of the Company. Each Participant will be entitled to direct the Trustee as to how to vote the shares of Company Stock allocated to his or her Company Stock Account with respect to any proposed merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all the assets of a trade or business, or any similar transactions that are specified in regulations interpreting Section 409(e)(3) of the Code.  The Trustee shall vote the shares of Company Stock which are not allocated to any Participant's Company Stock Account, and the shares of allocated Company Stock with respect to which no direction is received from the Participants to whose Accounts the shares are allocated, on the matters described in the preceding sentence in the manner directed by the Board of Directors of the Company.  Each Participant and each beneficiary of a deceased Participant shall be a "named fiduciary," within the meaning of Section 402 of ERISA, with respect to the voting of shares of Company Stock to the extent that voting rights are passed through to the Participant.

11.2    Right of First Refusal.  (a)  Company and Trustee's Rights of First Refusal. Any shares of Company Stock that are distributed by the Trustee and that are not required to be immediately sold to the Company or back to the Trust shall be subject to rights of first refusal held by the Company and by the Trustee.  Pursuant to these rights, any person who receives shares of Company Stock from the Trust shall be required to offer in writing to sell the shares first to the Company, and then to the Trustee, before transferring the shares to any other person.  The Company and the Trustee then shall have the option to purchase the shares at a price equal to the greater of:  (i) the fair market value of the shares, as determined by the Trustee based upon a valuation by an independent appraiser; or (ii) the price set forth in a bona fide written offer from an independent prospective purchaser.  The Company and the Trustee shall have fourteen days from the date that they receive notice of the shareholder's desire to transfer his or her shares to exercise their rights of first refusal. The Company may require that a Participant or beneficiary entitled to a distribution of Company Stock sign an appropriate stock transfer agreement evidencing the right of first refusal prior to receiving a certificate for shares of Company Stock.

(b)    Endorsement on Stock Certificates.  There shall be typed on the certificates representing shares of Company Stock held or distributed by the Trustee legend restrictions on transferability as reasonably required by the Company in order to assure compliance with the right of first refusal provided for in Section 11.2(a) and with applicable federal and state securities laws.

11.3    Put Option.  If a Participant receives a distribution of Company Stock free of any requirement that he or she sell the stock back to the Company or to the Trustee, then the Company shall provide a put option to that Participant.  Pursuant to this option, the Participant shall have the right to sell his or her Company Stock to the Company at any time during two option periods, at a price equal to the fair market value of the stock as of the most recent Valuation Date.  The first put option period shall be for at least 60 days, beginning on the date of the distribution of the stock.  The second put option period shall be for at least 60 days beginning after the new determination of the fair market value of the Stock in the following Plan Year (and after the delivery of notice of the value to the Participant or beneficiary).  The Company may allow the Trustee to purchase shares of Company Stock tendered to the Company under a put option.  Payment shall commence within 30 days after the put option is exercised and may be made either in a lump sum or, if the Company Stock was distributed in a lump sum, in substantially equal, annual periodic installments no less frequently than annually over a period not exceeding threefive years, with adequate security provided and interest payable at a reasonable rate on any unpaid installment balance (as determined by the Company).[25] Notwithstanding the foregoing, the put option described in this Section 11.3 shall apply if, and only if, the provisions of Section 10.2(a) do not apply (for example, if the Company is a C corporation and its articles of incorporation or by-laws do not restrict the ownership of substantially all outstanding shares of stock of the Company to current employees of the Company and to the Trust).[26]

11.4    Nonterminable Rights.  Except as otherwise provided in Section 10.2(a)(i) and in this Article XI, no shares of Company Stock held or distributed by the Trustee may be subject to a put, call, or other option or to a buy-sell or similar arrangement.  The provisions of this Article XI shall continue to be applicable to Company Stock even if the Plan ceases to be an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code.

---

[25] This sentence was modified by Amendment Number Twelve effective as of October 4, 2019.
[26] This sentence was added by Amendment Number Twelve effective as of October 4, 2019.

71045293.4

## ARTICLE XII.

## PLAN ADMINISTRATION

12.1     Plan Administration.  The authority to control and manage the operation and administration of the Plan is vested in the Administrator, which shall be the Company. The Company may designate a responsible person as the Administrator of the Plan, having the rights, duties, and obligations of an "administrator" under the provisions of ERISA. The Company shall be a "Named Fiduciary" (as described in Section 402 of ERISA) under the Plan.

