IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW DALY, on behalf of himself and all others similarly situated, | ) ) | |
| Plaintiff, | ) ) | Case No. 1:21-cv-06805 |
| v. | ) ) | CLASS ACTION |
| WEST MONROE PARTNERS, INC.; THE BENEFITS COMMITTEE OF WEST MONROE PARTNERS, INC. and its members; THE BOARD OF DIRECTORS OF WEST MONROE PARTNERS, INC. and its members; ARGENT TRUST COMPANY; and DOES 1-3. | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**AMENDED CLASS COMPLAINT**

## I.    INTRODUCTION

1.      Plaintiff Matthew Daly is a participant in the West Monroe Partners, Inc. Employee Stock Ownership Plan (the "Plan"), a defined contribution plan designed to invest primarily in the stock of Defendant West Monroe Partners, Inc. ("West Monroe" or the "Company"), Plaintiff's former employer. Plaintiff brings this action individually and on behalf of the Plan and a Class of its participants and beneficiaries[1] against the Plan's fiduciaries: West Monroe, the Board of Directors of

---

[1] Plaintiff seeks to represent a class of all participants and beneficiaries of the Plan who received a distribution from the Plan in an amount determined based on Defendants' 2020 valuation of Company stock.

1

West Monroe and its members (the "Board" or the "West Monroe Board of Directors"), and the Benefits Committee of West Monroe and its members (the "Committee") (collectively, the "West Monroe Defendants"), and the Plan's trustee, Argent Trust Company ("Argent" or "the Trustee"), for breach of fiduciary duties and prohibited transactions under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA"). Plaintiff also asserts a claim against West Monroe's Board of Directors and its members for breach of fiduciary duties under Delaware law.

2. West Monroe provides professional consulting services to businesses across various industries. Plaintiff worked for West Monroe as a consultant until late 2020. Like other West Monroe employees, Plaintiff had accrued Company stock in his account in the Plan as part of his compensation for years of service to the Company. Like other departing employees, Plaintiff remained invested in the Plan until September 2021, when West Monroe bought back his stock and cashed him out of the Plan.

3. As Plan fiduciaries, Defendants had a duty to operate the Plan (a) "solely in the interest of the participants and beneficiaries" and (b) "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." ERISA § 404(a)(1). Among other things, Defendants had a duty to ensure that Company stock held in the Plan was appraised at fair market value: the price to which a willing and informed buyer and seller would agree in an arms-length sale. In addition, when buying Company stock from participants' accounts, and when distributing the proceeds to Plan participants, Defendants had a duty to ensure that participants received fair market value in exchange for their shares. Participants trusted Defendants to perform their duties with the care and loyalty ERISA requires.

4. Defendants breached that trust. In April 2021, Defendants appraised the fair value of equity in the Company at approximately $465 million ($515.18 per share) as of year-end 2020 (the

"2020 Valuation"). As the facts below make clear, the 2020 Valuation was neither careful, skillful, prudent, nor diligent, and it grossly undervalued the Company stock held in the Plan. Nonetheless, in September 2021, West Monroe used that 2020 Valuation to purchase almost 28,000 shares of Company stock from the Plan—from the accounts of Plaintiff and Class members—at the discounted price of $515.18 per share. As a result, West Monroe cashed Plaintiff and Class members out of the Plan for well below the fair value of their shares. Within weeks, the Company would reveal that its stock's true fair value was over three times higher than the price the Class received.

5.      By the time they approved that stock buy-back from the Plan, the West Monroe Defendants knew that the Company's share value far exceeded the 2020 Valuation used to pay the Class. Within weeks of making those distributions to the Class, on October 14, 2021, West Monroe announced that it had sold a 50% stake in the Company to a third-party investor, MSD Partners, L.P., at a valuation equivalent to $1,616 per share—over **three times higher** than West Monroe paid the Class. This new valuation did not come out of thin air. Long before the deal closed, the West Monroe Defendants' preparations to sell a stake in the Company would have alerted them that Company stock was worth much more than $515.18 per share.

6.      While Defendants deflated the value of participants' stock, the West Monroe Defendants enabled themselves and other Company management to profit from the upcoming sale. In January 2021, just months before Defendants cashed out the Class, the Company announced that it had "create[d] an additional avenue for its senior leaders" to "benefit from the company's rapid growth" by allowing them to buy additional equity in the Company outside the Plan.[2] West Monroe

---

[2] West Monroe, Press Release: West Monroe Adopts New Incentive Program for Directors That Fuels Firm Investment (Jan. 25, 2021), *available at* https://www.westmonroe.com/press-releases/incentive-program-directors. Specifically, the program allowed Company management to buy equity in West Monroe Partners, LLC, of which West Monroe Partners, Inc. is the sole member and on which its share value depends.

management (including members of the Board and the Committee) could buy equity at a knockdown price of $432.10 per share (based on the 2019 valuation). As a result, West Monroe enabled its senior leaders to buy on the cheap and capture exorbitant profits from the ensuing sale to MSD Partners. Defendants thus enriched West Monroe's senior leaders while the Class suffered millions of dollars in losses.

7. As Plan fiduciaries, Defendants had the duty to ensure that the Plan's valuation of Company stock "remained a reasonable approximation" of the "fair market value of [the] stock at the times they relied on it." *Donovan v. Cunningham*, 716 F.2d 1455, 1473 (5th Cir. 1983); *see Armstrong v. LaSalle Bank Nat. Ass'n*, 446 F.3d 728, 734 (7th Cir. 2006) ("A trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent."). The West Monroe Defendants could have updated that valuation to reflect new information as West Monroe prepared and negotiated the sale to MSD Partners. But they failed to do so. Instead, they used the deflated and outdated 2020 Valuation to buy low from the Class as they sold high to MSD. And in the process, they allowed senior leaders to buy in at the artificially deflated valuation just before it ballooned. These Defendants' double-dealing violated their duties of prudence and loyalty.

8. West Monroe's bargain buy-back of Company stock from the Plan, for less than 32 cents on the dollar, was not just imprudent and disloyal; it was also a prohibited transaction under ERISA § 406. That provision prohibits direct *or indirect* transactions between the Plan and a party-in-interest as well as self-dealing by fiduciaries for less than adequate consideration. 29 U.S.C. §§ 1106(a)–(b), 1108(e)(1). By causing the transfer of thousands of shares of Company stock from the Plan to West Monroe for a small fraction of their fair value (which increased the value of equity held by Company management), the West Monroe Defendants violated ERISA § 406.

9.      Moreover, the West Monroe Defendants violated ERISA § 404 by failing to disclose the higher valuation and impending sale to Class members before they elected distributions. Had Class members known these facts, they could (and likely would) have chosen to retain balances in their Plan accounts, which would have entitled each Class member to a portion of the proceeds from the sale to MSD Partners and from the liquidation of the Plan—an allocation substantially higher than the distributions they received in September 2021. Participants who retained Plan balances as of the date the MSD sale closed received allocations substantially higher than $515.18 per share in their account.

10.     To remedy Defendants' breaches of fiduciary duties and prohibited transactions, Plaintiff brings this action individually, as a representative of the affected Class of participants and beneficiaries, and on behalf of the Plan under ERISA § 502, 29 U.S.C. §1132(a)(2) and (3). Plaintiff also brings claims under Delaware law to remedy the West Monroe Board of Directors' breach of the fiduciary duties the Directors owed to Class members, who were equitable shareholders of the corporation. He seeks damages resulting from Defendants' breaches and prohibited transactions, as well as any and all equitable or other remedial relief as the Court may deem appropriate.

11.     Plaintiff also brings a claim under 29 U.S.C. § 1132(a)(1)(A) and (c)(1) based on the Company's failure to comply with his written request for the Plan and Trust Documents, instruments under which the Plan was established and operated, in violation of ERISA § 104, 29 U.S.C. § 1024(b)(4). Although Plaintiff requested copies of the Plan and Trust Documents on October 17, 2021, the Company did not provide him with the documents until December 10, 2021, in violation of ERISA § 104. Accordingly, in addition to its liability under §§ 404 and 406, the Company is subject to the penalty provided in § 502(c) for its failure to timely deliver those documents.