12.2     The Trust.  All contributions made under the Plan will be held, managed, and controlled by a trustee acting under a trust which forms a part of the Plan.  The terms of the trust are set forth in a Trust Agreement known as the "West Monroe Partners, Inc. Employee Stock Ownership Trust" (the "Trust").  All rights which may accrue to any person under the Plan shall be subject to all of the terms and provisions of the Trust as in effect from time to time.  The trustee of the Trust shall be subject to the direction of the Board of Directors of the Company with respect to:

        (a)     the voting of Company Stock pursuant to Section 11.1;

        (b)     sales of Company Stock; and

        (c)     effective January 1, 2013, (i) purchases of Company Stock, and (ii) the borrowing of funds for the purpose of purchasing Company Stock or for the purpose of repaying all or any portion of the outstanding indebtedness previously incurred to purchase Company Stock.

The Board of Directors of the Company shall be a "Named Fiduciary" (as described in Section 402 of ERISA) under the Plan.

12.3     Rights, Powers, and Duties of the Administrator.  The Administrator shall have all authority and discretion as may be necessary to enable it to efficiently administer the Plan. The rights, powers, and duties of the Administrator shall include the following:

        (a)     to interpret and construe the provisions of the Plan;

        (b)     to determine all questions relating to the eligibility, benefits, and other rights of Employees, Participants, and beneficiaries under the Plan;

        (c)     to adopt rules of procedure and regulations, consistent with the provisions of the Plan, as the Administrator deems necessary and proper;

(d)     to maintain and keep adequate records concerning the Plan, and concerning the proceedings and acts of the Administrator, in the form and amount of detail as the Administrator may decide;

(e)     to appoint investment managers to manage any assets of the Trust Fund and to authorize the managers to acquire and dispose of assets of the Trust Fund;

(f)     to employ persons to render advice with respect to any responsibility which the Administrator has under the Plan;

(g)     to delegate authority and duties, including the authority to sign any documents, as the Administrator may deem appropriate to the Trustee or to other agents, provided that the Administrator shall exercise reasonable care in the selection of any agents; and

(h)     to act as the agent for the service of legal process.

12.4     Claims Procedure. (a) Procedure. (i) General. Claims for benefits under the Plan shall be made in writing to the Administrator. The Administrator shall have full discretion to render a decision with respect to any claim. If a claim for benefits is wholly or partially denied by the Administrator, then the Administrator must provide notice of its denial to the claimant (a "Notice of Denial"), which shall be written in a manner calculated to be understood by the claimant and which shall set forth: (A) the specific reason or reasons for denial of the claim; (B) a specific reference to the pertinent Plan provisions upon which the denial is based; (C) a description of any additional material or information necessary for the claimant to perfect the claim, together with an explanation of why the material or information is necessary; (D) a description of the right to bring a cause of action under ERISA Section 502(a) upon an adverse benefit determination upon appeal; and (E) appropriate information regarding the steps to be taken if the claimant wishes to submit his or her claim for review.

(ii)     Other Claims. The Administrator shall notify a claimant in writing of the denial of any claim within a reasonable period of time, not to exceed 90 days after receipt of the claim. If the Administrator shall fail to notify the claimant either that his or her claim has been granted or that it has been denied within 90 days after the claim is received by the Administrator, then the claim shall be deemed to have been denied.

(b)     Procedure for Review of a Denied Claim. (i) Timing. A claimant must file a written request for a review of any claim with the Administrator within 60 days after the receipt by the claimant of a Notice of Denial of his or her claim or within 60 days after the claim is deemed to have been denied. The Administrator's decision with respect to its review of the denied claim shall be rendered not later than 60 days after the receipt of the claimant's request for a review, unless special circumstances require an extension of time for processing, in which case the 60-day period may be extended to 120 days if the Administrator shall notify the claimant in writing within the initial 60-day period and shall

state the reason for the extension. The Administrator shall notify a claimant in writing of the denial of any claim within a reasonable period of time, not to exceed 90 days after receipt of the claim. If the Administrator shall fail to notify the claimant either that his or her claim has been granted or that it has been denied within 90 days after the claim is received by the Administrator, then the claim shall be deemed to have been denied.

   (ii) <u>Review of Documents</u>. In connection with a claimant's appeal of a denial of his or her benefits, the claimant may review pertinent documents and may submit issues and comments in writing.

   (iii) <u>Decision</u>. The Administrator shall have full discretion to fully and fairly review the claim, and the Administrator's decision upon review shall (A) include specific reasons for the decision, (B) be written in a manner calculated to be understood by the claimant, (C) include a description of the right to bring a cause of action under Section 502(a) of ERISA, and (D) contain specific references to the pertinent Plan provisions upon which the decision is based.

  12.5 <u>Procedures with Respect to Domestic Relations Orders</u>. (a) <u>Definitions</u>. For purposes of this Section 12.5, the following terms shall have the following meanings: (i) the term "domestic relations order" shall mean any judgment, decree, or order (including approval of a property settlement agreement) which relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a Participant and which is made pursuant to a state domestic relations law, including a community property law; (ii) the term "qualified domestic relations order" shall have the meaning set forth in Section 414(p) of the Code; and (iii) the term "alternate payee" shall mean any spouse, former spouse, child, or other dependent of a Participant who is recognized by a domestic relations order as having a right to receive all or a portion of the benefits payable under the Plan with respect to the Participant.