## II.  PARTIES

### A.  Plaintiff

12.     Matthew Daly was a consultant and employee of West Monroe from June 15, 2015 to November 9, 2020. He had a vested balance of approximately 313 shares of Company stock in the Plan until around September 22, 2021, when he received a cash distribution in the amount of $515.18 per share. Mr. Daly suffered significant losses due to Defendants' imprudent conduct, including their undervaluation of and failure to provide adequate consideration for the stock in his Plan account.

### B.  Defendants

13.     West Monroe Partners, Inc. is a self-described "digital consulting firm" incorporated in Delaware and headquartered in Chicago, Illinois. At all relevant times, West Monroe was the Plan's sponsor, as well as the administrator of the Plan under ERISA § 2(16), 29 U.S.C. § 1002(16), and a named fiduciary under ERISA § 402, 29 U.S.C. § 1102(a).  The Company was also a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority and control respecting the management and administration of the Plan. Both the Plan Document and the Plan's Summary Plan Description named West Monroe as the Administrator of the Plan. These documents also expressly empowered the Company to determine the "Valuation Date" under the Plan—the date as of when the value of Company stock held within the Plan was to be determined—and to direct the Trustee with respect to the purchase, sale, and distribution of Company stock. *See* Plan §§ 1.28, 12.1; Plan Amend. 13 (amending § 1.28). The Company acted through the Board and the Committee.

14.     The Board of Directors of West Monroe Partners, Inc. was also a named fiduciary of the Plan under 29 U.S.C. § 1102(a) as well as a fiduciary under 29 U.S.C. § 1002(21)(A). The Board has the authority to exercise all the powers of the Company, including with respect to the Plan. The Plan Document expressly named the Board as a fiduciary and empowered the Board to appoint and direct the Plan's Trustee, including with respect to the purchase, sale, and distribution of

Company stock. Specifically, the Board had the authority to direct the Trustee to sell, and the Company to repurchase, stock from the Plan, as it did in this case. The Board also had the authority and discretion to change the Valuation Date under the Plan. The Board includes management directors who are executive employees of the Company and who (on information and belief) hold equity in the Company. At the time of the decisions and transactions discussed herein (including in mid-September 2021), the Board's members included the Company's President and CEO, Chief Operating Officer, Chief People Officer, Chief Strategy Officer, and several managing directors.

15. The Benefits Committee, appointed by the Board of Directors of West Monroe, also administers the Plan on behalf of the Company. The Committee's membership overlapped with that of the Board and included the Company's Chief People Officer, Chief Financial Officer, Chief Administrative Officer, Director of Finance, and Senior Manager of ESOP and 401(k) Administration. At all relevant times, the Committee and its members were also fiduciaries under 29 U.S.C. § 1002(21)(A) because, along with the Board and its members, they exercised discretionary authority and control respecting management and administration of the Plan.

16. Argent Trust Company, a Tennessee corporation headquartered in Nashville, TN, was at all relevant times the Plan's Trustee. As Trustee, Argent was a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority and/or discretionary control respecting management of the Plan and its assets. Under the terms of the Plan, the Trustee had the authority and responsibility to determine the value of Company stock and to retain an appraiser to assist in making that determination. As the legal owner of the Company stock held in the Plan, the Trustee had the power and duty to vote shares of Company stock held in the Plan and to sell Company stock held in the Plan as directed by the Company. The Trustee also had the power to "[a]t the direction of the Administrator … make payments from the Trust Fund [i.e., from Plan assets] to the

7

persons, in the manner, at the times, and in the amounts as the Trustee determine[d] to be proper in accordance with the terms of the Plan." Trust Agreement § 2-6(c). Argent also retained the power "[t]o perform any and all other acts in its judgment necessary or appropriate for the proper and advantageous management, investment, and distribution" of the Plan's assets. *Id.* § 2-6(m).

17.     To the extent that Defendants delegated any of their fiduciary functions to another person or entity, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C. § 1002(21)(A) and is a Doe Defendant.

## III.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3). This Court also has subject matter jurisdiction under 29 U.S.C. § 1332(a) and (d) because Plaintiff is a citizen of Connecticut and Defendants are citizens of different states, and because at least one member of the proposed Class is a citizen of a state different from Defendants. The Court also has supplemental jurisdiction over Plaintiff's Delaware law claim under 28 U.S.C. § 1367(a).

19.     This Court has general personal jurisdiction over West Monroe, which is headquartered in this District, and over any other defendants that reside in this District. This Court has specific personal jurisdiction over all Defendants, including Argent Trust Company, because they took the actions described herein in this District through the management of the Plan and its assets.

20.     This District and Division are the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. § 1391(b) because they are the District and Division in which the subject Plan is administered and where at least one of the alleged breaches took place. They are also the District and Division in which Defendant West Monroe Partners, Inc. resides.

## IV.   ERISA'S FIDUCIARY STANDARDS

### A.  Fiduciary Duties of Prudence and Loyalty

21.     ERISA § 404(a), 29 U.S.C. § 1104(a), imposes strict fiduciary duties of prudence and loyalty upon the Defendants as fiduciaries of the Plan. They are "the highest [duties] known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982) (Friendly, J.). ERISA's dual duties of prudence and loyalty apply to all fiduciary acts, including the valuation, *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016), and disposition, 29 U.S.C. § 1002(21)(A), of Plan assets.

22.     The duty of prudence required Defendants to discharge their responsibilities "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404, 29 U.S.C. §1104(a)(1)(B). As part of this duty, Defendants were required "to conduct an adequate inquiry into the value of [Company] stock" held by the Plan, *Allen*, 835 F.3d at 678, and to "communicate material facts affecting the interests of beneficiaries," *Solis v. Current Dev. Corp.*, 557 F.3d 772, 777 (7th Cir. 2009), among other things.

23.     The duty of loyalty required Defendants to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries" and "(ii) defraying reasonable expenses of administering the plan." ERISA § 404, 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty is "'[p]erhaps the most fundamental duty of a [fiduciary]"; it requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 224, 235 (2000).

24.     ERISA § 404(a) also required Defendants to operate the Plan "in accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent" with ERISA and the duties of prudence and loyalty outlined above.

### B. Prohibited Transactions

25.     As a corollary to the duty of loyalty, ERISA § 406 also presumptively prohibits certain transactions between the Plan and a party in interest, including any plan fiduciary, the plan administrator, or the sponsoring employer. *See* 29 U.S.C. § 1002(14) (defining "party in interest"). First, ERISA § 406(a)(1), 29 U.S.C. §1106(a)(1) states:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> (B) lending of money or other extension of credit between the plan and a party in interest;
>
> (C) furnishing of goods, services, or facilities between the plan and party in interest;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
>
> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

26.     In addition, ERISA § 406(b), 29 U.S.C. § 1106(b) prohibits self-dealing by a fiduciary to the Plan. That section provides:

> A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

27.     Engaging in any of these prohibited transactions constitutes a *per se* violation of ERISA, unless the transaction is exempt under ERISA § 408. In relevant part, ERISA § 408(e)

permits the purchase or sale of qualifying employer securities (i.e., company stock) with parties in interest or fiduciaries, but only if "such acquisition, sale, or lease is for adequate consideration," 29 U.S.C. § 1108(e)(1), or "fair market value," 29 U.S.C. § 1002(18)(B). "Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *Eyler v. Comm'r*, 88 F.3d 445, 451 (7th Cir. 1996). Fair market value "must be determined as of the date of the transaction." D.O.L., Proposed Regulation Re: Adequate Consideration, 53 FR 17632-01.