   (b) <u>Procedures</u>. The Administrator shall establish reasonable procedures with respect to the following matters: (i) the manner for determining whether a domestic relations order constitutes a qualified domestic relations order; and (ii) the administration of distributions under qualified domestic relations orders.

   (c) <u>Notice</u>. Promptly following the receipt of any domestic relations order, the Administrator shall notify the Participant affected by the order, and any other alternate payee, of the receipt of the order and of the procedures established under the Plan for determining the qualified status of domestic relations orders. Within a reasonable period of time after receipt of any domestic relations order, the Administrator shall determine whether the order is a qualified domestic relations order and shall notify the Participant affected by the order and each alternate payee of the determination.

   (d) <u>Segregation of Account</u>. During any period in which the issue whether a domestic relations order is a qualified domestic relations order is being determined by the Administrator, by a court of competent jurisdiction, or otherwise, the

Administrator shall instruct the Trustee to segregate in a separate account under the Trust Fund or to deposit in an escrow account the amounts which would have been payable to the alternate payee during this period if the order had been determined to be a qualified domestic relations order. If the order or any modification of the order is determined to be a qualified domestic relations order within eighteen months, the Administrator shall direct the Trustee to pay the segregated amounts, plus any accrued interest, to the persons entitled to those amounts. If within eighteen months either it is determined that the order is not a qualified domestic relations order or the issue whether the order is a qualified domestic relations order is not resolved, then the Administrator shall direct the Trustee to pay the segregated amounts, plus any accrued interest, to the persons who would have been entitled to those amounts if there had been no order. Any determination that an order is a qualified domestic relations order which is made after the close of the eighteen-month period described above shall be applied prospectively only.

71045293.4

**ARTICLE XIII.**

**TRANSFERS FROM OTHER BENEFIT PLANS**

13.1 <u>Rollover Contributions</u>.  The Plan may not receive "Rollover Contributions" from a tax-qualified plan, trust, individual retirement account, or annuity.  The term "Rollover Contributions" means amounts described in Sections 402(c), 403(a)(4), and 408(d)(3) of the Code.

13.2 <u>Transferred Accounts from Merged Plans</u>.  Notwithstanding the limits on annual contributions that otherwise apply, the Plan may receive account balances from a tax-qualified plan or trust that has been merged into this Plan as approved by the Board of Directors of the Company.

13.3 <u>Separate Accounts</u>.  All amounts transferred in accordance with Section 13.2 will be credited to "Transfer Accounts" separate from the other Accounts provided for under the Plan.  These Transfer Accounts will share only in the gains and losses in the net value of the Investment Fund as determined from time to time on Valuation Dates, as provided in Article VII.

13.4 <u>Restrictions on Transferred Amounts</u>.  Notwithstanding any other provision of this Article XIII, no amounts shall be transferred to this Plan from any defined benefit plan, from any defined contribution plan which is subject to the funding standards of Section 412 of the Code, or from any other defined contribution plan to which clause (III) of Section 401(a)(11)(B)(iii) of the Code applied with respect to any person who is a Participant in the Plan or who otherwise would become a Participant by reason of the merger of this Plan and another defined contribution plan.

13.5 <u>Eligibility and Vesting</u>.

(a)  Participants in merged plans will be credited with Years of Service based upon their prior plan in determining their eligibility and vesting under this Plan.

(b)  Employees of subsidiaries or of affiliated companies that have adopted this Plan in accordance with Section 15.4 will be credited with Years of Service with the subsidiary or affiliated company, as the case may be, in determining their eligibility and vesting under this Plan.

(c)  If a business entity is acquired by the Company and its employees are employed by the Company:

(i)  if the acquired entity does not have a qualified retirement plan, then employees of that entity will be credited with Years of Service for employment with the prior employer for eligibility purposes only; and

(ii)     if the acquired entity has a qualified retirement plan which is to be merged into this Plan, the provisions of this Article XIII relative to merging plans of subsidiaries shall apply.

13.6   <u>Other Provisions of the Plan</u>.  All provisions of the Plan not inconsistent with this Article XIII shall apply to all transferred Participants and to all Transfer Accounts.

53

## ARTICLE XIV.

## AMENDMENT AND TERMINATION

14.1     Amendment.   Subject to the provisions of Section 15.1, the Company reserves the right to amend the Plan at any time by action of its Board of Directors.  Subject to the provisions of Section 411(d)(6)(C) of the Code and the regulations interpreting Section 411(d)(6) of the Code, no amendment shall eliminate any accrued benefit, including an optional form of benefit, or divest a Participant of any amount that he or she would have received had he or she resigned from employment with his or her Employer immediately prior to the effective date of the amendment.