### C.  Fiduciary Liability Under ERISA

28.     Fiduciaries to the Plan are liable to make good to the Plan any harm caused by their breach of fiduciary duty. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes participants and beneficiaries to sue on behalf of the Plan for the relief under ERISA § 409, 29 U.S.C. § 1109(a), which provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29.     In addition, ERISA § 502(a)(3) authorizes actions by participants and beneficiaries on their own behalf: "(A) to enjoin any act or practice which violates" ERISA or the terms of the plan, or "(B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(3).

### D.  Duty to Monitor

30.     A fiduciary who delegates its fiduciary responsibility to another nonetheless retains a duty to appoint and monitor that delegate's performance of its delegated responsibilities with the care, skill, prudence, diligence, and loyalty required under § 404, and may be held liable for failing

11

to discharge those duties in appointing or monitoring its delegates. 29 U.S.C. §1105(c)(2)(B).

### E. Co-Fiduciary Liability

31.    ERISA provides for co-fiduciary liability where a fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty by a co-fiduciary if:

> (1) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

> (2) by his failure to comply with [29 U.S.C. § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

32.    In addition to direct liability for their own breaches, fiduciaries are subject to co-fiduciary liability under ERISA § 405 if they participate knowingly in another's breach, enable another fiduciary to commit a breach through a breach of their own duties, or if they learn of but fail to remedy other fiduciaries' breaches of their duties. 29 U.S.C. § 1105(a)(1)–(3).

## V.    THE PLAN

33.    The Plan was a defined contribution plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2) and is subject to coverage under the Act under ERISA § 4(a), 29 U.S.C. § 1003(a). Designated as an employee stock ownership plan (or "ESOP"), the Plan was designed to invest primarily in Company stock, which the Plan holds in trust for the benefit of Plan participants, who are current and former employees. West Monroe employees automatically became Plan participants on January 1, 2012, or if hired later, on the first day of the month following their employment date. The Company contributed cash and stock to the Plan. Company contributions were allocated to participant's individual accounts based on that participant's years of service and compensation.

34.     The Trustee was the legal owner of the Company stock in the Plan and had the power and responsibility to vote that stock as directed by the Board for the exclusive benefit of Plan participants. Plan participants are beneficial owners of the vested Company stock in their accounts.

35.     A participant's account vested according to a schedule that depends on their tenure with the Company. For participants hired before December 31, 2019, such as Plaintiff, the participant's account fully vested after three years of employment with the Company.

36.     Former employees could (for a time) remain participants in the Plan and retain beneficial ownership of their Company stock. In the year after a former employee's separation, the Company would buy back the former employee's interest in Company stock. In particular, the Plan provided that a distribution of a participant's Company stock account "shall be made in the form of either (A) cash, or (B) Company Stock, subject to the requirement that the Company Stock be immediately sold back to the Company or back to the Trust at a price equal to its fair market value." Participants could receive the proceeds from the redemption in cash (subject to applicable taxes) or roll them from the Plan into a 401(k) plan or individual retirement account (IRA).

37.     If a former employee failed to make an election within a 30 to 60-day election window, and the value of their account exceeded $5,000 (as did Plaintiff's), the Trustee would convert the Company shares in the participant's account into cash "based on the most recent value of the shares" and invest the proceeds "in a mutual fund in the [Plan] or transfer[] [them] to [the participant's] account in the [Company's] 401(k) plan." Jan. 2021 Summary Plan Description ("SPD") at 12. In this case, the Company represented that if Class members did not make their elections in 2021, the Trustee would convert their shares into cash before the year's end.

## VI.     VALUATION OF COMPANY STOCK IN THE PLAN

38.     Unlike publicly-traded stock, which is valued continuously by market makers and specialists during normal market hours, West Monroe's stock was and is private: it is not traded on

a public exchange and does not always have a current, readily available market price or valuation. As a result, Defendants had to determine the fair market value for Company stock in the Plan. As described in the Plan's public filings, "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."[3] The Plan directed the Trustee to determine the fair market value "in good faith and based on all relevant factors for determining the fair market value of securities." Plan § 5.4.

39.     After the end of each calendar year, the Trustee, with the assistance of an appraiser, conducted a valuation to determine the fair market value of Company stock as of December 31 of the prior year, and Defendants typically announced the results the following spring. Thus, for example, in April 2021, Defendants announced the Company's valuation as of December 31, 2020. As detailed below, that valuation substantially undervalued the Company as of year-end 2020.

40.     The Company retained the discretion to have the Trustee value Company stock as of any other date or dates that the Company deemed "necessary or appropriate" for the valuation of Company stock held in participants' accounts. In particular, the Plan provided that, in general, the value of Company stock "must be determined as of the most recent Valuation Date under the Plan." Plan § 5.4. The Plan defined "Valuation Date" as "the last day of the Plan Year," i.e., December 31, and any "other date or dates deemed necessary or appropriate by the Administrator for the valuation of Participants' Accounts during the Plan Year." *Id.* § 1.28, amend. 13. The West Monroe Defendants retained this discretion so that they could obtain an updated valuation in the event of material changes, either positive or negative, that would affect the value of Company stock.

41.     In this case, however, despite having notice that the fair market value of Company stock was substantially higher than the 2020 Valuation appraised in April 2021, the West Monroe

---

[3] See, e.g., West Monroe Partners Employee Stock Ownership Plan Form 5500 (2019), Financial Statement, at 11, available at https://www.efast.dol.gov/5500search/.

Defendants failed to exercise their discretion to update the value of Company stock before they redeemed the Class's shares for less than fair market value. This failure violated their fiduciary duties of prudence and loyalty under ERISA, as detailed further below.

## VII.    DEFENDANTS' BREACHES OF FIDUCIARY DUTY

### A.  Defendants Imprudently Undervalued Plan Assets

42.    In April 2021, the Trustee completed an annual valuation of the Company stock held in the Plan (the "2020 Valuation") ███████████████████████████████████████ ████████████████████████████. Based on the 2020 Valuation, in April 2021, Defendants announced that the value of Company stock as of December 31, 2020 was $515.18 per share. At the time, however, Defendants knew or should have known that the value of the Company far exceeded $515.18 per share. As detailed below, contemporaneous with the 2020 Valuation, the West Monroe Defendants were preparing to sell a stake in the Company for a substantially higher share price. Nonetheless, they used the undervalued appraisal to repurchase the shares in Class members' accounts at well below fair market value, causing Plaintiff and the Class millions of dollars in losses.

**i.    Starting in 2020, West Monroe Achieved "Explosive Growth," Positioned Itself for a Sale, then Enabled High-Ranking Leaders to Capture the Profits**

43.    Long before the 2021 sale to MSD Partners, West Monroe took steps to drive up the Company's value, position it for a sale, and enable high-ranking employees to reap the profits.

44.    To increase their value and market themselves to potential buyers, private companies typically implement a preparation strategy well before any sale. As part of that strategy, companies often first lay off employees, especially highly-compensated employees, to reduce expenses, make the company appear more profitable, and increase its attractiveness to investors.

15

45. In October 2020, West Monroe laid off approximately 90 employees—nearly 10% of its workforce—including highly-compensated consultants. At a later internal meeting, West Monroe's leadership explained that it made the layoffs to position the Company for planned growth.

46. On information and belief, West Monroe made the October 2020 layoffs to reduce its expenses and anticipated the terminations would raise the Company's value to potential buyers.

47. Next, to position themselves for a sale, companies will often make acquisitions to shore up gaps in their offerings. In 2020, West Monroe acquired two companies. Both acquisitions were designed to and would have increased the Company's value as of year-end 2020.