14.2     Termination.  The Company reserves the right to terminate the Plan at any time by action of its Board of Directors.

14.3     Merger or Consolidation of Plan, Transfer of Plan Assets.  In the case of any merger or consolidation with, or transfer of assets and liabilities to, any other pension or profit-sharing plan, each Participant in the Plan on the date of the merger, consolidation, or transfer shall be entitled to receive a benefit immediately after the merger, consolidation, or transfer if the Plan then terminated which is equal to or greater than the benefit he or she would have been entitled to receive immediately prior to the merger, consolidation, or transfer if this Plan had terminated then.

14.4     Vesting and Distribution on Termination and Partial Termination.  Notwithstanding any other provision of the Plan to the contrary, on termination of the Plan in accordance with Section 14.2 or on partial termination of the Plan by operation of law, after all adjustments required on a Valuation Date have been made, each affected Participant's benefits will be nonforfeitable.  The provisions of Article VII will continue to apply until the benefits of all affected Participants have been distributed to them.

## ARTICLE XV.

## MISCELLANEOUS

15.1     No Reversion to Company.  No part of the corpus or income of the Trust Fund shall revert to the Company or be used for or diverted to purposes other than for the exclusive benefit of Participants and their beneficiaries, except as specifically provided in Article III of the Trust Agreement.

15.2     Notices.  Any notice required to be filed with any person under the Plan will be properly filed if delivered or mailed to that person, in care of the Company, at 222 West Adams Street, 11th Floor, Chicago, Illinois 60606, or at such other address as the Company may designate from time to time.

15.3     Indemnification.  The Company shall indemnify the members of the Board of Directors of the Company, and any person acting as Administrator of the Plan for, and hold them harmless against, any and all liabilities, losses, costs, or expenses of any kind or nature which may be imposed on, incurred by, or asserted against them at any time by reason of their service under this Plan (including legal fees and expenses), to the extent the liability, loss, cost, or expense is not insured against or exceeds any insurance recovery. However, no person shall be entitled to indemnity under this Section if he or she acted dishonestly or in willful or grossly negligent violation of the law or regulation under which the liability, loss, cost, or expense arises. The provisions of this Section 15.3 shall be in addition to, and shall not supersede, any other agreement reached between the Company and any other person relating to indemnification in connection with the administration of the Plan or of the Trust.

15.4     Subsidiary and Affiliated Companies.  With the approval of the Board of Directors of the Company, any subsidiary or affiliate of the Company may become a party to this Plan, and become entitled to all of the benefits and subjected to all of the obligations of this Plan, by executing an acceptance of this Plan in the form that the Company shall approve.  Upon acceptance of this Plan by any subsidiary or affiliate, employees of the subsidiary or affiliate may become Participants upon meeting the eligibility requirements provided in Article III; and when so qualified, they shall be subject to the same obligations and entitled to the same rights and benefits as if they were employees of the Company.  The subsidiary or affiliate shall have no right to defer payment of its contribution or to terminate the Plan in respect of itself or its participating employees without the written consent of the Board of Directors of the Company.

15.5     Participation Not Guarantee of Employment.  Participation in the Plan does not constitute a guarantee or contract of employment with the Company.

15.6     Gender and Number.  In this Plan, where the context admits, words in the masculine gender include the feminine and neuter genders, words in the singular include the plural, and the plural includes the singular.

15.7 <u>Governing Laws</u>. The Plan shall be construed and administered according to the laws of the State of Illinois, to the extent that those laws are not preempted by the laws of the United States of America.

15.8 <u>Text to Control</u>. The Article and Section headings and numbers in this Plan are included solely for convenience of reference, and if there shall be any conflict between the headings and numbers and the text of this Plan, the text shall control.

The foregoing is a true and correct copy of the West Monroe Partners, Inc. Employee Stock Ownership Plan.

West Monroe Partners, Inc.
Employee Stock Ownership Plan
Appendix A[27]

      The 2014 Additional Contribution shall be allocated in the amounts specified below to the Other Investments Accounts of the following Participants (each of whom was a non-Highly Compensated Employee and benefitted under the Plan during the Plan Year ending December 31, 2014):

| Participant Name | Allocation Amount |
|---|---|
| Lindsay Croke | $5,369.10 |
| Stephanie Scott | $4,828.58 |
| Chandra Stefan | $3,062.91 |
| Megan Lantz | $4,756.51 |
| Caryn Alavi | $4,756.51 |

---

[27] Appendix A was added by Amendment Number Six effective for the Plan Year ending December 31, 2014.