48. On or around November 4, 2020, West Monroe acquired Pace Harmon, a national strategy and outsourcing advisory firm. This was then the largest acquisition in the Company's history. As a result of the acquisition, West Monroe established a new office in Washington, D.C. In a Press Release, West Monroe boasted that the acquisition of Pace Harmon would add "depth in transformation advisory for West Monroe, as well as new capabilities in IT strategy and business process outsourcing, procurement, and vendor management." West Monroe added that with the acquisition of Pace Harmon, the Company would "finish 2020 with 13 consecutive years of top-line revenue growth and EBITDA growth," growth that would have raised the Company's value.[4]

49. On or around December 1, 2020, West Monroe acquired Two Six Capital, a firm that develops data science tools to advise private equity firms. The acquisition was a strategic investment that added significant value to West Monroe's private equity consulting business, which generates a substantial portion of West Monroe's revenue. With it, West Monroe added "Intellio

---

[4] West Monroe, Press Release: West Monroe Acquires Strategy and Outsourcing Advisory Firm Pace Harmon (Nov. 4, 2020), *available at* https://www.westmonroe.com/press-releases/west-monroe-acquires-pace-harmon. EBITDA stands for "Earnings Before Interest, Taxes, Depreciation, and Amortization." Companies and analysts often calculate enterprise value by applying an appropriate multiple to EBITDA.

Predict," proprietary technology developed by Two Six Capital, to its proprietary Intellio® suite of tools. Along with Two Six, the Company also gained two new directors with deep experience in private equity, including one (Ian Picache) who had years of experience in advising on private equity transactions. West Monroe's Chief Strategy Officer, Tom Bolger, characterized the Two Six acquisition as "another step in a series of strategic moves" to increase West Monroe's value.[5]

50.     Finally, companies preparing to sell often implement a retention initiative to prevent defections of key employees as news of the company's intent to sell starts to leak internally. In January 2021, West Monroe announced a new program (the "Capital and Profits Interest Program") to enable the Company's "directors" (around 120 of the Company's senior leaders) to acquire additional equity in the Company *outside of the Plan*. In the Company's words, this change "create[d] an additional avenue for senior leaders to invest in and benefit from the company's rapid growth, in addition to their participation in the employee stock ownership plan (ESOP)."[6] In other words, the Company opened a backdoor for directors to capture more of the Company's growth in value than its lower-level employees, who owned Company equity only through the Plan.

51.     The investment banker Macquarie Capital and the law firms of Mayer Brown LLP and Polsinelli PC—three firms that would advise the Company on the October 2021 deal to sell 50% of its stock to MSD Partners—all advised the Company concerning the launch of the Capital and Profits Interest Program. On information and belief, the Company launched the program in anticipation of a potential sale of Company stock to a third-party investor.

---

[5] West Monroe, Press Release: West Monroe Acquires Two Six Capital, a Data Science Firm for Private Equity, *available at* https://www.westmonroe.com/press-releases/west-monroe-acquires-two-six-capital-data-science-firm-private-equity.

[6] West Monroe, Press Release: West Monroe Adopts New Incentive Program for Directors That Fuels Firm Investment, *available at* https://www.westmonroe.com/press-releases/incentive-program-direcors.

17

### ii. Public Information Suggests that Defendants Substantially Undervalued the Company as of December 31, 2020

52.     On April 13, 2021, West Monroe reported that the Company had "achiev[ed] explosive growth in 2020."[7] On April 16, 2021, however, West Monroe announced that its stock had appreciated only 19.2% during 2020 (from $432.10 as of December 31, 2019 to $ 515.18 as of December 31, 2020): by far the smallest rise in stock price since the Plan incepted. West Monroe's purported 19.2% appreciation in 2020 was also far below its compound annual growth rate ("CAGR") of 56% over the preceding seven years and 23% over the preceding 10 years.[8]

53.     Table 1 shows the Plan's annual valuations for each year-end from 2012 through 2020 and the percentage change in that valuation relative to the previous year. The fourth column compares West Monroe's change in valuation with the returns of the market, represented by the Russell 2000® Index. The Russell 2000 index is a well-recognized market index made up of 2,000 small public companies with a median market capitalization of approximately $1.2 billion.[9] Whether valued at $465 million (the total equity value assessed in the 2020 Valuation) or approximately $1.4 billion (as implied by the price MSD paid), West Monroe was comparable in size to the public companies listed in the Russell 2000 index, whose yearly returns are listed below.

---

[7] West Monroe, Press Release: West Monroe Expands Human Capital Management Capabilities to Address Swelling Demand for People, Organization, and HR Consulting, *available at* https://www.westmonroe.com/press-releases/human-capital-management-expansion.

[8] West Monroe, Press Release: West Monroe Adopts New Incentive Program for Directors That Fuels Firm Investment, *available at* https://www.westmonroe.com/press-releases/incentive-program-directors.

[9] A company's "market capitalization" is equal to the number of shares of common stock outstanding multiplied by the market price of those shares.

18

| Table 1 | | | |
|---|---|---|---|
| Year | Appraised Share Value | Percent Change | Performance of the Russell 2000 Index |
| 2012 | $19 | — | — |
| 2013 | $40.9 | **115.3%** | 38.82% |
| 2014 | $70.5 | **72.4%** | 4.89% |
| 2015 | $92.8 | **31.6%** | -4.41% |
| 2016 | $119.60 | **28.9%** | 21.31% |
| 2017 | $186 | **55.5%** | 14.65% |
| 2018 | $262 | **40.8%** | -11.01% |
| 2019 | $432.10 | **64.9%** | 25.52% |
| 2020 | $515.18 | **19.2%** | 19.96% |

54. As shown in Table 1 above, 2020 was the first year since the Plan's inception that West Monroe's investment performance was lower than that of the Russell 2000 Index.

55. West Monroe's next equity valuation, at approximately $1.4 billion (or $1,616 per share) by October 2021, confirms that Defendants had grossly undervalued the Company as of December 31, 2020. A rise in value from $515.18 per share on December 31, 2020, to $1,616 per share in October 2021, would have been a 213% appreciation. It is extremely unusual for a consulting firm to more than triple in value in under ten months, and it is implausible that West Monroe did so. Far more likely, West Monroe's stock was already significantly more valuable on December 31, 2020 than the $515.18 price appraised in April, but either the Trustee failed to

19

conduct an adequate appraisal or the Company failed to provide the Trustee with material information, or both.

56.     Indeed, there was only one public company classified in the Management and IT Consulting Services Industry (SIC Code 8742)[10] whose enterprise value (as distinct from its stock price) grew by more than 213% from December 31, 2020 to October 2021, but that company (Apollo Medical Holdings, Inc.) was an outlier, whose value jumped because it joined the S&P 600 small cap index in June 2021. Thus, no comparable company grew as much as West Monroe would have had to grow to reconcile the 2020 Valuation with the October 2021 sale price.

**iii.**



58.     The discounted cash flow approach considers the company's actual and forecast cash flows and applies a discount rate—equal to the "weighted average cost of capital" for the firm ("WACC")—as to future cash flows to arrive at the net present value of the enterprise. For the final

---



year of the analysis period, the final cash flow is discounted at a terminal long-term growth rate (i.e., the rate at which the company can expect to grow in perpetuity).

59.     Under this approach, West Monroe's value could have tripled in nine months (between January and October 2021) in one of only four ways: i.e., if the company's forecast earnings and cash flow tripled, if its weighted average cost of capital (WACC) decreased significantly, if the terminal growth rate increased significantly, or some combination of these three factors. On information and belief, none of these conditions occurred here.

60.     First, the Company's projected net revenues for 2021–2025 ▉▉▉▉▉▉▉▉ which does not account for a three-fold increase in value.

61.     Second, West Monroe's WACC could not reasonably have decreased significantly over the relevant period. WACC, a measure of the relative risk of an investment, comprises of the risk-free interest rate (the rate at which the government borrows) and company-specific risk factors.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

62.     Third, the terminal growth rate should not have been much lower in 2020 ▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉



63. Accordingly, it is highly unlikely that West Monroe's value tripled from December 31, 2020 to the date of the MSD transaction under the discounted cash flow approach.

66. The market (or "guideline public company" approach) also suggests that the 2020 Valuation undervalued the Company. Under the market approach, an appraiser first selects a set of comparable publicly-traded firms and calculates a set of multiples that reflect the value of those firms (as determined by the market) relative to each comparator's financial metrics (i.e., its revenue or its EBITDA). The appraiser then uses those multiples as benchmarks to determine an appropriate multiple for the company to be valued based on relative size, expected growth, risks, and profitability. Under this approach, West Monroe's value could have tripled in nine months in one of only three ways: i.e., if the comparable market multiples tripled over the nine months between December 2020 and October 2021, if West Monroe's financial performance tripled over the same nine months, or a combination of the two. All three of these scenarios are highly unlikely, as explained below.

22

67.    The tables below show the market multiples as of December 31, 2020 and November 9, 2021 for a set of companies offering similar consulting services, including multi-faceted consulting firms, IT consultants, and strategy and management consultants. ███████████████████ ████████████████████████████████ **Table A** shows the multiples for the enterprise value of each company relative to its projected EBITDA, while **Table B** shows the multiples for the enterprise value of each company relative to its revenues. ██████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

68.    As shown below, to reconcile the 2020 Valuation with the more reliable value assessed at the time of the 2021 MSD Transaction (which was supported by a contemporaneous transaction with a sophisticated arms-length buyer), West Monroe's valuation multiple would have needed to expand at an unparalleled rate ██████████████████████████████

██████████████████████████████████████████

23

| Table A | | | |
| --- | --- | --- | --- |
| Multiple Expansion of West Monroe and Comparators Relative to EBITDA | | | |
| Company | EBITDA Multiple (2020) | EBITDA Multiple (2021) | Percent Increase |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |

| Table B | | | |
| --- | --- | --- | --- |
| Multiple Expansion of West Monroe and Comparators Relative to Revenue | | | |
| Company | Revenue Multiple (2020) | Revenue Multiple (2021) | Percent Increase |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ |

69. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Far more likely, the 2020 Valuation assigned a deflated multiple to the Company and, therefore, appraised the Company at far lower than fair market value.

iv. **Defendants Should Have Known by April 2021 that the 2020 Valuation was Too Low**

70. Information available to Defendants before April 2021, when they announced the 2020 Valuation, would have alerted a diligent fiduciary that the Company was worth more than $515.18 per share. As the Company's Directors and C-Suite executives, both the members of the Board and the Benefits Committee had access to the Company's financial statements and projections, as well as all relevant information about the Company's expected growth, risks, and profitability. As the Trustee charged with assessing the value of Plan assets, moreover, Argent should have requested all information relevant to the valuation. Even the minimal information Defendants have thus far provided reveals facts that would have raised red flags for a prudent fiduciary before April 2021.

▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

###### v.   Defendants Grossly Undervalued the Plan's Stock as of September 2021

73.     By mid-September 2021, when the West Monroe Defendants approved the Company's repurchase of the Class's shares, it would have long been patently obvious to the West Monroe Defendants that the fair market value of West Monroe's stock was many times higher than the modest 2020 Valuation. Within four weeks, by October 5, 2021, they had valued Company stock at approximately $1,616 per share (or more)—over **three times** the 2020 Valuation—and had agreed to sell half the Company to MSD Partners for that dramatically higher price.

74.     To effectuate the sale to MSD, Defendants liquidated the Plan. On October 5, 2021, they entered into a Stock Purchase Agreement to sell *all* Company stock in the ESOP to a newly-formed corporation (WMC IntermediateCo.). As an ultimate result of that transaction, the Plan was terminated, MSD acquired a 50% stake in the Company, and West Monroe retained the other 50%.

75.     Selling a multi-billion-dollar company is a complex transaction that requires extensive planning and preparation long before the sale, especially when that sale involves liquidating an ESOP. To prepare for such a sale, companies customarily hire financial and legal advisors to assist in the process of valuation, negotiation, and review of various aspects of the transaction. On the other side of the deal, a private equity firm contemplating the purchase of 50% of a company at over a billion dollars would engage in its own process of appraisal and deliberation, including a comprehensive review of business operations, key personnel, and customer contracts.

26

Often, the parties must also obtain outside financing for the transaction. The process of preparing for and negotiating such a deal typically takes several months and often stretches on for over a year.

76. ███████████████████████████████████████ ████████████████████████████████████████ West Monroe engaged investment bankers Guggenheim Securities, LLC and Macquarie Capital to conduct a sale process. These investment bankers would have advised the Company on valuation and deal structure. The Company also retained the law firms of Katten Muchin Rosenman LLP, Mayer Brown LLP, and Polsinelli PC to provide legal advice. MSD Partners engaged Houlihan Lokey, Inc. as an advisor. Blackstone Inc. and Owl Rock Capital Corp. financed the transaction.[12]

77. As a routine and customary practice, before entering a negotiation for a corporate acquisition as large and complex as West Monroe's partial acquisition by MSD Partners, a sophisticated corporate seller such as West Monroe obtains an up-to-date valuation from a financial advisor or appraiser to inform negotiations with a prospective buyer. The seller typically obtains such a valuation more than one month in advance of any agreement to an acquisition.

78. Accordingly, before entering the October 5 agreement with MSD Partners, the West Monroe Defendants would have procured a more recent valuation of the Company in preparation for negotiations with MSD and other potential buyers. Consistent with industry practice, the size and complexity of the transaction, the likelihood of protracted negotiations, and the need for review and approval by multiple parties and advisors, they would have obtained that valuation of the Company more than one month before they entered the sale agreement on October 5, 2021.

---

[12] West Monroe, Press Release: West Monroe announces strategic investment by MSD Partners (Oct. 14, 2021), *available at* https://www.westmonroe.com/press-releases/west-monroe-announces-strategic-investment-msd-partners.

79. Based on industry practice and the size and circumstances of the transaction, well before mid-September 2021, West Monroe would have been in active negotiations and/or a bidding process with prospective buyers in anticipation of the sale. By mid-September 2021, the ongoing negotiations ███████ for the sale of Company stock revealed that informed arms-length buyers were willing to pay a price for Company shares that was substantially higher than the 2020 Valuation ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

80. Well before mid-September 2021, then, the West Monroe Defendants and their investment bankers would have forecasted that in an orderly transaction between market participants, the fair market value of Company stock was close to three times the 2020 Valuation.

81. As the Company's governing body, the Board, which included C-Suite executives, would have been timely informed of all material facts regarding the Company's business, operations, and valuation, and all material facts regarding the negotiations with MSD and other potential buyers.

████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████. The Board approved the redemption and the stock sale to MSD.

82. On information and belief, the members of the Benefits Committee, which included C-Suite executives such as the Chief Financial Officer and Chief People Officer (who was also a member of the Board), also knew of all material facts regarding the Company's business, operations, and valuation, and all material facts regarding the negotiations with MSD Partners and other potential buyers. On information and belief, before it approved the terms of the redemption of the Class's

shares at the 2020 Valuation for recommendation to the Board, █████████████████████

████████████████████████████████████████████████████████.

83.    As noted above, the West Monroe Defendants had the discretion and, under the circumstances, the obligation to update the valuation of Company stock before the Company bought back shares from the Plan. Nonetheless, despite having information—including ██████ likely an updated valuation—indicating that the current value of Company stock was far higher than the 2020 Valuation, the West Monroe Defendants turned a blind eye to their fiduciary duties and used the stale 2020 Valuation to cash out the Class at a price far below the fair market value of their stock.

### B.  Defendants Caused the Plan to Engage in a Prohibited Transaction with West Monroe, a Fiduciary, for Less than Adequate Consideration

84.    Plaintiff separated from the Company in November 2020. Between June 11 and August 9, 2021, Plaintiff and the rest of the Class elected a distribution of their account balances from the Plan, to be implemented (according to the Company) in late September or October of 2021. Collectively, these Plan participants held a vested beneficial interest in approximately 27,960 shares of Company stock. The Company assigned those shares a total value of approximately $14,404,808 based on the 2020 Valuation. However, based on the contemporaneous deal with MSD Partners, the actual value of the Class's shares was at least $45,184,540 (or $1,616 per share).

85.    Nonetheless, on or about September 21, 2021, West Monroe forced the Plan to transfer those 27,960 shares of Company stock to the Company at the 2020 Valuation ($515.18 per share), and Plaintiff and the Class received the proceeds of the redemption as distributions. Specifically, the Board directed Argent (as the Plan's Trustee) to release the 27,960 shares from the Plan for purchase by the Company at $515.18 per share.[13] The shares were then "immediately and

---

[13] As a member of the Benefits Committee wrote to Plaintiff, describing how the transaction would occur: "the ESOP Trustee is being directed by the Board to push out the shares, to be bought[.]"

29

automatically sold back to the Company" at the 2020 Valuation of $515.18 per share, as both the Summary Plan Description and West Monroe itself described the transaction. Next, Argent directed the Plan's recordkeeper (Principal) to distribute the proceeds to Class members (or to their IRA or 401(k) accounts, if the participant so elected), in proportion to the number of shares formerly held in each participant's account, at the 2020 Valuation of $515.18 per share.

86.     In or around late August 2021, the Benefits Committee approved the transaction described above and recommended that the Board approve the same. In mid-September 2021, the Board directed the Company's repurchase of Company stock from the Plan at or around the price of $515.18 per share. When the West Monroe Defendants directed and entered those transactions, they knew or should have known that the 2020 Valuation was well below the fair market value of the Company stock, both as of December 31, 2020 and as of mid-September 2021, the date of the decision.

87.     Plaintiff and Class members never held Company stock or exercised any control over Company stock involved in the September 2021 transaction, except for electing the ultimate destination for the proceeds.[14] The West Monroe Defendants, not the Plan participants, determined the terms of the transaction, including the timing of the sale and price the Company would pay for the shares of Company stock held in Plaintiff's and Class members' accounts in the Plan. Plan Participants could not keep Company stock or decide to sell it to anyone or on any terms other than those determined by the West Monroe Defendants. Nor was the stock in Plaintiff's account ever transferred to an account he owned other than his account in the Plan.

---

[14] As a member of the Benefits Committee wrote to Plaintiff, describing the redemption transaction, "***You are not getting stock*** so you don't have to put it in a brokerage account to 'sell' your stock. The 'sale' is handled behind the scenes; ***you will only get cash from your distribution election***." (emphasis added).

### C. The West Monroe Defendants Withheld Material Information from the Class and Deprived the Class of the Proceeds of the Sale

88.     On October 5, 2021, West Monroe agreed to the sale of 50% of the Company to MSD Partners, a private equity firm. The sale was set to close on or about November 9, 2021. As noted earlier, to effectuate the transaction, Defendants sold the Plan's stock to WMC IntermediateCo. (the "Stock Sale"). By amendment to the Plan effective November 9, 2021, Defendants allocated the proceeds among the accounts of Plan participants who had *not* elected distributions. Plan §§ 16.2, 16.4(a), amend. 16. The amendment allocated the funds pro rata based on each such participant's Company Stock Account balance as of the last Valuation Date: December 31, 2020. *Id.* §§ 16.4(a), 16.5(b).  Participants could then choose to roll their allocations into a new stock fund in the West Monroe 401(k) plan or to receive them as cash distributions. *See id.* §§ 16.2(b), 16.5(e).

89.     On information and belief, all Plan participants (including former employees) who (a) like the Class, had held Company stock through the Plan as of January 1, 2021, and (b) unlike the Class, had not elected distributions of their accounts, received an allocation of the proceeds from the Stock Sale in an amount equal to **nine times** the value of their Company Stock Account balance as of December 31, 2020 (as assessed in the 2020 Valuation). Specifically, Plan participants who remained invested in the Plan received proceeds from the sale of the stock in their accounts, as well as proceeds from the sale of additional Plan stock allocated to them before the Stock Sale closed.[15]

90.     Accordingly, if Plaintiff and other Class members had remained invested in the Plan (whether through stock or liquid assets), they would have received a portion of the proceeds from the Stock Sale, allocated based on the balance of their Plan Stock Accounts as of December 31, 2020 (or the most recent Valuation Date under the Plan, if later). In the alternative, even absent the Stock Sale

---

[15] In addition to the approximately 300,000 shares in participants' accounts, the Plan held approximately 564,000 unallocated shares that were allocated to the remaining participants as part of the transaction.

and the Plan's resulting liquidation, the Trustee would have converted the Company shares in their accounts to cash "**based on the most recent value of the shares**" and invested the proceeds in a mutual fund in the Plan or transferred to their accounts in the Company's 401(k) plan. SPD at 12. As explained, the "most recent value" of Company stock was far higher than $515.18 when the Class made their elections. In either case, if Plaintiff and the Class were informed that value of Company stock was substantially higher than the 2020 Valuation, and/or of the impending Stock Sale, they could (and likely would) have chosen to defer their distributions and, therefore, would have received many times the $515.18 per share they received in the September 2021 distribution.

91. As explained earlier, the West Monroe Defendants knew or should have known months in advance that the Company was planning to sell and liquidate the Plan and that the value of the Plan's stock was higher than the 2020 Valuation. As early as July 2021, news leaked to certain employees inside the Company that the Company was considering terminating the ESOP. Still, the West Monroe Defendants never disclosed to Plaintiff or the Class the anticipated Stock Sale or sale to MSD Partners, nor the results of any valuation that occurred after the 2020 Valuation, nor any offer made by a third party to buy shares of Company stock, nor the fact that the fair market value of Company stock exceeded the 2020 Valuation. Defendants failed to disclose that if Class members did not elect distributions and remained invested in the Plan, they were likely to receive an amount substantially higher than the $515.18 per share distributed in September 2021.

92. Instead, the Company repeatedly pressured Plaintiff and Class members to make elections, against the Class's best interests and to the benefit of the Company and its leadership. In a document distributed to the Class in May and June 2021, the Company wrote: "**We strongly encourage you to make a distribution election now**" (bold text in original). When Plaintiff did not make an election in June 2021, on July 7, 2021, the Company's Senior Manager of ESOP and 401(k)

Administration wrote him to "confirm that you are working on making your election," noting that Plaintiff "had a rather large balance." On July 23, 2021, the same senior manager emailed the Class again urging them to make elections, noting that he had "tried to reach out to all of you via email, phone calls, and LinkedIn" to remind them to elect distributions. The following week, after "only six new elections were made," he wrote the Class that this was "a disappointment," and that he would "try calling again" the following week to "see if [he could] get some more elections." As a result of the Company's pressure campaign, Plaintiff and all 146 members of the Class elected distributions.

## VIII. CLASS ACTION ALLEGATIONS

93. Plaintiff brings this suit under ERISA § 502(a)(2) on behalf of the Plan, as well as under § 502(a)(3) individually. Plaintiff also brings a claim for breach of fiduciary duty under Delaware law. To enhance the due process protections of unnamed participants and beneficiaries of the Plan, and to obtain relief for similarly situated participants under § 502(a)(3), Plaintiff seeks to certify this action as a class action and to represent the following Class:

**Class Definition**: All participants in the Plan who received a distribution in an amount determined based on the 2020 Valuation of Company stock.

94. This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

    a. The Class includes approximately 146 members and is so large that joinder of all its members is impracticable.

    b. There are numerous questions of law and fact common to the Class because the Defendants owed the same fiduciary duties to the Plan and to all participants and beneficiaries and took a common course of conduct as alleged herein as to the Plan that affected all class members through their participation in the Plan in the same way. Thus, questions of law and fact common to the Class include the

following: (1) whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. §§1109(a), 1132(a)(2), 1132(a)(3), and Delaware law; (2) whether Defendants breached their fiduciary duties to the Plan and participants by (i) employing an imprudent process for valuing Company stock in the Plan; (ii) failing to conduct, obtain, or use an up-to-date valuation for the 2021 stock redemption; (iii) failing to disclose to the Class material information that would have affected their distribution decision; (iv) causing the Plan to sell company stock to West Monroe for less than fair market value; and (v) making distributions to the Class for less than fair market value; (3) whether the transfer of Company stock from the Plan to West Monroe was a prohibited transaction under ERISA; (4) what are the losses to the Plan and the Class resulting from each breach of fiduciary duty; and (5) what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c. Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant at all relevant times and remains a participant under 29 U.S.C. § 1002(7). Plaintiff, like the Class, received a distribution in 2021 based on the undervalued 2020 Valuation. Thus, all Class members were harmed by Defendants' breaches of fiduciary duties and prohibited transactions.

d. Plaintiff is an adequate representative of the Class because Plaintiff was a Plan participant at all relevant times, remains a participant under 29 U.S.C. § 1002(7), has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

e. There are no substantial individual questions of law or fact among Class members on the merits of this Action.

95. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants in respect to the discharge of their fiduciary duties to the Plan and the Class and personal liability to the Plan and the Class. Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties and remedies for the Plan and the Class would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

96. Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because the Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

97. Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this

matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

98.     Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to the Defendants' liability to the Plan and the Class for their alleged misconduct.

99.     Plaintiff's counsel, Sanford Heisler Sharp, LLP and Matt Singer Law, LLC, will fairly and adequately represent the interests of the Classes and is best able to represent the interests of the Classes under Rule 23(g).

## IX.     CAUSES OF ACTION

### COUNT I

### Breach of Fiduciary Duty

### (Violation of ERISA § 404, 29 U.S.C. § 1104)
### (Against All Defendants)

100.     The allegations in this Complaint are realleged and incorporated herein by reference.

101.     At all relevant times, Defendants were fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) because the Board and West Monroe were named as fiduciaries in the Plan Document, because Argent was the Plan's Trustee, and because all Defendants exercised authority and control with respect to the management of the Plan and its assets.

102.     As a former employee of West Monroe and as a Plan participant, Plaintiff trusted Defendants to manage with care, diligence, and disinterest the Company stock held in his account, which was part of his compensation for his years of dedicated service to the Company.

103.     ERISA § 404(a) required Defendants to administer the Plan, to value and dispose of Company stock held in the Plan, and to engage in transactions with respect to the Plan with the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a

36

like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Allen*, 835 F.3d at 678 (quoting 29 U.S.C. § 1104(a)(1)).

104.     In valuing Company stock, ERISA 404(a) also required Defendants to conduct a careful, diligent, and prudent investigation that (among other things): (a) considered all the relevant facts and circumstances then prevailing; (b) applied sound business principles of valuation; and (c) was sufficient to determine the fair market value of Company stock as of December 31, 2020.

105.     In addition, the duty of prudence required Defendants to ensure that their valuation "remained a reasonable approximation" of the current "fair market value of [Company] stock at the times they relied on it" to administer the Plan and dispose of Plan assets, *Donovan*, 716 F.2d at 1473, including when Defendants sold Company stock to West Monroe and made distributions to Plan participants. *See* ERISA § 404(a), 29 U.S.C. § 1104(a)(1)(B) (requiring a fiduciary to act with prudence "under the circumstances *then prevailing*" (emphasis added)). This duty required Defendants to ensure that participants received fair market value for the stock held in their accounts.

106.     Prudence also required Defendants to timely disclose "material facts affecting the interests of beneficiaries." *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466 (7th Cir. 2010).

107.     ERISA § 404(a) also imposes a duty of loyalty, requiring Defendants to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries" and "(ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). "Where it might be possible to question the fiduciaries' loyalty," the fiduciaries must "at a minimum … engage in an intensive and scrupulous independent investigation of their options to insure [sic] that they act in the best interests of the plan beneficiaries." *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984).

108. The duties of prudence and loyalty require a fiduciary "to take impartial account of the interests of all beneficiaries"; a fiduciary may not unreasonably favor one group of participants or beneficiaries over another. *Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996).

109. Defendant Argent breached the duty of prudence because it failed to conduct, review, and otherwise act with respect to the 2020 Valuation with the care, skill, prudence, and diligence of a prudent fiduciary.

110. The West Monroe Defendants breached the duty of prudence and loyalty when they: (a) failed to monitor, review, and otherwise act with respect to the 2020 Valuation with the care, skill, prudence, and diligence of a prudent fiduciary; (b) failed to direct, conduct, obtain, or use an up-to-date valuation of Company stock to redeem Plan participants' Company stock and make distributions to participants in September 2021; (c) failed to timely disclose information material to participants' distribution decision; (d) caused the Plan to sell Company stock to West Monroe for less than fair market value; and therefore (e) caused the Plan to pay Plaintiff and the Class substantially less than fair market value for the vested shares of Company stock in their accounts; and (f) inequitably deprived Plaintiff and the Class of proceeds and other value from the Stock Sale.

111. At all relevant times, the West Monroe Defendants knew or should have known that these acts and omissions would enrich themselves and certain other current holders of equity in West Monroe Partners, Inc. and West Monroe Partners, LLC at the Class's expense.

112. Defendants' breaches of fiduciary duties substantially impaired the Plan's use and value, including the value of shares of Company stock held in Plaintiff's account.

113. As a direct and proximate result of Defendants' breaches of fiduciary duties, the West Monroe Defendants and certain West Monroe employees were unjustly enriched, and the Plan,

38

Plaintiff, and the Class suffered millions of dollars in losses, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a).

114.     Each of the Defendants is liable to make good to the Plan the losses resulting from the above-described breaches and to restore to the Plan any profits resulting from the breaches. Each is also subject to other equitable or remedial relief as appropriate pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), including constructive trust, equitable surcharge, and restitution.

## COUNT II

### Prohibited Transactions

**(Violation of ERISA § 406, 29 U.S.C. § 1106)**
**(Against the West Monroe Defendants)**

115.     Plaintiff restates and incorporates the allegations contained in the Complaint.

116.     By causing the direct or indirect transfer of Company stock from the Plan to Defendant West Monroe, causing the Company to purchase such stock for less than fair market value, by failing to update the valuation of Company stock, and by otherwise using Company stock for the benefit of Defendant West Monroe and certain of its senior employees, the West Monroe Defendants caused the Plan to engage in a transaction that they knew or should have known constituted a direct or indirect:

    a.  Sale or exchange of property between the Plan and a party in interest under 29 U.S.C. § 1106(a)(1)(A);

    b.  Transfer of Plan assets to a party in interest or use of Plan assets by or for the benefit of a party in interest under 29 U.S.C. § 1106(a)(1)(D).

117.     In causing the direct or indirect transfer of Company stock held by the Plan to Defendant West Monroe, causing the Company to purchase such stock at less than fair market value,

39

causing participants to receive less than fair market value for their vested interests in Company stock, and in engaging in the other acts and omissions set forth above, the West Monroe Defendants:

    a. Dealt with the assets of the Plan in their own interest and for their own account in violation of 29 U.S.C. § 1106(b)(1);

    b. Acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the Plan or the interests of its participants or beneficiaries, in violation of 29 U.S.C. § 1106(b)(2); and

    c. Received consideration for their own personal account from a party dealing with the Plan in connection with a transaction involving assets of the Plan, in violation of 29 U.S.C. § 1106(b)(3).

118. Defendants did not provide, and the Plan and the Class did not receive, adequate consideration for the transactions described above.

119. As a direct result of these prohibited transactions, the West Monroe Defendants were unjustly enriched, and the Plan and the Class suffered millions of dollars in losses, for which the West Monroe Defendants are jointly and severally liable for damages and appropriate equitable relief pursuant to 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a).

## COUNT III

**Breach of Co-Fiduciary Duty**
**(Violation of ERISA § 405, 29 U.S.C. § 1105(a)(1)-(3))**

**(Against All Defendants)**

120. Plaintiff restates and incorporates the allegations contained in the Complaint.

121. A fiduciary with respect to a plan is liable for the breach "of another fiduciary" for the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach," 29 U.S.C. § 1105(a)(1), or if, "by

40

his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach," *id.* § 1105(a)(2), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach," *id.* § 1105(a)(3).

122.    The West Monroe Defendants are liable as co-fiduciaries with respect to each other's violations because they participated knowingly in their co-fiduciaries' breaches; imprudently and disloyally enabled other fiduciaries to breach their duties under ERISA; and enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy them.

123.    As Trustee of the Plan, Argent evaluated and approved the Stock Sale in connection with the transaction with MSD Partners. Indeed, Argent was a party to the October 5, 2021 Stock Purchase Agreement. Thus, Argent must have known that the fair market value of company stock was approximately three times the 2020 Valuation by October 5, 2021.

124.    Argent therefore knew by October 5, 2021 that the West Monroe Defendants redeemed the Class's shares for less than fair market value, but it failed to take steps to remedy the violation, for example, by reporting the West Monroe Defendants to the Department of Labor.

**COUNT IV**

**Failure to Monitor**
**(Violation of ERISA § 404, 29 U.S.C. § 1104)**

**(Against All Defendants)**

125.    Plaintiff restates and incorporates the allegations contained in the Complaint.

126.    To the extent any of the Defendants delegated their fiduciary responsibilities to another fiduciary, the Defendant had an obligation under ERISA § 404 to prudently appoint such delegates and to ensure that they performed any delegated tasks both prudently and loyally.

127.    The Defendants breached their fiduciary monitoring duties by, among other things:

41

a. Failing to act with required care, skill, prudence, and diligence in selecting and appointing their delegates;

b. Failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as their appointee's imprudent actions undervalued Plan assets, caused their transfer to the Company for less than adequate consideration, and made distributions to Plan participants for less than the fair market value of the assets;

c. Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breaches in the failure to prudently and loyally value Plan assets and disposing of Plan assets for less than fair market value;

d. Failing to ensure that the monitored fiduciaries had a prudent process in place for valuing, disposing of Plan assets, and making distributions to participants; and

e. Failing to remove appointees whose performance was inadequate.

128. The Board failed to prudently monitor the Benefits Committee, the West Monroe Defendants failed to prudently monitor Argent, and Argent failed to prudently monitor ███ to the extent that any of these Defendants delegated fiduciary responsibilities to those persons or entities.

129. As a direct result of these breaches of fiduciary duty, West Monroe and certain of its employees were unjustly enriched and the Plan and Plan participants suffered substantial losses. Had Defendants prudently discharged their fiduciary monitoring duties, such unjust enrichment would not have occurred and the Plan and Plan participants would not have suffered such losses.

## COUNT V

**Breach of Fiduciary Duties**
**(Violation of Delaware Law)**

**(Against the West Monroe Board of Directors)**

42

130. The Board of Directors of West Monroe owes fiduciary duties of care and loyalty to the Company's stockholders. *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020). These duties include the duty to abstain from unfairly favoring certain shareholders over other shareholders. *See Montgomery v. Aetna Plywood, Inc.*, 956 F. Supp. 781, 787 (N.D. Ill. 1997). The duties of care and loyalty extend to equitable owners of Company shares, such as Plan participants, as well as to legal owners. *See, e.g., Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 478 (Del. Ch. 2011).

131. "When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). "The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Id.* A fair deal requires "fair dealing" (which "embraces questions of when the transaction was timed" as well as "how it was initiated, structured, negotiated") and a "fair price." *Id.*

132. Corporate officers and directors also have a "duty of candor" to shareholders, meaning they "may not mislead any stockholder by use of corporate information to which the latter is not privy." *Id.* (citing *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977)).

133. At the time of the transactions and events set forth in this Complaint, several members of the West Monroe Board of Directors were officers or managing employees of the Company and held substantial shares of Company stock. By engaging in the acts and omissions set forth above, causing the Plan to transfer Company stock from the Plan to West Monroe at less than fair market value, and failing to timely disclose material information concerning the value of the shares to the Class before directing the purchase, the West Monroe Board of Directors favored the interests of certain directors and other shareholders over the interests of the Plan and the Class.

134.     The Directors are therefore liable to the Plan and the Class for damages and appropriate equitable relief under Delaware law.

## COUNT VI

**Failure to Produce Plan Documents**
**(Violation of ERISA § 104, 29 U.S.C. § 1024(e)(4))**

135.     ERISA § 104, 29 U.S.C. § 1024(b)(4) provides that a Plan "administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."

136.     ERISA § 502(c) provides that an administrator who fails to comply with a participant's request for such documents "within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper." 29 U.S.C. § 1132(c)(1). ERISA § 502(a)(1)(A) authorizes a participant to sue for such relief. *See* 29 U.S.C. § 1132(a)(1)(A).

137.     Under ERISA, the term "participant" includes any "former employee" of a sponsoring employer "who is or may become eligible to receive a benefit of any type" from the Plan. 29 U.S.C. § 1002(7). Plaintiff is a Plan participant because he has a colorable claim to monetary relief from the Plan and therefore is or may become eligible to receive a benefit from it.

138.     On October 17, 2021, Plaintiff requested by email copies of the Plan and Trust Documents governing the Plan, which are "instruments under which the Plan is established and operated" within the meaning of ERISA § 104, 29 U.S.C. § 1024(b)(4).

139.     The Company did not comply with Plaintiff's request until December 10, 2021.

140.     Therefore, the Company is liable to Plaintiff for the $100 monetary penalty for each day that it failed to provide the requested documents as required under 29 U.S.C. §§ § 1024(b)(4) and 1132(c)(1), and for such equitable relief the court deems just and proper.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

i)     find and adjudge that the Defendants have breached their fiduciary duties and engaged in prohibited transactions, as described in the Complaint above;

ii)    find and adjudge that the Defendants are personally liable to make good to the Plan losses resulting from each breach of fiduciary duty and prohibited transaction, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty and prohibited transactions;

iii)   find and adjudge that the Defendants are liable to the Plan and the Class for damages and appropriate equitable relief;

iv)    determine the method by which losses under 29 U.S.C. § 1109(a) should be calculated;

v)     order all accountings and appraisals necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C.§ 1109(a) and to determine the amounts necessary to make the Class whole under 29 U.S.C. § 1132(a)(3) and Delaware law;

vi)    remove the fiduciaries who have breached their fiduciary duties and enjoin them from future unlawful conduct;

vii)   surcharge against the Defendants and in favor of the Plan and/or the Class all losses suffered by the Plan and/or the Class and any profits gained by Defendants from their unlawful conduct;

viii) order restitution and disgorgement in favor of the Plan and the Class;

ix) impose a constructive trust for the benefit of the Plan and the Class;

x) reform the Plan as appropriate to make the Class whole;

xi) certify the Class, appoint the Plaintiff as a class representative, and appoint Sanford Heisler Sharp LLP and Matt Singer Law, LLC as Class Counsel;

xii) impose the monetary penalty described in Count VI;

xiii) award to the Plaintiff and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

xiv) order the Defendants to pay interest to the extent allowed by law; and

xv) grant other equitable or remedial relief as the Court deems appropriate.

Dated: August 19, 2022

/s/ Charles Field

Charles Field*
**SANFORD HEISLER SHARP, LLP**
2550 Fifth Avenue, 11th Floor
San Diego, CA 92101
Telephone: (619) 577-4242
Facsimile: (619) 577-4250
cfield@sanfordheisler.com

David Sanford*
Russell Kornblith*
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Fl.
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
rkornblith@sanfordheisler.com

Kevin Sharp*

**SANFORD HEISLER SHARP, LLP**
611 Commerce St., Suite 3100
Nashville, TN 37203
Phone: (615) 434-7001
Facsimile: (615) 434-7020
ksharp@sanfordheisler.com

Sean Ouellette*
James Hannaway*
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, D.C. 20003
Phone: (646) 402-5644
Facsimile: (202) 499-5199
souellette@sanfordheisler.com
jhannaway@sanfordheisler.com

Matthew J. Singer
**MATT SINGER LAW, LLC**
77 W. Wacker Dr., Suite 4500
Chicago, IL 60601
Telephone: (312) 248-9123
matt@mattsingerlaw.com

*Attorneys for Plaintiff and the Proposed Class*

*\* Admitted Pro Hac Vice*

47